## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MALAIKA LEWIS and<br>N.L., a minor, by and through her next friend<br>and guardian, Malaika Lewis<br>5333 Connecticut Ave. NW Apt. #116<br>Washington, D.C. 20015<br><br>              Plaintiffs,<br><br>  v.<br><br>THE DISTRICT OF COLUMBIA<br>c/o Mayor and Office of the Attorney General<br>for the District of Columbia<br>400 6th Street, N.W.<br>Washington, D.C. 20001<br><br>GEORGE ARHIN, MONIQUE BOYD,<br>DIANE BROOKS, NATALIE CHARLES,<br>ALBERT CIPOLARI, BENJAMIN FINCK,<br>CHAD HAMBRICK, ANTHONY HECTOR,<br>RICHARD KENNEDY, JAMES KOENIG,<br>LASHAUN LOCKERMAN, JOHNATHAN<br>MATTHEWS, JERMAINE MAUBRY,<br>STEPHEN OWENS, BENJAMIN RUBIN,<br>JOHN WRIGHT, and JAY DOES 6-10<br>Metropolitan Police Department Officers<br>c/o Office of the Attorney General for the<br>District of Columbia<br>400 6th Street NW<br>Washington, D.C. 20001<br><br>              Defendants. | Case No. 1:22-cv-03369<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR DAMAGES[1]

---

[1] Plaintiffs amend their Complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1)(A) within 21 days of service. Out of an abundance of caution, Plaintiffs also obtained the D.C. Office of the Attorney General's consent to filing this Amended Complaint via email on November 18, 2022. Pursuant to the Court's Standing Order, a redline version of this Amended Complaint is attached as an exhibit.

## NATURE OF THE ACTION

1.     Malaika Lewis is a single Black mother who lives with her two daughters in Upper Northwest, D.C.

2.     On an evening in June 2020, Ms. Lewis's older daughter, who was at risk of a mental health crisis, went missing. Ms. Lewis called the District of Columbia Metropolitan Police Department ("MPD") for help.

3.     Instead of following several credible leads indicating that Ms. Lewis's daughter was in Maryland and helping to bring her home, the officers attempted to use Ms. Lewis's call as a pretext to search her apartment.

4.     The officers lured Ms. Lewis outside her building and snuck into her apartment. When Ms. Lewis realized what was happening and tried to go back inside, they physically blocked her path.

5.     Eight different officers showed up at Ms. Lewis's building. Together, they awoke her six-year-old daughter, N.L., who had been sleeping, and ransacked the apartment without a warrant, probable cause, or any other legal basis.

6.     For nearly three hours, until 1:00 A.M., N.L. remained alone inside the apartment, frightened and confused.

7.     The officers did not find Ms. Lewis's older daughter inside the apartment—as Ms. Lewis had advised them they would not. When questioned about their illegal conduct, the officers asserted that they were required to search the apartment under department policy. No such policy existed.

8.      An independent examiner with the D.C. Office of Police Complaints later found that at least one of the officers had violated Ms. Lewis's Fourth Amendment rights and referred the officer to the United States Attorney's Office for criminal prosecution. The same officer has been discredited by several D.C. courts and is the subject of other misconduct lawsuits.

9.      This would not be a one-time occurrence for Ms. Lewis. When MPD received a call from a third-party in January 2022 reporting that Ms. Lewis might be having a mental health crisis, officers again chose to harass Ms. Lewis rather than help her.

10.     That night in January 2022, nearly a dozen police officers showed up at Ms. Lewis's door and demanded that she let them in. Panicked, she refused.

11.     For the next several hours, the officers kept a baton shoved into Ms. Lewis's doorjamb to prevent her from closing her door and trapping her in their presence. "You can make this easy, or you can make this hard," they threatened her. They ignored her pleas to not traumatize her further.

12.     Once they had forced entry, the officers lured N.L., then eight years old, out of the apartment and detained her in the lobby for several hours. They told Ms. Lewis that they would take N.L. unless Ms. Lewis "cooperated" with their demands.

13.     Eventually, the officers broke down Ms. Lewis's door, handcuffed her in her hallway, and unzipped her shirt to expose her bare breasts.

14.     Meanwhile, several officers surrounded N.L.—who had no coat or shoes—in the lobby for hours. They forced her to watch as they questioned her mother's mental fitness in excruciating detail and eventually paraded her mother in handcuffs into the back of a police car.

15.     The officers involuntarily committed Ms. Lewis to a psychiatric facility. N.L., scared, texted her older sister that "the worst" had happened: "Mommy got taken away."

16.    The next morning, a doctor met with Ms. Lewis, promptly determined that she was not a threat to herself or others, and released her.

17.    These repeated instances of police harassment and abuse have left lasting damage. Ms. Lewis was humiliated in front of her neighbors, has undergone many hours of expensive psychotherapy, and is afraid that her building is going to evict her because of police activity at her apartment unit. N.L., too, has been traumatized; she was twice separated from her mother in the middle of the night for several hours, threatened with being taken away from her mother, and is seeking psychotherapy to process the fallout.

18.    Ms. Lewis, on behalf of herself and N.L., now asks this Court to enter a judgment confirming that these officers are not above the laws they enforce, and that they will be held accountable for abusing their authority.

## PARTIES

19.    Malaika Lewis is a resident of Washington, D.C.

20.    N.L. is a nine-year-old girl.[2] She lives with her mother Malaika Lewis in Washington, D.C.

21.    Defendants George Arhin, Monique Boyd, Diane Brooks, Natalie Charles, Albert Cipolari, Benjamin Finck, Chad Hambrick, Anthony Hector, Richard Kennedy, James Koenig, LaShaun Lockerman, Johnathan Matthews, Jermaine Maubry, Stephen Owens, Benjamin Rubin, John Wright, and Jay Does 6–10 (collectively, the "Defendant Officers") are officers of the Metropolitan Police Department. At the time of the events at issue, Defendant Officers were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

---

[2] Pursuant to Federal Rule of Civil Procedure 5.2, N.L., a minor, is identified only by her initials.

22.     Defendant District of Columbia is a municipal corporation and the local government of Washington, D.C. It operates and governs MPD, which is a *non sui juris* entity, pursuant to the laws of the District of Columbia. In this case, the District acted through its agents, employees, and servants, including the Defendant Officers.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to redress the deprivation of rights under the First, Fourth, and Fifth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

24.     Plaintiffs' claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this Court because the events that give rise to this action occurred in the District of Columbia.

26.     This Court has personal jurisdiction over Defendants because they were employed by the District of Columbia during all times relevant to this Complaint, and they were engaged in the relevant conduct in the District of Columbia.

## STATEMENT OF FACTS

27.     Malaika Lewis lives with her two daughters in an apartment building in Ward 3 of Washington, D.C.

28.     Ward 3 is significantly whiter and wealthier than the District as a whole.

29.    Ward 3 is about 80 percent white; the District as a whole is about 40 percent white. Ward 3 is about eight percent Black; the District is about 46 percent Black. The median household income in Ward 3 is $128,670; in the District, it is $86,420.[3]

30.    Unlike most residents of her building and Ward 3, Ms. Lewis is Black.

31.    Unlike most residents of her building and Ward 3, Ms. Lewis is a single mother.

32.    Unlike most residents of her building and Ward 3, Ms. Lewis lives in an "affordable housing unit."[4]

### The June 2020 Incident

**A. Ms. Lewis Attempts to Report that Her Older Daughter, Who Is at Risk of a Mental Health Crisis, Is Missing.**

33.    On the evening of June 24, 2020, Ms. Lewis was at home with N.L., who was then six years old.

34.    At that time, Ms. Lewis's oldest daughter, K.R., was 16 years old and living with Ms. Lewis and N.L. But K.R. had not been home since the prior morning, for nearly 48 hours.

35.    Early in the day on the 24th, Ms. Lewis received a call from the aunt of one of K.R.'s friends. The aunt informed Ms. Lewis that K.R. and her nephew were hanging out together in Maryland and might be getting into trouble. Ms. Lewis was also messaging one of K.R.'s friends, who similarly told her that K.R. was in Maryland with people that Ms. Lewis did not know.

36.    Ms. Lewis tracked K.R.'s iPhone to Riverdale, Maryland, via the Find My iPhone application. She also saw pictures of K.R. on social media.

---

[3] District of Columbia State Data Center, *2015–19 ACS Key Demographic Indicators*, https://planning.dc.gov/sites/default/files/dc/sites/op/page_content/attachments/Key%20Indicators%202015%20-%202019.pdf.

[4] 5333 Connecticut Avenue, *Housing for All*, https://www.5333conn.com/housing-for-all/ (last visited Oct. 31, 2022) ("5333 Connecticut is a 261 unit apartment community located at 5333 Connecticut NW in Washington, DC with 19 affordable units.  By agreement with the District of Columbia, 19 units will be reserved for individuals meeting the qualifications below.").

37.    K.R. had previously been diagnosed with clinical depression and anxiety, for which she had been committed to a psychiatric facility a few months prior. After K.R. was released from the facility, she stopped taking her medications. When K.R. left the house on June 23, she did not take her medications with her.

38.    Ms. Lewis was hesitant to call the police. This was the summer of 2020. Ms. Lewis was acutely aware that, "[f]or Black people calling the police can be dangerous."[5]

39.    A few weeks earlier, police had shown up at Ms. Lewis's door for reasons unrelated to Ms. Lewis herself. After that incident, her apartment building manager reached out to the entire building about police presence. Ms. Lewis felt humiliated in front of her mostly white and wealthy neighbors. She felt that the building manager was threatening her for causing "trouble" in the building. She was afraid that if the police showed up at her door again, she might be evicted.

40.    Although Ms. Lewis feared the police would mistreat her, her concern for her daughter was paramount. Ms. Lewis decided to call MPD and file a missing person's report.

41.    To mitigate the embarrassment and possible retaliation by her landlord and neighbors, Ms. Lewis did not call the police from inside the building.

42.    Instead, around 10:00 P.M., Ms. Lewis left N.L. sleeping in the apartment, walked outside, and crossed the street to the corner of Connecticut Avenue NW and Kanawah Street NW.

43.    From there, Ms. Lewis called 911 from her cell phone.

44.    Ms. Lewis informed the dispatcher that K.R. was missing; that she had tracked K.R.'s iPhone to Riverdale; that K.R. was mentally unwell; and that Ms. Lewis preferred to meet

---

[5] Angelyn Francis, *For Black People Calling the Police Can Be Dangerous*, TORONTO STAR (June 3, 2020), https://www.thestar.com/opinion/contributors/2020/06/02/for-black-people-calling-the-police-can-be-dangerous-its-time-we-had-another-option.html.

the police outside because police coming to her apartment had caused problems with her neighbors and her landlord in the past.

45.    The dispatcher instructed Ms. Lewis to wait on the street corner and informed her that MPD would meet her there. Ms. Lewis complied.

**B.  MPD Officers Refuse to Follow Several Credible Leads to Find K.R. and Instead Use Ms. Lewis's 911 Call as an Excuse to Search Her Apartment.**

46.    Defendant Officer Richard Kennedy arrived on the scene at approximately 10:15 P.M.

47.    Defendant Kennedy questioned Ms. Lewis for about fifteen minutes.

48.    Ms. Lewis explained to Defendant Kennedy that K.R. had not been home since the prior morning, that K.R. had mental health issues and was off her medications, and that Ms. Lewis had tracked K.R.'s iPhone to a general location in Riverdale.

49.    Ms. Lewis also told Defendant Kennedy about the aunt's call and the messages from K.R.'s friend. While Ms. Lewis did not know who K.R. knew in Riverdale, the friend did and would be able to provide this information to MPD.

50.    Ms. Lewis answered all of Defendant Kennedy's questions calmly and patiently.

51.    Around 10:30 P.M., Defendant Sergeant James Koenig arrived on scene and approached Ms. Lewis and Defendant Kennedy. Defendant Kennedy explained to Defendant Koenig what Ms. Lewis had told him.

52.    Defendant Koenig began asking Ms. Lewis the same questions that Defendant Kennedy had already asked her. Ms. Lewis patiently gave Defendant Koenig the same answers she had given Defendant Kennedy.

53.    Ms. Lewis showed Defendant Koenig the Find My iPhone application, which displayed K.R.'s current location in Riverdale.

54.    Defendant Koenig, however, had other ideas. Despite having just seen the Find My iPhone screen, he told Ms. Lewis that pursuant to MPD policy the officers needed to search Ms. Lewis's apartment.

55.    MPD General Order 304.03, which governs missing person's reports, states that, for missing persons under the age of 12, a residence search is required. *Id.* § V.A.6.c.1. For missing persons 12 and older, a residence search is not required. Rather, such a search should only be conducted "if warranted."[6] *Id.* § V.A.6.c.2.

56.    Ms. Lewis had informed the officers, from the start, that K.R. was 16 years old.

57.    Ms. Lewis explained that she was uncomfortable having police in her apartment and would not authorize a search. In any case, K.R. was in Maryland, not in the apartment. Ms. Lewis invited Defendant Koenig to look at her Find My iPhone screen again.

58.    At this point, nearly 45 minutes had passed since Ms. Lewis's 911 call. The officers, however, took no urgent action.

59.    Instead, back in their vehicle, Defendants Kennedy and Koenig mused that there was something "wrong" with Ms. Lewis. "Why wouldn't she let us into her apartment?" they asked. They checked MPD's Record Management System (COBALT) for prior records involving Ms. Lewis and K.R. The COBALT search came up blank.

60.    They also alerted the authorities in Riverdale, who went to search for K.R. around the location that the Find My iPhone application indicated.

61.    Around 10:50 P.M., a third officer, Defendant Chad Hambrick, arrived on the scene.

---

[6] Available at MPD General Order 304.03.

62.     Defendant Hambrick knew Ms. Lewis and K.R. Earlier that year, he had helped transport K.R. to the psychiatric facility.

63.     When Defendant Hambrick arrived, Ms. Lewis had been standing outside answering police questions for nearly an hour.

64.     Nevertheless, Ms. Lewis again calmly explained to him the same things she had explained to the dispatcher, Defendant Kennedy, and Defendant Koenig: that she had tracked K.R.'s iPhone to Riverdale, that K.R. had stopped taking her medications, and that she had been in touch with the aunt of one of K.R.'s friends, who had alerted her that K.R. might be getting into trouble.

65.     Ms. Lewis also explained to Defendant Hambrick that she had not wanted to call MPD because of the negative attention it drew to her family in the eyes of her neighbors and her landlord. As such, she met the officers on the street corner where they were standing.

66.     Ms. Lewis showed Defendant Hambrick a picture from K.R.'s Instagram account. She gave him the social media handles for K.R., K.R.'s friend, and K.R.'s friend's aunt. Ms. Lewis also provided Defendant Hambrick with contact information for K.R.'s friend's aunt, whom Ms. Lewis had been in touch with, and encouraged the officers to call the aunt.

67.     Defendant Hambrick walked down the block toward Defendants Kennedy and Koenig and called the aunt. The aunt provided Defendant Hambrick with the name and phone number of the person that K.R. was with in Riverdale.

68.     At this point, Ms. Lewis had been standing outside answering the officers' repetitive questions for about one-and-a-half hours. It was late at night. She continued waiting patiently for the officers to confer.

69.     Defendant Hambrick explained to Defendant Koenig that he had responded to calls at the same location before and knew Ms. Lewis and K.R.

70.     Defendant Koenig responded that, despite Defendant Hambrick's familiarity with K.R. and the fact that the Maryland police were already searching for K.R., as the senior officer on the scene he would not allow a missing person's report to be filed unless MPD searched Ms. Lewis's apartment.

71.     Defendant Koenig also noted that he did not think they could get a warrant to search the apartment, which is why they needed Ms. Lewis's consent.

72.     Defendant Hambrick went back to Ms. Lewis and informed her that, pursuant to MPD policy, the officers needed to search her apartment to make sure that K.R. was not inside.

73.     Ms. Lewis responded that she saw no reason for this as she had tracked K.R.'s phone to Riverdale and given the officers K.R.'s friend's aunt's contact information.

74.     Defendant Hambrick went back to Defendants Koenig and Kennedy and explained that Ms. Lewis would not consent to a search of her home and that he did not think K.R. was in the apartment based on his conversations with Ms. Lewis and the friend's aunt, as well as his prior experience with Ms. Lewis and K.R.

75.     Defendant Koenig agreed; he did not think that K.R. was in the apartment either.

76.     Even so, the officers went back to Ms. Lewis and proposed having a female officer search her apartment. Ms. Lewis responded that this would not assuage her concerns. At this point she had been answering their repeated questions for almost two hours.

77.     Ms. Lewis finally told the officers that if she could not file a missing person report without consenting to a police search of her apartment, then she would give up on trying to file the report. She prepared to go back inside.

11

78.     The officers began to leave, too. At this point, it was approximately 11:45 P.M.

79.     But just then, a fourth officer—Defendant Officer John Wright—arrived.

80.     Defendant Wright began asking Ms. Lewis many of the same questions that Defendants Kennedy, Koenig, and Hambrick had already asked her.

81.     Ms. Lewis asked why Defendant Wright was questioning her again when she had already patiently answered these questions several times.

82.     Defendant Wright then switched tactics. He asked Ms. Lewis who was watching N.L. inside.

83.     Ms. Lewis did not know why this question was relevant, but in an attempt to end the interaction, told Defendant Wright that a friend was watching N.L. and attempted to go inside.

84.     Defendant Wright stopped her. He asked Ms. Lewis if the friend was male or female.

85.     Ms. Lewis told Defendant Wright that she did not want to answer any more questions and was going to give up on filing a missing person's report.

86.     Again, she attempted to leave.

87.     Again, Defendant Wright stopped her. He asked Ms. Lewis if his female partner, Defendant Officer Natalie Charles, could search Ms. Lewis's apartment.

88.     Again, Ms. Lewis refused.

89.     It was now approximately midnight. Ms. Lewis had been standing outside for two hours. She told the officers she was going inside to check on N.L., get water, and use the restroom.

90.     After she left, Defendant Wright asked the other officers if they had run a COBALT search. They told him they had, and that they had found nothing.

91.     Defendant Wright responded that he still wanted to search Ms. Lewis's apartment, for reasons unrelated to K.R. Instead, Defendant Wright said he wanted to know which "friend" was watching N.L. inside.

92.     The other officers hesitated. Defendant Hambrick responded that, the last time he had been to Ms. Lewis's apartment, she had similarly expressed hesitation about having police in her apartment and asked them to come through the back door.

93.     Defendant Hambrick, the only officer with prior experience with Ms. Lewis and K.R., told the other officers that Ms. Lewis had never lied to him.

94.     Defendant Wright was not dissuaded. He returned to his vehicle and re-ran the same COBALT check that the other officers had told him they had already performed, looking for a basis to search the apartment.

95.     At this point, two detectives, Defendants Diane Brooks and Anthony Hector arrived. There were now seven officers on the scene, all to complete a missing person's report that Ms. Lewis no longer wanted to file.

**C. The Officers Lure Ms. Lewis Back Outside and Prevent Her from Re-Entering Her Own Apartment While They Illegally Search It and Detain N.L. Alone Inside.**

96.     As the officers began to fill in the detectives, Defendant Wright had another idea. He said that he planned to go inside, knock on Ms. Lewis's door, and see who answered.

97.     The officers knew that this was wrong. Defendant Koenig covered his face with his hand and said, "Uh, dude." Defendants Koenig and Hambrick reiterated that they had no basis to believe K.R. was inside the apartment. Despite their knowledge that Defendant Wright's plan was wrong, the other officers did not stop Defendant Wright. In fact, they enabled him.

98.     After Defendants Wright and Charles entered the building, Defendant Wright called the Defendants Koenig, Hambrick, and Kennedy, who were still standing outside, and asked them to lure Ms. Lewis back outside. They did just that.

99.     Defendant Wright also asked on the phone whether he had a "public safety" exception to enter the apartment. Defendants Koenig, Hambrick, and Kennedy said that he did not, so Defendants Wright and Charles resorted to other means.

100.    Defendants Wright and Charles hid in the lobby—out of Ms. Lewis's view—and watched her walk outside, where she had been lured by the other officers.

101.    While they hid, they observed another man walk into the lobby and then outside. They asked the security guard at the front desk if this man was affiliated with Ms. Lewis. The guard responded that he was not.

102.    With the coast clear, Defendants Wright and Charles walked to Ms. Lewis's apartment door. The door was closed but not locked. Defendants Kennedy, Hambrick, and Koenig, as well as the two detectives, continued to distract Ms. Lewis outside.

103.    Defendant Wright knocked on Ms. Lewis's door while Defendant Charles stood watch.

104.    N.L., awakened from her sleep, responded, "Mommy, there's someone at the door."

105.    Defendant Wright said nothing. Instead, he knocked again. Again, the girl responded, "Hello?"

106.    Defendants Wright and Charles then opened Ms. Lewis's apartment door fully. N.L., standing naked, opened her eyes and saw not her mother, but two police officers standing on her doorstep. Defendant Wright stepped inside and shone his flashlight, illuminating everything

that he could see from the doorway—which included the entryway, living room, kitchen, K.R.'s room, and N.L.

107.    He would remain standing in that threshold, detaining N.L. inside, and separating the six-year-old from her mother, for nearly an hour.

108.    Defendant Wright asked N.L. if she was home alone. N.L., who thought her mother was there, said she was not alone.

109.    Defendant Wright then asked N.L. who she was with. N.L., still naked, looked around. Not seeing her mother, she told Defendant Wright that she seemed to be alone.

110.    Defendant Charles approached and asked N.L. if she was injured. N.L. responded that she was not.

111.    Defendant Charles asked N.L. if she needed medical attention. N.L. responded that she did not.

112.    Defendant Charles asked N.L. when she last saw her sister. N.L. responded it had been about two days prior, which was consistent with what Ms. Lewis had told the officers.

113.    Meanwhile, when Ms. Lewis exited her building onto Connecticut Avenue, she found the detectives standing right outside.

114.    Ms. Lewis was confused as to why more police officers had arrived, when she had clearly told them that she did not wish to pursue a missing person's report.

115.    Ms. Lewis informed the detectives that she did not wish to speak to them right outside her building for the same reasons she did not want police in her building. She walked with them back to the corner of Connecticut Avenue NW and Kanawah Street NW.

116.    There, she informed the detectives of the same things she had already informed Defendants Kennedy, Koenig, Hambrick, Wright, and Charles: that she did not consent to MPD searching her apartment and that she no longer wished to file a missing person's report.

117.    It was now after midnight. Ms. Lewis attempted to leave the officers and go back inside. The officers, who knew Ms. Lewis would find Defendants Wright and Charles inside, followed.

118.    Ms. Lewis walked into her building, through the lobby, and turned the corner into her hallway. Ms. Lewis's apartment is at the end of the hallway, furthest from the lobby.

119.    As soon as she turned the corner, Ms. Lewis saw Defendant Wright standing in the threshold of her apartment with her door swung open. Defendant Wright stood half in, half out of her home and was shining a flashlight into her home and onto her seven-year-old daughter.

120.    Immediately, Ms. Lewis told the officers she did not consent to them searching her apartment.

121.    Defendant Wright asked Ms. Lewis if anyone besides N.L. was in the apartment. Ms. Lewis repeated that N.L. was alone.

122.    Defendant Charles ushered Ms. Lewis away from her apartment. For the next hour or so, Defendants Charles, Brooks, and Hector took turns detaining and questioning Ms. Lewis against her will at the far end of her hallway, approximately 50 feet from her apartment door and her daughter. Defendant Wright held her door open and searched the apartment without a warrant, consent, or any evidence that would otherwise justify a search, while Defendants Charles, Brooks, and Hector prevented Ms. Lewis from getting any closer to her door or to N.L.

123.    Defendant Koenig approached Defendant Wright and asked if the apartment door had been open when he arrived.

16

124.    Defendant Wright hesitated, and then lied. He initially responded that it had been open.

125.    Then he said it had been locked.

126.    Then he said it had been cracked.

127.    Defendant Charles chimed in to cover for Defendant Wright: it was open, she claimed.

128.    Defendant Koenig, despite being the supervisory officer on the scene, having heard Defendants Charles and Wright's questionable answers, and having every reason to believe that K.R. was in Riverdale, did not reign them in. Instead, Defendant Koenig let Defendant Wright continue searching the apartment and walked back down the hall toward Defendants Charles, Brooks, and Hector, who were continuing to detain Ms. Lewis.

**D. Even After Determining that This Is Not a Police Matter, the Officers Continue to Search Ms. Lewis's Apartment and to Detain Ms. Lewis and N.L. Until Nearly 1:00 A.M.**

129.    After Defendant Wright had been standing in the apartment doorway for about twenty minutes, the detectives approached Defendant Wright and explained that they had called the D.C. Child & Family Services Agency ("CFSA"), who would take over the matter.

130.    Defendant Wright protested. He did not want to leave.

131.    Defendant Hector responded that, while he knew Defendant Wright wanted to search Ms. Lewis's apartment, the officers did not have a legal basis to do so.

132.    "It was never going to be a detective matter," Defendant Hector explained.

133.    But Defendant Wright would not budge, and so the detectives and other officers continued to aid him.

134. Defendants Charles and Brooks continued to barricade Ms. Lewis at the end of the hallway, so she could not get close to her apartment or see what Defendant Wright was doing.

135. Defendants Hambrick and Hector continued to question Ms. Lewis at the far end of the hallway. When Ms. Lewis asked Defendant Hector if the officers had a search warrant. Defendant Hector responded that the officers did not need a warrant "because it's children."

136. Until this time, K.R. had not been responding to Ms. Lewis's video calls. But when Ms. Lewis explained what the MPD officers were doing to her and N.L., K.R. video-called Ms. Lewis and Defendant Hector and showed them that K.R. was not in the apartment. Defendant Hector saw K.R. on the video-call, but he did not call off the officers. Instead, he told Ms. Lewis that a supervisor was on her way and that they would just have to wait.

137. Defendant Wright continued to stand in Ms. Lewis's doorway. Defendant Koenig told him not to back down until the supervisor arrived.

138. Five more times, Defendant Wright asked N.L. if she was alone. Five more times, she responded that she was.

139. It was now well past midnight. N.L. was detained alone in the apartment, and Ms. Lewis was detained at the other end of the hallway.

140. Finally, Defendant Lieutenant LaShaun Lockerman arrived around 12:30 A.M.

141. Outside the building, Defendant Hector informed Defendant Lockerman that Ms. Lewis had video-called K.R. and shown him that she was not in the building. Further he admitted that the officers would not be able to get a warrant, nor did they have probable cause for a search.

142. Defendant Lockerman proceeded inside the building. Within a matter of minutes, Ms. Lewis video-called K.R. again, showed the screen to Defendant Lockerman, and allowed

Defendant Lockerman to compare the face on her screen to a prior missing person's report for K.R.

143.    Upon seeing the prior report, Defendant Lockerman immediately exclaimed that the girl on the video-call was "definitely" K.R.

144.    Defendant Lockerman walked over to Defendant Wright. Defendant Wright claimed to Defendant Lockerman that he had entered the apartment for the purposes of "public safety." Defendant Lockerman accepted this explanation and did not instruct Defendant Wright to stand back or to allow Ms. Lewis back inside her apartment.

145.    Instead, Defendant Lockerman walked back to Ms. Lewis and began to speak with her. Ms. Lewis said that she would prefer not to speak to Defendant Lockerman inside, for the same reasons that she had not wanted police officers in her building in the first place. But, she said, she was afraid that if they went outside to talk, Defendant Wright would further enter her apartment.

146.    Defendant Lockerman assured Ms. Lewis that Defendant Wright would not enter the apartment, but Defendant Lockerman did not instruct Defendant Wright to step away or close the door. Nor did Defendant Lockerman instruct any of the other MPD officers milling about the hallway at 12:30 in the morning to leave.

147.    Defendant Lockerman escorted Ms. Lewis outside, leaving the other officers inside. Once they had exited the building, Defendant Lockerman attempted to justify to Ms. Lewis why MPD needed to search her apartment.

148.    Ms. Lewis responded that she had heard explanations from the other officers, and that she had reasons for not wanting police in her home. Ms. Lewis also said that she was confused as to why so many officers were present and why this was still going on nearly three hours later.

Ms. Lewis explained that she felt traumatized, humiliated, and stigmatized by the events of the evening.

149.    "The damage is done," Ms. Lewis told Defendant Lockerman. "We have a child who's traumatized, I'm traumatized . . . I'm humiliated. I'm stigmatized, because I'm a young Black single parent."

150.    Defendant Lockerman finally responded that she was satisfied that K.R. was not in the apartment. She said MPD would file a missing person's report and follow CFSA's directions going forward.

151.    Still, Defendant Lockerman did not order her officers out of Ms. Lewis's apartment.

152.    Rather, while Defendants Lockerman and Kennedy spoke to CFSA on the phone, Defendants Charles and Hambrick stood with Ms. Lewis outside the building. When Ms. Lewis asked if she could rejoin N.L. inside, Defendants Charles and Hambrick told her that she could not.

153.    CFSA quickly informed Defendant Lockerman that they were not concerned for Ms. Lewis's daughters' safety and suggested that MPD leave.

154.    Meanwhile, Defendant Hambrick continued to detain Ms. Lewis outside. "Had you let me go in, none of this would have happened," he told her.

155.    At nearly 1 A.M., Defendant Kennedy handed Ms. Lewis a missing person's report number. The officers departed, and Ms. Lewis was finally permitted to re-join N.L. inside.

**The January 2022 Incident**[7]

---

[7] On information and belief, additional officers to those named below may have been present at this incident. Any additional officers are named as Jay Does # 6-10.

156.    On Thursday, January 13, 2022, Ms. Lewis was home alone when she received a call from N.L.'s school that there had been a possible COVID outbreak, and N.L. needed to be picked up.

157.    Ms. Lewis and N.L.'s father, Michael Lewis, share custody of N.L. It was Mr. Lewis's day to pick N.L. up from school, and Ms. Lewis told the school as much.

158.    The school said that Mr. Lewis was not responding to their calls. So, Ms. Lewis went to the school and picked up N.L.

159.    That day, Ms. Lewis had not been feeling well. She had a headache and was considering going to the doctor.

160.    Both because she had a headache, and because of their custody agreement, Ms. Lewis was displeased that she had had to fill in for Mr. Lewis. Ms. Lewis decided to call the CFSA hotline and see if they could help.

161.    Ms. Lewis was connected to CFSA employee Tim Beirne.

162.    Ms. Lewis explained the situation to Mr. Beirne and asked if there was anything CFSA could do to help her. Mr. Beirne responded there was not.

163.    Ms. Lewis asked to know if Mr. Lewis's failure to pick up N.L. on his day constituted neglect.

164.    Mr. Beirne responded unequivocally that CFSA would not help Ms. Lewis in this situation.

165.    Ms. Lewis felt defeated. She felt like CFSA only provides help when someone says they are going to kill themselves. She voiced her frustration and hung up.

166.    Unbeknownst to Ms. Lewis, Mr. Beirne, a former law enforcement officer himself, decided to inform the police about this interaction. Around 4:40 P.M., he called 911 and told the dispatcher that Ms. Lewis had mentioned self-harm.

**A.  MPD Officers Show Up at Ms. Lewis's Door and Become Angry When She Does Not Submit to Their Demands.**

167.    Four MPD officers—Defendant Officers Johnathan Matthews, Stephen Owens, Monique Boyd, and Jermaine Maubry—knocked on Ms. Lewis's door around 4:50 P.M.

168.    Ms. Lewis was startled. She had no idea why the police were at her door, because she had no idea Mr. Beirne had called 911. Given the prior police abuse she had experienced, she did not want to interact with police or let them into the apartment.

169.    The officers shouted through her door so that not only Ms. Lewis, but all of her neighbors could hear. They announced that CFSA had called 911 and said that Ms. Lewis was going to kill herself.

170.    Ms. Lewis was startled. She had no intention of harming herself.

171.    Ms. Lewis called CFSA back and was connected to a different social worker. She explained that police officers were at her door, supposedly at CFSA's request. Ms. Lewis asked the social worker to stay on the line to help her resolve the situation without more police in her home.

172.    The officers yelled through the door that they wanted Ms. Lewis to open it so that they could see Ms. Lewis and verify that she was okay.

173.    Ms. Lewis responded that she was fine and did not want to open the door or interact with the police.

174.    The officers were irritated that Ms. Lewis did not comply with their demand. Again, they told her to open the door.

175.    "You can make this easy, or you can make this hard," one of the officers yelled.

176.    Ms. Lewis did not want to open the door. Given her past experience with MPD, she was afraid of what would happen if she did. Instead, she said that the officers could video-call her or look in at her from her floor-to-ceiling window—which is fully visible from the entryway to the apartment building—to verify that she was okay.

177.    Despite the supposed urgency of verifying Ms. Lewis's well-being, the officers did not try to call her, go around to the window to check on her, or take any other immediate action. Instead, Defendant Boyd threatened to break down Ms. Lewis's door if she did not open it.

178.    Another officer radioed for a unit with a breach kit.

179.    Defendants Matthews, Owens, Boyd, and Maubry continued screaming at Ms. Lewis—whom they say they believed was at risk of harming herself. The officers became increasingly angry that Ms. Lewis would not open the door.

180.    On the other side of the door, Ms. Lewis continued to speak with the CFSA social worker. She asked the social worker to explain the situation to MPD. Ms. Lewis cracked open the door, put the CFSA social worker on speakerphone, and held up her phone to the door so MPD could hear the social worker.

181.    As soon as she cracked open her door, Defendant Owens shoved his baton into the doorjamb, preventing Ms. Lewis from closing the door.

182.    He held his baton there, preventing Ms. Lewis from closing her door, for the next two hours. The damage he did to her door frame remains to this day:



183.    As Ms. Lewis continued to tell the officers that she was okay—suggesting that they

talk to the CFSA social worker on the phone and/or check on her via video call—the officers took

no action to verify her well-being. Instead, they continued to disregard both Ms. Lewis and the

social worker.

**B.  MPD Officers Trick Ms. Lewis into Letting N.L. out of the Apartment, Detaining Ms. Lewis and N.L. Separately for Several Hours.**

184.    The officers decided to try a different tactic. While Defendant Owens held his baton

in the doorjamb, Defendants Boyd and Maubry yelled to Ms. Lewis that if they could just see N.L.

and verify that she was okay, they would leave.

185.    Relieved that the officers seemed to have accepted her affirmations that she was

okay, Ms. Lewis asked N.L. to come to the door.

186.    Ms. Lewis let the officers inspect N.L. through the cracked door.

187.    But, having seen N.L., the officers did not keep their word. Instead, they summoned N.L. into the hallway, allegedly so they could get a better look at her. "Just for a second," Defendant Boyd assured Ms. Lewis and N.L.

188.    Ms. Lewis let N.L. slip through the cracked door into the hallway with the understanding that the officers would let N.L. right back into the apartment.

189.    As such, even though it was the middle of winter, Ms. Lewis did not tell N.L. to put on a coat or shoes, because she did not think N.L. was going outside.

190.    Defendants Boyd, Owens, and Maubry spoke to N.L. in the hallway and verified that she was okay. But the officers did not permit N.L. to go back into the apartment with her mother. Instead, the three officers continued to question N.L.

191.    Meanwhile, three more MPD officers arrived: Defendant Sergeant Albert Cipolari and Defendant Officers Benjamin Rubin and Benjamin Finck.

192.    Defendant Cipolari told Ms. Lewis through her door that, if she did not come out of her apartment, the officers would take N.L. away with them.

193.    "We need to see you too," Defendant Maubry yelled at Ms. Lewis.

194.    It was then that Ms. Lewis realized the officers had tricked her. They were using her eight-year-old daughter as bait and collateral.

195.    Ms. Lewis, who was still on the phone with CFSA, again held her phone up to the door and had the CFSA social worker explain to the officers that this had all started only because Ms. Lewis wanted Mr. Lewis to pick up N.L. and had called CFSA for help. The social worker also told the officers that no threats of self-harm had been made to her.

196.    The CFSA social worker read out her direct phone number and invited the officers to call her directly to discuss what was best for N.L. given the situation. The officers refused.

197.    Ms. Lewis offered to give the officers Mr. Lewis's number, so they could call him to come pick N.L. up. The officers refused.

198.    Ms. Lewis again invited the officers to video-call her so they could see that she was okay. The officers refused.

199.    Ms. Lewis asked Defendant Owens to remove his baton from the door so she could close it. Defendant Owens refused.

200.    The officers did not take any action to verify Ms. Lewis's well-being. Instead, at Defendant Cipolari's instruction, Defendants Owens, Maubry, and Rubin continued to yell at her through the door and insist that she open it further.

201.    Ms. Lewis calmly explained to the officers that she had been traumatized by past experiences with the police and for that reason did not want to continue to interact with the officers. She assured the officers that she was not thinking of harming herself or anyone else.

202.    At Defendant Cipolari's direction, Defendant Boyd led N.L. away from the apartment, down the hallway, and into the building lobby. The officers would keep N.L. in the lobby with no coat and shoes, separated from her mother, in full view of all the neighbors and surrounded by police officers for the next several hours.

203.    Over the next several hours, Defendants Boyd, Maubry, and Finck, among others, took turns watching over N.L., questioning her, and detaining her in the lobby, preventing her from rejoining Ms. Lewis in the apartment or otherwise leaving.

204.    Meanwhile, back at Ms. Lewis's door, the officers continued to discuss what to do in light of Ms. Lewis's refusals to open the door further. Defendant Rubin asked the first officers who had arrived on the scene what statements about self-harm Ms. Lewis had made.

205.    Defendant Owens clarified that Ms. Lewis did not make any statements about self-harm to MPD directly.

206.    One of the officers who had arrived alongside Defendant Cipolari wondered aloud—if Ms. Lewis did not make any statements to us, have we not already done our due diligence?

207.    Ms. Lewis, who heard the officers talking about her outside her door, asked them not to talk about her in the hallway. She explained that she did not want her neighbors in her business.

208.    The officers ignored her and continued to talk about her in public view.

209.    Defendant Rubin instructed Defendant Owens to "keep the door propped."

**C.  The Officers Take No Steps to Ensure Ms. Lewis's Well-Being, but Rather, Prevent Her from Accessing Medical Attention.**

210.    Around 5:30 P.M., two paramedics arrived on the scene.

211.    Ms. Lewis told the officers through the cracked door that she would allow the paramedics but not the police to come into her apartment and verify her well-being.

212.    Despite the fact that Ms. Lewis's well-being was, purportedly, the central concern, Defendant Cipolari refused to let the paramedics do their job without police involvement. He insisted that Ms. Lewis step into the hallway if she wanted the paramedics to check her out.

213.    Ms. Lewis, who saw no reason for police involvement when there were two trained paramedics on the scene, refused.

214.    Defendant Cipolari suggested that Ms. Lewis open her door fully and allow the MPD to watch the paramedics conduct their exam. Ms. Lewis replied that the police presence still made her uncomfortable.

215.    Another officer then told Ms. Lewis that they were going to take N.L. to CFSA because Ms. Lewis refused to cooperate with them.

216.    Ms. Lewis repeated her request that they not talk about such private matters as her custody agreement in the hallway where her neighbors could hear.

217.    "I have to live here when you leave," she reminded the officers.

218.    Instead of honoring Ms. Lewis's request, the officers yelled through the door that yet another police officer was on his way to talk to Ms. Lewis.

219.    Ms. Lewis pleaded with the officers. Thinking that the police would leave her alone if she found somewhere else for N.L. to go, she asked them to call Mr. Lewis and have him pick his daughter up. She even offered to step outside her apartment if they got Mr. Lewis on the phone.

220.    The CFSA social worker, still on speakerphone, affirmed that CFSA would allow N.L. to be released into Mr. Lewis's custody, thereby resolving the situation.

221.    The officers refused.

222.    Ms. Lewis began receiving texts from some of her neighbors, wondering why N.L. was in the lobby surrounded by police officers with no shoes or coat in the dead of winter.

223.    Ms. Lewis felt trapped. She could not simply close the door, both because Defendant Owens still had his baton in her doorjamb and because N.L. would be alone. She could not leave her post at the door to retrieve shoes or a coat for N.L., because then Defendant Owens could further push the door open. She was fearful of what the officers might do if they were given full access to her apartment and her body.

224.    At this point, Defendant Officer George Arhin, who was supposedly trained in crisis management, arrived. There were now four officers standing outside Ms. Lewis's door.

225.    Defendant Arhin began speaking to Ms. Lewis through the cracked door. She assured him, just as she had assured the half-dozen officers to whom she had already spoken, that she was okay. This was all a big misunderstanding, she explained.

226.    Meanwhile, at least four officers, including Defendant Boyd, swarmed about the building lobby. They hovered over N.L., who had been separated from her mother for more than an hour. Defendants Boyd, Maubry, and Finck continued to surround and question N.L.

227.    Standing in the lobby, Defendants Matthews and Maubry finally called Mr. Lewis around 6:00 P.M., after more than an hour of harassment and yelling in a residential lobby, and asked if he could come pick N.L. up. Mr. Lewis responded that he could be there in 20 minutes.

228.    Meanwhile, Ms. Lewis's neighbors walked through the lobby. They saw N.L. surrounded by police officers and heard other officers yelling about Ms. Lewis's mental health through her door.

229.    The officers rejected Ms. Lewis's attempts to deescalate the situation. When Ms. Lewis reached out to a neighbor, who knew N.L. and offered to take care of her, the officers sent the neighbor away. When Ms. Lewis asked to speak with a supervisory officer, the officers refused.

230.    Defendant Arhin continued to talk to Ms. Lewis through the door, trying to coax her into leaving her apartment or allowing the police in, while other officers listened.

231.    Ms. Lewis pointed out that, if the officers were really concerned that she or N.L. were in imminent danger, they would have forced their way in instead of yelling at a woman—whom they were supposedly concerned wanted to harm herself—through her door for an hour and a half.

232.    "I do not feel safe with five cops at my door," Ms. Lewis told the officers.

233.    Again, Ms. Lewis asked Defendant Arhin to stop questioning her and Defendant Owens to take his baton out of the doorjamb; again, the officers refused.

**D.  MPD Officers Storm into Ms. Lewis's Apartment, Drag Her Past N.L. in Handcuffs, and Involuntarily Commit Her Because She Would Not Submit to Their Demands.**

234.    Around 7:00 P.M., when the officers had already been there for more than two hours, a representative from the Department of Behavioral Health ("DBH") arrived.

235.    The DBH representative held up her badge so Ms. Lewis could see it through the crack in the door and asked Ms. Lewis to let her inside the apartment.

236.    Ms. Lewis replied that she did not feel comfortable given the number of police officers present. She invited the DBH representative to video-call her, as she had invited the officers to do more than two hours prior.

237.    The DBH representative told Ms. Lewis that she had two options: either let DBH into her apartment or be involuntarily committed to a psychiatric facility.

238.    Defendant Arhin told Ms. Lewis that she "had" to let DBH into her apartment and promised that the police would not take her to the hospital if she let DBH into her apartment.

239.    As the officers listened in, one remarked to another, "This is what I would have done in the beginning." The other responded, "Now we've checked the box."

240.    Defendant Cipolari, who had been listening in, became impatient. "Either you let her in, or we are going to force our way in right now," he yelled.

241.    The DBH representative told Ms. Lewis that involuntarily commitment was "the only option left" if Ms. Lewis did not let DBH into her apartment.

242.    Ms. Lewis was scared. She did not want to open the door, but she did not want to be hospitalized either. She had already tried to reason with the officers for two hours, proposing alternatives and assuring them she was okay. But her efforts to deescalate the situation had only

30

seemed to anger the officers. Meanwhile, N.L. had been detained in the lobby, on display for all her neighbors to see, for hours. The officers would not allow N.L.'s father or the neighbor to take her inside.

243.    The DBH representative told Ms. Lewis that she was going to "take [Ms. Lewis] to the hospital against [her] will."

244.    Ms. Lewis did not want to go to the hospital. Feeling threatened, Ms. Lewis said she would let only the DBH worker into her apartment.

245.    The DBH worker slipped into Ms. Lewis's apartment. A few minutes passed.

246.    The officers were still not satisfied. Around 7:10 P.M., at Defendant Cipolari's direction, at least four Defendant Officers rammed through the door and forced their way into Ms. Lewis's apartment. At least four Defendant Officers, including Defendant Cipolari, stormed into the apartment, dragged Ms. Lewis out, and slammed her against the hallway wall.

247.    These officers immediately handcuffed Ms. Lewis. Defendant Cipolari instructed the other officers to tighten the handcuffs, and they complied—so much so that they left bruises.

248.    Meanwhile, Defendants Cipolari and Owens entered Ms. Lewis's apartment, and began to look around her living room.

249.    Defendant Boyd, the only female officer on scene, was summoned to search Ms. Lewis. As she had no plans to leave the house, Ms. Lewis was wearing only leggings, a sweatshirt, and a bonnet.

250.    Defendant Boyd blithely unzipped Ms. Lewis's sweatshirt, exposing her breasts to the surrounding officers.

251. Ms. Lewis begged the officers, if they were going to take her away, to at least get out of her apartment and close her door. The officers refused, purportedly because N.L. might need to fetch her things if she were going to leave with her father.

252. Ms. Lewis proposed that N.L. could take the keys to the apartment so that she could get back in if needed. The officers refused.

253. Ms. Lewis said that the building manager, sitting at the front desk, could let N.L. into the apartment while Ms. Lewis was gone. The officers refused.

254. The officers insisted on keeping Ms. Lewis's door propped wide open, leaving her living room and daughter's bedroom in full view for anyone to see or enter.

255. Ms. Lewis also pleaded with the officers to take her out the back door—which is right next to her apartment door—instead of leading her down the hallway, through the lobby, and out the front door. She explained that she did not want her neighbors to see her being led away in handcuffs. The officers refused. "Everybody already knows," they told her.

256. Even after the DBH representative had entered the apartment, and taken shoes and a jacket for N.L., the officers refused to close the apartment door.

257. Defendants Arhin, Boyd, and Cipolari, along with at least two other Defendant Officers, paraded Ms. Lewis in handcuffs through the lobby, while N.L. looked on in horror.

258. Once Ms. Lewis had been placed in the back of a police vehicle, Defendant Arhin taunted her: "Had you spoken to me, all this would not have transpired."

259. Around 7:30 P.M., Ms. Lewis was taken to a psychiatric facility and involuntarily committed. The following morning she was evaluated by a doctor, who immediately determined that she was not a risk to herself or anyone else and released her.

260.    Several weeks later, CFSA informed Ms. Lewis that the agency was opening an investigation of parental neglect against her. It was only then that Ms. Lewis learned a CFSA worker had entered her apartment after she was kidnapped from her home and taken pictures. The worker had decided to open an investigation because the apartment appeared "cluttered." Ms. Lewis expressed concern that the person investigating her was the same person who had entered her apartment without her knowledge or permission and taken the photographs. CFSA eventually reassigned the investigation to another caseworker, who promptly determined that the allegations against Ms. Lewis were unfounded and closed the investigation. By this point, Ms. Lewis had lived for several weeks under the terrifying threat that her children might be taken away from her.

### Office of Police Complaints Findings

261.    On July 10, 2020, Ms. Lewis filed a complaint with D.C.'s Office of Police Complaints ("OPC"), detailing MPD's conduct at her residence on June 24-25, 2020 and the harm the officers had caused her.

262.    OPC opened an investigation into Ms. Lewis's complaint.

263.    In December 2020, OPC referred the complaint to the United States Attorney's Office ("USAO") for criminal prosecution. OPC is required to refer complaints to the USAO where "there is reason to believe that the misconduct alleged in a complaint or disclosed by an investigation of the complaint may be criminal in nature." D.C. Code § 5-1109.

264.    OPC paused its investigation while the USAO decided whether to prosecute the involved officers. After the USAO used its discretion not to prosecute, OPC resumed its investigation in March 2021.

265.    In September 2021, OPC referred one of Ms. Lewis's allegations—that Defendant Wright had harassed her—to an independent complaint examiner.

266.    The examiner issued a report in November 2021 finding that Defendant Wright had recklessly violated Ms. Lewis's Fourth Amendment rights:

> As discussed below, Subject Officer's behavior here constituted harassment. He violated Complainant's Fourth Amendment expectation of privacy in her home by opening her door and stepping his foot inside to hold the door open. His statements during the encounter show that he recklessly violated Complainant's Fourth Amendment rights.

267.    In particular, the report found that Defendant Wright had searched Ms. Lewis's apartment without a warrant or probable cause. It noted that a missing person is not enough to invoke the exigent circumstances exception to the warrant requirement. The examiner also found it suspicious that the officers had been attempting to justify their actions aloud in real time and referred to Defendant Wright's conduct in particular as "egregious."

268.    The examiner did not investigate, and thus the report did not contemplate, whether officers besides Defendant Wright had violated Ms. Lewis's rights, but the examiner did find it "concerning" that Defendant Koenig, as the supervisory officer on the scene for most of the incident, did not "reign in" Defendant Wright:

[3] Although WITNESS OFFICER #4 is not a Subject of this allegation, it is concerning that as the superior officer on the scene, given that he knew they did not have basis for a search warrant, that he did not believe the missing girl or anyone besides the seven-year-old daughter was in the apartment, and that he knew of Complainant's concerns regarding the police in her building, that he did nothing more to reign in Subject Officer's actions here.

269.    In March 2022, OPC informed Ms. Lewis that Defendant Wright had received counseling as a result of the report and that it would take no further action in the matter.

270.    Defendant Wright has previously been sued for violently and unlawfully invading and searching peoples' homes. *See Lane v. District of Columbia*, No. 1:14-cv-01316-RBW (D.D.C. Aug. 4, 2014), Doc. 1; Complaint, *A.B. v. District of Columbia*, No. 1:15-cv-01490-RDM (D.D.C. Feb. 4, 2015), Doc. 1. The District of Columbia Court of Appeals twice recently noted

Defendant Wright's lack of credibility as a witness. *See Mayo v. United States*, 266 A.3d 244, 258

n.16 (D.C. 2022); *Golden v. United States*, 248 A.3d 925, 947 (D.C. 2021). There is at least one

other lawsuit pending regarding Defendant Wright fabricating justifications for illegal stops and

searches, particularly of Black civilians. *See Crudup v. District of Columbia*, No. 1:20-cv-01135

(D.D.C. filed Apr. 30, 2020).

271.    A recent local news article cited Defendant Wright as a "perfect example" of

"police misconduct."[8]

### Ms. Lewis's and N.L.'s Ongoing Injuries

272.    As a result of these repeated instances of police abuse, Ms. Lewis and N.L. suffer

ongoing harm.

273.    Ms. Lewis's mental health has been demonstrably worsened because of these

incidents. She has experienced, among other things, major dissociative episodes. Ms. Lewis has

sought psychotherapy and other mental health treatment as a result of these incidents. The

psychological trauma from these incidents continues to interfere with her daily functioning.

274.    The handcuffs that were put on Ms. Lewis in January 2022 were so tight that they

left bruises. Her wrists hurt so much that she could not carry her grocery bags for several weeks

afterward.

275.    Ms. Lewis took photographs of her bruises just after the incident:

---

[8] Mitch Ryals, *How the D.C. Police Department, DOJ, and D.C. Attorney General's Office Shield Cops' Bad Act*s, Wash. City Paper (June 25, 2020), https://washingtoncitypaper.com/article/304093/how-the-dc-police-department-doj-and-dc-attorney-generals-office-shield-the-bad-actions-of-cops/



276.    As Ms. Lewis feared, she has been stigmatized by her landlord and neighbors as a result of these incidents. She has been warned by her building management company that she is on thin ice because of police activity at her unit—even when that activity was no fault of her own.

277.    Ms. Lewis is afraid that she will be evicted and is considering moving before this happens—even though moving will destabilize her family's life and cost thousands of dollars that she does not have.

278.    Ms. Lewis lives under the terrifying fear that, as a result of these incidents, N.L. will be taken away from her.

279.    N.L. too has been traumatized. She was twice separated from her mother for several hours, invasively searched in the middle of the night, and swarmed by dozens of officers in the lobby of her apartment while her neighbors looked on. She has sought psychotherapy but is having trouble accessing care, in part because of the cost.

280.    On the evening of January 13, 2022, N.L. texted her older sister K.R. that "the worst" had happened. N.L. will carry this trauma with her for the rest of her life.

281.     A few days after the January 2022 incident, Ms. Lewis wrote to CFSA and outlined the trauma that she and N.L. were suffering as a result of the incident. She included photographs of bruises left on her wrists by the handcuffs and screenshots of the text messages that she received from concerned neighbors. In closing, she wrote:

> I intend to make sure this NEVER happens to families or people experiencing a mental health crisis again; and ALL responsible parties are held accountable for being complicit in the abuse and trauma unnecessarily inflicted upon me and my child.
>
> In conclusion, I ask myself if I were a white woman would my experience have been different? I think we all know the answer.
>
> Traumatized & Broken,
> Malaika Lewis

## Compliance with D.C. Code § 12-309.

282.     Plaintiffs have satisfied the requirements of D.C. Code § 12-309.

283.     Regarding the June 2020 incident, on July 10, 2020, Ms. Lewis filed an OPC Complaint, No. 20-0644, informing the District of the approximate time, place, cause, and circumstances of the injuries and damages that Plaintiffs suffered and continue to suffer.[9] OPC investigated the complaint, sustained some of the allegations, and posted its final report publicly on its website.

284.     Regarding the January 2022 incident, on April 21, 2022, Plaintiffs, by and through counsel, mailed to the District's Office of Risk Management, the Mayor, and MPD and CFSA's General Counsels notice of claim letters informing the District of the approximate time, place, cause, and circumstances of the injuries and damages that Plaintiffs suffered and continue to suffer.

285.     On May 11, 2022 the Office of Risk Management wrote back to Ms. Lewis, regarding her Claim Number GL-22-002309, and denied her claim.

---

[9] OPC is an agency within D.C.'s municipal government that reports up to the Mayor. *See* Gov't of the District of Columbia Organizational Chart, https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/publication/attachments/DCGovtOrgChart2019.pdf (last accessed Oct. 30, 2022).

286.    D.C. Code § 12-309 states that "[a] report in writing" by MPD "in regular course of duty" constitutes "sufficient notice" under this provision. In turn, D.C. Code § 5–113.01 requires MPD to maintain a record of every interaction between MPD officers and civilians. As such, on information and belief, such records were made for both the June 2020 and January 2022 incidents and constitute sufficient notice for the purposes of D.C. Code § 12-309.

**CLAIMS FOR RELIEF[10]**

287.    As to each claim below, Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

**COUNT I**
**Fourth Amendment: Unreasonable Search (June 2020)**
*All Plaintiffs against Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and*
*Lockerman*

288.    Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman are jointly and severally liable for entering and searching Plaintiffs' home, the most private of spaces, without consent, probable cause, a warrant, exigent circumstances, or any other lawful basis.

289.    Defendants Wright and Charles opened Plaintiffs' apartment door. Defendant Wright crossed the threshold and searched the apartment for several hours. Defendant Wright repeatedly invoked a false "public safety" exception in real time.

290.    Defendants Hambrick, Kennedy, and Koenig stated contemporaneously that the officers did not have a basis to search Plaintiffs' apartment because no "public safety" exception existed. Defendants Hambrick and Koenig stated that they did not think K.R. was inside and could not get a warrant. Nevertheless, Defendants Hambrick, Kennedy, and Koenig agreed to lure Ms.

---

[10] "Defendant Officers" refers to all Defendants except the District of Columbia. "June 2020 Defendant Officers" refers to Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, Lockerman, and Wright. "January 2022 Defendant Officers" refers to Defendants Arhin, Boyd, Cipolari, Finck, Matthews, Maubry, Owens, Rubin, and Does #6-10.

Lewis outside under false pretenses so that Defendants Wright and Charles could sneak into Plaintiffs' apartment.

291.    Supervisor-Defendant Koenig knew that the officers were exceeding their authority; he stated, from the start, that he did not think that the officers could get a warrant because K.R. was likely not in the apartment. Nevertheless, Defendant Koenig did not reign the other officers in; instead, he facilitated the unlawful search of Plaintiffs' apartment.

292.    Supervisor-Defendant Lockerman verified soon after she arrived on the scene that K.R. was not in the apartment. Nevertheless, she did not stop Defendant Wright from standing in Plaintiffs' doorway or the other June 2020 Defendant Officers from detaining Ms. Lewis. In fact, Defendant Lockerman let the illegal search and seizures continue for several minutes.

**COUNT II**
**Fourth Amendment: False Arrest/Unlawful Seizure (June 2020)**
*Plaintiff Malaika Lewis against June 2020 Defendant Officers*

293.    The June 2020 Defendant Officers are jointly and severally liable for seizing Ms. Lewis for several hours absent a warrant, probable cause, reasonable suspicion, or any other lawful basis.

294.    As evinced by the officers' on-the-scene acknowledgement that the "public safety" exception did not apply and their decision to lure Ms. Lewis outside, the June 2020 Defendant Officers knew they had no lawful reason to detain Ms. Lewis.

295.    OPC found as much: that Defendant Wright searched Plaintiffs' warrant without a warrant, probable cause, exigent circumstances, or any other lawful basis.

296.    Nevertheless, utilizing both words and force, the June 2020 Defendant Officers prevented Ms. Lewis from leaving their presence, thereby depriving her of her personal freedom of locomotion. Defendants Koenig, Kennedy, and Hambrick, at Defendants Wright and Charles's

instruction, tricked Ms. Lewis into coming back outside and kept her there while Defendants

Wright and Charles illegally entered her apartment. Defendants Charles and Brooks blocked the

hallway so that Ms. Lewis could not re-enter her apartment. Defendant Hector also detained Ms.

Lewis in the hallway, even after she showed him K.R. on a video call and asked if they could end

the interaction. Defendant Lockerman took Ms. Lewis back outside the building, even after she

had verified that K.R. was not in the apartment, and forced Ms. Lewis to speak with Defendant

Lockerman there for several minutes. Defendants Hambrick and Charles then detained Ms. Lewis

outside for several minutes, refusing her requests to rejoin N.L. inside, even after the officers had

verified K.R. was not home.

297.    Supervisor-Defendants Koenig and Lockerman knew the officers did not have a

legal basis to detain Ms. Lewis, but they did not reign in the officers. To the contrary, they

instructed the other officers to continue detaining her.

**COUNT III**
**Fourth Amendment: False Arrest/Unlawful Seizure (June 2020)**
*Plaintiff N.L. against Defendants Wright, Charles, Koenig, and Lockerman*

298.    Defendants Wright, Charles, Koenig, and Lockerman are jointly and severally

liable for seizing N.L. for several hours without a warrant, probable cause, reasonable suspicion,

or any other legal basis.

299.    The June 2020 Defendant Officers had no reason to believe any crime had been

committed or that N.L. was in danger, as evidenced by the lack of any arrest or criminal charges,

as well as the officers' on-the-scene acknowledgement that the "public safety" exception did not

apply.

300.    Nevertheless, knowing that N.L. was inside, Defendants Wright and Charles

opened the apartment and began questioning N.L. Defendant Wright stood in the doorway for

several hours, preventing N.L. from leaving, while Defendant Charles stood down the hallway, preventing Ms. Lewis from re-joining N.L. Together, they detained N.L. alone in the apartment in the middle of the night for several hours.

301.    Supervisor-Defendants Koenig and Lockerman knew that there was no lawful basis to detain N.L.; Defendant Koenig stated that he did not think the officers could get a warrant to enter the apartment and that he did not think K.R. was inside, while Defendant Lockerman had verified within a few minutes of her arrival that K.R. was not inside. Nevertheless, Defendants Koenig and Lockerman did not reign Defendants Wright and Charles in; rather, Defendants Koenig and Lockerman instructed Defendants Wright and Charles to keep doing what they were doing.

### COUNT IV
### Fifth Amendment: Substantive Due Process (June 2020)
### *All Plaintiffs against June 2020 Defendant Officers*

302.    In the alternative to a finding of liability under the Fourth Amendment, the June 2020 Defendant Officers are jointly and severally liable for treating Plaintiffs with deliberate indifference that shocks the conscience and invokes the very notion of an "arbitrary exercise of governmental power." *See Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015).

303.    Ms. Lewis contacted the police because she was in need of assistance to bring her minor daughter, who was at risk of a mental health crisis, home. Rather than assist her and uphold their duty, Defendants Kennedy, Koenig, and Hambrick lured Ms. Lewis outside under false pretenses while Defendants Charles and Wright unlawfully entered and searched Plaintiffs' home under the guise of a "policy" which did not say what they alleged it did. Defendants Charles, Brooks, Hector, and Wright detained Ms. Lewis and N.L. separately for several hours in the middle

41

of the night. They had plenty of time to make unhurried judgments and follow the proper investigative steps. Instead, they chose to subject Ms. Lewis and N.L. to substantial harm.

304.    Supervisor-Defendants Koenig and Lockerman, rather than reigning the other officers in, instructed and/or permitted the officers to deliberately exceed their authority.

**COUNT V**
**First Amendment: Retaliation (June 2020)**
*Plaintiff Malaika Lewis against June 2020 Defendant Officers*

305.    The June 2020 Defendant Officers are jointly and severally liable for retaliating against Ms. Lewis in violation of her First Amendment rights.

306.    Ms. Lewis freely asserted her right to be free from government harassment and lawfully refused to consent to a search of her home. Both statements are protected speech under the First Amendment.

307.    Because Ms. Lewis expressed her desire to end her interaction with the June 2020 Defendant Officers and refused to permit them entry into her home, Defendants Kennedy, Koenig, and Hambrick lured Ms. Lewis outside under false pretenses while Defendants Charles and Wright unlawfully entered and searched Plaintiffs' home—among other illegal acts. Defendants Charles, Brooks, Hector, and Wright detained Ms. Lewis and N.L. separately for several hours in the middle of the night.

308.    But for Ms. Lewis's assertion of her protected First Amendment rights, Defendants would not have engaged in these adverse actions against her. As Defendant Hambrick told Ms. Lewis, "Had you let me go in, none of this would have happened."

309.    Supervisor-Defendants Koenig and Lockerman did not reign the other officers in. Rather, Defendant Koenig helped trick Ms. Lewis into coming back outside so Defendants Wright and Charles could illegally enter her apartment, and Defendant Lockerman instructed Defendants

Hambrick and Charles to continue detaining Ms. Lewis, and Defendant Wright to remain in her doorway, even after Defendant Lockerman had verified that K.R. was not inside the apartment.

## COUNT VI
### Intrusion upon Seclusion (June 2020)
### *All Plaintiffs against Defendants District of Columbia, Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman*

310.    Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman are jointly and severally liable for entering and searching Plaintiffs' home without consent, a warrant, probable cause, or any other legal basis. At no point did Plaintiffs permit the officers to enter their home. In fact, Ms. Lewis repeatedly asked the officers to leave and asserted that she did not consent to a search. Nevertheless, Defendants Hambrick, Kennedy, and Koenig lured Ms. Lewis outside so that Defendants Wright and Charles could enter the apartment. These deceptive acts by supposed "officers of the law" are highly offensive to an ordinary person. Supervisor-Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did.

311.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT VII
### Trespass (June 2020)
### *All Plaintiffs against Defendants District of Columbia, Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman*

312.    Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman are jointly and severally liable for entering Plaintiffs' home without consent, a warrant, probable cause, or any other lawful basis. In fact, Ms. Lewis explicitly and repeatedly stated that she was not consenting to the officers' entry into her home.

313.    Defendants Hambrick, Kennedy, and Koenig lured Ms. Lewis outside so that Defendants Wright and Charles could enter the apartment. The officers' entry disrupted Ms. Lewis's exclusive possession of her home. Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did.

314.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**COUNT VIII**
**Intentional Infliction of Emotional Distress (June 2020)**
*All Plaintiffs against Defendant District of Columbia and June 2020 Defendant Officers*

315.    The June 2020 Defendant Officers are jointly and severally liable for their intentional and/or reckless, extreme, and outrageous conduct. Defendants Hambrick, Kennedy, and Koenig tricked Ms. Lewis into leaving her building. Defendants Wright and Charles hid in the lobby so she would not see them, and then searched the apartment—in which a naked child was alone—for more than an hour. Defendants Charles, Brooks, and Hector detained Ms. Lewis down the hallway while all of this was happening, while Defendant Wright detained N.L. in the apartment. Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did. The June 2020 Defendant Officers' conduct was extreme and outrageous by any standard of decency.

316.    During and since this incident, Ms. Lewis and N.L. have suffered a multitude of harms. Ms. Lewis was humiliated in front of her neighbors and is concerned about being evicted due to police activity at her apartment. N.L. was trapped, naked and alone, for several hours in the middle of the night. Both were distressed, afraid, and anxious during the entirety of the ordeal.

Since the incident, both Ms. Lewis and N.L. have been forced to seek psychotherapy and other support to deal with the lingering traumas heaped upon them.

317.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**COUNT IX**
**Negligent Infliction of Emotional Distress (June 2020)**
***All Plaintiffs against Defendant District of Columbia and June 2020 Defendant Officers***

318.    In the alternative to a finding of intentional infliction of emotional distress, the June 2020 Defendant Officers' are jointly and severally liable for their negligent infliction of emotional distress upon Ms. Lewis and N.L.

319.    Ms. Lewis sought the aid of the June 2020 Defendant Officers to help bring home her missing daughter. The officers owed Ms. Lewis a duty to properly respond to her request for aid and N.L. a duty of care in entering her home in the middle of the night, purportedly to look for her sister. Instead, Defendants Kennedy, Koenig, and Hambrick ignored several credible leads as to K.R.'s whereabouts; and Defendants Wright and Charles, followed by Defendants Kennedy, Koenig, Hambrick, Brooks, and Hector, entered Plaintiffs' building and remained there for several hours despite Ms. Lewis's repeated pleas that having police in her building might lead to negative repercussions for her family. Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did. In so doing, the officers placed Plaintiffs in a zone of danger wherein Plaintiffs feared for their own safety. Plaintiffs have continued to suffer emotional and mental turmoil since the incident.

320.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT X
### Negligence (June 2020)
### *Plaintiff Malaika Lewis against*
### *Defendant District of Columbia and June 2020 Defendant Officers*

321.    The June 2020 Defendant Officers are jointly and severally liable for their negligence in responding to Ms. Lewis's call.

322.    Ms. Lewis sought the aid of the June 2020 Defendant Officers to help bring home her missing daughter. The officers owed Ms. Lewis a duty to properly respond to her request for aid. The officers breached this duty by failing to follow credible leads to find K.R., and instead detaining Ms. Lewis and N.L. for four hours in the middle the night, breaching the sanctity of their home, and traumatizing them in front of their neighbors. In particular, Defendants Koenig, Kennedy, and Hambrick failed to follow credible leads; and Defendant Wright detained N.L. while Defendants Brooks, Charles, and Hector detained Ms. Lewis. Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did. Ms. Lewis has continued to suffer emotional and mental turmoil since the incident.

323.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XI
### Negligence (June 2020)
### *Plaintiff N.L. against Defendants District of Columbia, Wright, Charles, Koenig, and*
### *Lockerman*

324.    Defendants Wright, Charles, Koenig, and Lockerman are jointly and severally liable to N.L. for their negligence.

325.    Defendants Wright and Charles owed N.L. a duty of care in entering her home, purportedly to look for her sister. Instead, Defendants Wright and Charles awoke N.L. in the middle of the night, questioned her while she stood naked in her apartment, and separated N.L. from her mother for several hours. N.L. has continued to suffer emotional and mental turmoil since the incident. Defendants Koenig and Lockerman, the supervisory officers on the scene, instructed and/or permitted the other officers to act as they did.

326.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the June 2020 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### COUNT XII
### Fourth Amendment: False Arrest/Unlawful Seizure (January 2022)
*Plaintiff Malaika Lewis against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin,*
*and at least two other January 2022 Defendant Officers*

327.    Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for seizing Ms. Lewis for several hours without a warrant, probable cause, reasonable suspicion, or any other lawful basis.

328.    Using both words and force, several of these officers detained Ms. Lewis at the threshold of her apartment without legal basis for several hours. In particular, Defendant Owens held his baton in Ms. Lewis's doorjamb so she could not close it; Defendants Owens, Boyd, and Maubry spoke to Ms. Lewis through the door and refused her requests to leave; Defendant Rubin instructed Defendant Owens not to remove the baton; and Defendant Arhin questioned Ms. Lewis through the door despite her pleas to leave. Later, Defendants Boyd, Arhin, and Cipolari, and at

least two other January 2022 Defendant Officers violently handcuffed Ms. Lewis and dragged her

out of her building and into the back of a police car against her will.

329.    The January 2022 Defendant Officers had no reason to believe that any crime had

been committed or that Ms. Lewis was a danger to herself or others, as evinced by the several

hours over which the incident played out and the lack of any formal arrest or criminal charges.

## COUNT XIII
### Fourth Amendment: False Arrest/Unlawful Seizure (January 2022)
### *Plaintiff N.L. against Defendants Boyd, Owens, Cipolari, Maubry, and Finck*

330.    Defendants Boyd, Owens, Cipolari, Maubry, and Finck are jointly and severally

liable for seizing N.L. for several hours without a warrant, probable cause, reasonable suspicion,

or any other legal basis.

331.    Defendants Boyd, Owens, and Maubry lured N.L. out of her apartment under false

pretenses, questioned her in the hallway, and refused to let her rejoin Ms. Lewis inside the

apartment. Defendant Boyd, at Defendant Cipolari's instruction, then forcibly took N.L. to the

public lobby of her building, and kept her there, away from a parent or guardian, for several hours.

During this time, Defendants Boyd, Maubry, and Finck took turns watching over N.L. Defendant

Cipolari rejected several opportunities to safely release N.L. to the custody of a parent or known

guardian, and instead instructed the officers to continue to detain her without any lawful basis.

## COUNT XIV
### Fourth Amendment: Unreasonable Search (January 2022)
### *All Plaintiffs against Defendants Owens and Cipolari*

332.    Defendants Owens and Cipolari are jointly and severally liable for searching

Plaintiffs' home without consent, a warrant, probable cause, or any other lawful purpose.

333.    Defendant Owens forced a baton into the threshold of Plaintiffs' home and held

their front door open, despite the lack of any lawful purpose to enter and Ms. Lewis's repeated

protests for several hours. Defendants Cipolari and Owens later fully entered Plaintiffs' home, milled about their apartment, and touched their personal items, again absent any lawful purpose. Defendant Cipolari instructed the officers to leave the apartment door open, even after DBH had retrieved items for N.L., exposing their home to another unlawful search by CFSA officials.

## COUNT XV
### Fourth Amendment: Excessive Force (January 2022)
### *Plaintiff Malaika Lewis against Defendants Cipolari, Boyd, Arhin and at least two other January 2022 Defendant Officers*

334.    Defendants Cipolari, Boyd, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for using excessive force against Ms. Lewis.

335.    These officers acted unreasonably in effectuating force onto Ms. Lewis as there was no reason for the utilization of any force at all. As explained above, the officers had no basis for their unlawful detention of Ms. Lewis and were thus not entitled to the use of any force upon her. Nevertheless, Defendants Cipolari, Arhin, and at least two other officers—at Defendant Cipolari's instruction—removed Ms. Lewis from her apartment, slammed her against the hallway wall, handcuffed her, and violently placed her in a police vehicle. Defendant Cipolari instructed the other officers to tighten the handcuffs. Furthermore, Defendant Boyd conducted an invasive search of Ms. Lewis, including exposing her bare breasts to other officers.

## COUNT XVI
### Fifth Amendment: Substantive Due Process (January 2022)
### *All Plaintiffs against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 Defendant Officers*

336.    In the alternative to a finding of liability under the Fourth Amendment, Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for treating Plaintiffs with deliberate indifference that shocks the conscience and invokes the very notion of an "arbitrary exercise of

governmental power." *See Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015).

337.    As outlined above, Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers unlawfully detained Ms. Lewis and used excessive force against her. These officers yelled at Ms. Lewis about personal matters—including the fact that she was supposedly going to harm herself—in front of her neighbors for several hours. Defendants Boyd, Owens, and Cipolari tricked N.L. into leaving the apartment and used N.L. as bait to lure Ms. Lewis outside. Defendants Boyd, Maubry, and Finck unlawfully detained N.L. Ms. Lewis exercised her right to be free from government harassment, and she and N.L. were severely violated as a result. The officers had plenty of time to make unhurried judgments and follow the proper procedures. Instead, they chose to subject Ms. Lewis and N.L. to substantial harm.

## COUNT XVII
### First Amendment: Retaliation (January 2022)
***Plaintiff Malaika Lewis against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers***

338.    Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for retaliating against Ms. Lewis in violation of her First Amendment rights.

339.    Ms. Lewis asserted her right to be free from government harassment and lawfully declined to engage with police officers. Both statements are protected speech under the First Amendment.

340.    In response to Ms. Lewis's desire to end her interaction with the January 2022 Defendant Officers, the officers escalated the situation. Defendant Owens held his baton in Ms. Lewis's door, at Defendant Rubin's instruction, and illegally entered her apartment. Defendants

Boyd and Maubry coaxed N.L. out of the apartment under false pretenses. Defendants Boyd, Cipolari, Arhin, and at least two other January 2020 Defendant Officers eventually dragged Ms. Lewis from her home, unlawfully searched her residence, forcibly placed her in handcuffs, and forced her to spend the night in a psychiatric facility.

341.    But-for Plaintiff's assertion of her protected First Amendment rights, Defendants would not have engaged in these adverse actions against her. Defendant Arhin specifically told Ms. Lewis that "[h]ad [she] spoken to [them], all this would not have transpired."

## COUNT XVIII
### False Arrest (January 2022)
*Plaintiff Malaika Lewis against Defendants District of Columbia, Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers*

342.    Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for detaining Ms. Lewis with their force and words, absent any lawful basis to do so.

343.    Defendant Owens held his baton in Ms. Lewis's doorjamb so she could not close it; Defendants Owens, Boyd, and Maubry spoke to Ms. Lewis through the door and refused her requests to leave; Defendant Rubin instructed Defendant Owens not to remove the baton; and Defendant Arhin questioned Ms. Lewis through the door despite her pleas to leave.

344.    Later, Defendants Boyd, Arhin, and Cipolari, and at least two other defendant officers violently handcuffed Ms. Lewis and dragged her out of her building and into the back of a police car against her will.

345.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XIX

51

**False Arrest (January 2022)**
*Plaintiff N.L. against Defendants District of Columbia,*
*Boyd, Owens, Cipolari, Maubry, and Finck*

346.    Defendants Boyd, Owens, Cipolari, Maubry, and Finck are jointly and severally liable for seizing N.L. for several hours absent a warrant, probable cause, reasonable suspicion, or any other legal basis.

347.    Defendants Boyd, Owens, and Maubry lured N.L. out of her apartment under false pretenses, questioned her in the hallway, and refused to let her rejoin Ms. Lewis inside the apartment. Defendant Boyd, at Defendant Cipolari's instruction, then forcibly took N.L. to the public lobby of her building, and kept her there, away from a parent or guardian, for several hours. During this time, Defendants Boyd, Maubry, and Finck took turns watching over N.L. Defendant Cipolari refused several offers to safely release N.L. to the custody of a parent or known guardian, and instead instructed the officers to continue to detain her without any lawful basis.

348.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**COUNT XX**
**Intrusion upon Seclusion (January 2022)**
*All Plaintiffs against Defendants District of Columbia, Owens, and Cipolari*

349.    Defendants Owens and Cipolari are jointly and severally liable for entering and searching Plaintiffs' home without consent, a warrant, probable cause, or any other legal basis.

350.    Defendant Owens forced a baton into the threshold of Plaintiffs' home and held their front door open, despite the lack of any lawful purpose to enter her apartment and Ms. Lewis's repeated protests for several hours. Defendants Cipolari and Owens later fully entered Plaintiffs' home, milled about their apartment, and touched their personal items, again absent any lawful

purpose. Defendant Cipolari instructed the officers to leave the apartment door open, even after DBH had retrieved items for N.L., exposing their home to another unlawful search by CFSA officials.

351.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XXI
### Trespass (January 2022)
### *All Plaintiffs against Defendants District of Columbia, Owens, and Cipolari*

352.    Defendants Owens and Cipolari are jointly and severally liable for entering Plaintiffs' home without consent, a warrant, probable cause, or any other lawful basis

353.    Defendant Owens forced a baton into the threshold of Plaintiffs' home and held their front door open, despite the lack of any lawful purpose to enter her apartment and Ms. Lewis's repeated protests for several hours. Defendants Cipolari and Owens later fully entered Plaintiffs' home, milled about their apartment, and touched their personal items, again absent any lawful purpose. Defendant Cipolari instructed the officers to leave the apartment door open, even after DBH had retrieved items for N.L., exposing their home to another unlawful search by CFSA officials. Ms. Lewis explicitly and repeatedly stated that she did not consent to the officers entering her home. The officers' entry disrupted Ms. Lewis's exclusive possession of her home.

354.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XXII
### Intentional Infliction of Emotional Distress (January 2022)

***All Plaintiffs against Defendants District of Columbia, Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 Defendant Officers***

355.    Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for their intentional and/or reckless, extreme and outrageous conduct.

356.    As outlined above, Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers unlawfully detained Ms. Lewis and used excessive force against her. These officers yelled at Ms. Lewis about personal matters—including the fact that she was supposedly going to harm herself—in front of her neighbors for several hours. Defendants Boyd, Owens, and Cipolari tricked N.L. into leaving her apartment and used N.L. as bait to lure Ms. Lewis outside. Defendants Boyd, Maubry, and Finck unlawfully detained N.L.

357.    During and since this incident, Plaintiffs have suffered a multitude of emotional harms. Plaintiffs were both significantly distressed, angry, and anxious during the entirety of the ordeal. Ms. Lewis was humiliated by being paraded in handcuffs through her apartment building in full view of her neighbors and N.L. Since this incident, Plaintiffs have had to seek psychotherapy as a method of dealing with the lingering traumas heaped upon them by Defendants.

358.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XXIII
### Negligent Infliction of Emotional Distress (January 2022)
***All Plaintiffs against Defendants District of Columbia, Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 Defendant Officers***

359.    In the alternative to a finding of intentional infliction of emotional distress, Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January

2022 Defendant Officers are jointly and severally liable for their negligent infliction of emotional distress upon Ms. Lewis and N.L.

360.    Through their negligence in responding to the 911 call, the officers placed Plaintiffs in a zone of danger wherein Plaintiffs feared for their own safety. The officers chose to ignore Plaintiffs' well-being, and instead detained and separated Plaintiffs for several hours while unlawfully searching their home. In particular, Defendants Boyd, Owens, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers detained and used excessive force against Ms. Lewis; while Defendants Boyd, Maubry, and Finck detained N.L.

361.    During and since this incident, Plaintiffs have suffered a multitude of emotional harms. Plaintiffs were both distressed, angry, and anxious during the entirety of the ordeal. Ms. Lewis was humiliated by being paraded in handcuffs through her apartment building in full view of her neighbors and N.L. Since this incident, Plaintiffs have had to seek psychotherapy as a method of dealing with the lingering traumas heaped upon them by Defendants.

362.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## COUNT XXIV
### Assault and Battery (January 2022)
***Plaintiff Malaika Lewis against Defendants District of Columbia, Cipolari, Boyd, Arhin and at least two other January 2022 Defendant Officers***

363.    Defendants Cipolari, Boyd, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for the assault and battery committed on Ms. Lewis through both word and act. These officers, at Defendant Cipolari's direction, physically dragged Ms. Lewis from her home, violently placed her in handcuffs, conducted an intrusive and baseless search of her person, and involuntarily transported her to a psychiatric facility—all without any lawful basis.

364.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**COUNT XXV**
**Negligence (January 2022)**
***Plaintiff Maliaka Lewis against Defendants District of Columbia, Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers***

365.    Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 Defendant Officers are jointly and severally liable for their negligence in responding to Ms. Lewis's call.

366.    The officers owed Ms. Lewis a duty to act reasonably and in the interest of her well-being when they approached her regarding an allegation that she was going to harm herself. Rather than act reasonably when confronted with a person who was perfectly calm, but simply did not wish to engage with police, these officers instead chose to breach their duty of care by yelling at her for more than an hour (Defendants Owens, Boyd, Rubin, Cipolari, Maubry, and Arhin); luring N.L. out of the apartment under false pretenses and using her as bait (Defendants Owens, Boyd, and Maubry); dragging Ms. Lewis from her home (Defendants Owens, Cipolari, Arhin, and at least two other officers); and unlawfully searching their residence (Defendants Owens and Cipolari). Each of these offensive actions were committed despite the fact that there was no indication that Ms. Lewis had committed a crime or was a danger to herself or others. These unlawful acts directly and proximately caused compensable injuries to Ms. Lewis.

367.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**COUNT XXVI**

56

**Negligence (January 2022)**
*Plaintiff N.L. against Defendants District of Columbia, Boyd, Cipolari, Maubry, and Finck*

368.    Defendants Boyd, Cipolari, Maubry, and Finck are jointly and severally liable for their negligence in ensuring N.L.'s well-being. The officers owed N.L. a duty to act in the interests of her well-being when conducting their "wellness check." Instead, they tricked her into leaving her home (Defendants Boyd, Cipolari, and Maubry), threatened to take her away from her mother if her mother did not comply with the officers' demands (Defendant Cipolari), and detained her in the lobby (Defendants Boyd, Maubry, and Finck) for several hours. Each of these offensive actions were committed despite the fact that there was no indication that N.L. was unsafe with her mother. These unlawful acts directly and proximately caused compensable injuries to N.L.; that night, she texted her older sister that "the worst" had happened: "Mommy got taken away."

369.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents, the January 2022 Defendant Officers, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**REQUEST FOR RELIEF**

370.    Defendants' flagrant disregard for their professional obligations, the rule of law, and Plaintiffs' basic dignity led to pain, fear, and material costs for Plaintiffs. Plaintiffs now ask the Court to enter a judgment confirming that these officers are not above the laws they enforce and that they will be held accountable for abusing their authority.

371.    WHEREFORE, on the basis of the foregoing, Plaintiff demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

    a.    Declare that Defendants violated Plaintiffs' constitutional rights and rights under D.C. law;

b.  Award compensatory damages against Defendants in an amount to be determined by a jury at trial, for the emotional distress, fear, embarrassment, humiliation, reputational damage, inconvenience, loss of income, and physical pain that Plaintiffs have suffered and continue to suffer as a result of these incidents;

c.  Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;

d.  Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

e.  Award such other relief as the Court deems just and proper.

Respectfully submitted this 21st day of November, 2022.

 /s/ Ellora Thadaney Israni
Ellora Thadaney Israni (D.C. Bar 1740904)*
Leonard J. Laurenceau (Florida Bar 106987)*[†]
Brittany Francis (New York Bar 5337555)*[†]
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
ellora@civilrightscorps.org
Phone: (202) 894-6132

* Not a member of the Bar of this Court. Appearing without compensation from clients, pursuant to Local Civil Rule 83.2(f).
[†] Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. (49)(c)(8), with supervision by members of the D.C. Bar.

*Counsel for Plaintiffs*