**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MALAIKA LEWIS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-03369-RDM** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    I.    The Incidents ............................................................................................................... 2

    II.    Plaintiffs' Amended Complaint and Procedural History ............................................. 5

LEGAL STANDARD ............................................................................................................... 5

ARGUMENT ............................................................................................................................ 6

    I.    Plaintiffs Fail To Allege a Violation of Their Fourth Amendment Rights................... 6

        A.    June 2020 Incident ........................................................................................... 6

        B.    January 2022 Incident ..................................................................................... 13

    II.    Plaintiffs Fail To Allege a Violation of Their Fifth Amendment Rights.................... 17

        A.    June 2020 Incident (Count 4). ....................................................................... 19

        B.    January 2022 Incident (Count 16). ................................................................ 22

    III.    Plaintiffs Fail To Allege a Violation of Their First Amendment Rights. ................... 24

        A.    June 2020 Incident (Count 5) ........................................................................ 25

        B.    January 2022 Incident (Count 17) ................................................................. 27

    IV.    Plaintiffs Fail To Allege Intrusion Upon Seclusion (Counts 6 and 20)..................... 29

    V.    Plaintiffs Fail To Allege Trespass (Counts 7 and 21)................................................ 30

    VI.    Plaintiffs Fail To Allege Intentional Infliction of Emotional Distress. ...................... 30

        A.    June 2020 Incident (Count 8) ........................................................................ 31

        B.    January 2022 Incident (Count 22) ................................................................. 33

    VII.    Plaintiffs Fail To Allege Negligent Infliction of Emotional Distress. ....................... 34

    VIII.    Plaintiffs Fail To Allege Negligence (Counts 10-11, 25-26)..................................... 35

    A.      June 2020 Incident (Counts 10-11) ............................................................. 36

    B.      January 2022 Incident (Counts 25-26) ....................................................... 38

IX.    Plaintiffs Fail To Allege False Arrest (Counts 18-19)................................................. 40

X.    Plaintiffs Fail To Allege Assault and Battery (Count 24)............................................ 40

XI.    Plaintiffs' Constitutional Claims Should Be Dismissed Because the Individual Defendants Are Entitled to Qualified Immunity. ..................................................... 42

    A.      The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' Fourth Amendment Claims....................................................................................... 43

    B.      The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' Fifth Amendment Claim. ....................................................................................... 45

    C.      The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' First Amendment Claim. ...................................................................................... 45

CONCLUSION ........................................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   787 F.3d 524 (D.C. Cir. 2015) .................................................................................... 19

*Albright v. Oliver*,
   510 U.S. 266 (1994) ..................................................................................................... 19

*Am. Fed'n of Gov't Employees, Local 446*,
   475 F.3d 341 (D.C. Cir. 2007) .................................................................................... 21

*Amobi v. D.C. Dep't of Corr.*,
   755 F.3d 980 (D.C. Cir. 2014) .................................................................................... 31

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) .................................................................................... 25

*Arrington v. United States*,
   473 F.3d 329 (D.C. Cir. 2006) .................................................................................... 41

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ..................................................................................................... 42

*Ashcroft v. American Civil Liberties Union*,
   535 U.S. 564 (2002) ..................................................................................................... 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... Passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................. 6, 21

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ....................................................................................................... 6

*Bernstein v. Fernandez*,
   649 A.2d 1064 (D.C. 1991) ......................................................................................... 31

*Betz v. Howard Univ. Hosp.*,
   2023 WL 130734 (D.D.C. Jan. 9, 2023) ...................................................................... 29

*Black Lives Matter D.C. v. Trump*,
   544 F. Supp. 3d 15 (D.D.C. 2021) .............................................................................. 19

*Butera v. District of Columbia,*
235 F.3d 637 (D.C. Cir. 2001) ................................................................. 36

*Caniglia v. Strom,*
141 S. Ct. 1596 (2021) ..................................................................... 15, 44

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998) ......................................................................... 18, 22

*Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury,*
45 F.4th 324 (D.C. Cir. 2022) .................................................. 26, 27, 28

*Cox v. State of La.,*
379 U.S. 559 (1965) ............................................................................... 25

*Crawford-El v. Britton,*
523 U.S. 574 (1998) ............................................................................... 26

*Daugherty v. Sheer,*
891 F.3d 386 (D.C. Cir. 2018) .............................................................. 26

*Devenpeck v. Alford,*
543 U.S. 146 (2004) ............................................................................... 14

*District of Columbia v. Chinn,*
839 A.2d 701 (D.C. 2003) ........................................................ 36, 37, 39

*District of Columbia v. Harris,*
770 A.2d 82 (D.C. 2001) ........................................................................ 38

*District of Columbia v. Wesby,*
138 S. Ct. 577 (2018) ............................................................................. 42

*Duckett v. Quick,*
282 F.3d 844 (D.C. Cir. 2002) .............................................................. 20

*Dukore v. District of Columbia,*
799 F.3d 1137 (D.C. Cir. 2015) ............................................................ 42

*Elkins v. District of Columbia,*
527 F. Supp. 2d 36 (D.D.C. 2007) ........................................................ 20

*Elkins v. District of Columbia,*
610 F. Supp. 2d 52 (D.D.C. 2009) .......................................................... 7

*Elkins v. District of Columbia*,
    690 F.3d 554 (D.C. Cir. 2012) ................................................................. 19, 20

*Etheredge v. District of Columbia*,
    635 A.2d 908 (D.C.1993) ................................................................................ 41

*Evans–Reid v. District of Columbia*,
    930 A.2d 930 (D.C. 2007) ............................................................................. 40

*Fernandors v. District of Columbia*,
    382 F. Supp. 2d 63 (D.D.C. 2005) ................................................................. 7

*Fisher v. Harden*,
    398 F.3d 837 (6th Cir. 2005) ....................................................................... 14

*FOP Dep't of Corr. Labor Comm. v. Williams*,
    375 F.3d 1141 (D.C. Cir. 2004) .................................................................... 18

*Garay v. Liriano*,
    839 F. Supp. 2d 138 (D.D.C. 2012) ............................................................. 29

*Graham v. Connor*,
    490 U.S. 386 (1989) ............................................................. 10, 19, 23, 41

*Gudger v. District of Columbia*,
    74 F. Supp. 3d 47 (D.D.C. 2014) ................................................................. 11

*Hargraves v. District of Columbia*,
    134 F. Supp. 3d 68 (D.D.C. 2015) .......................................................... 31, 41

*Harris v. U.S. Dep't of Veterans*,
    776 F.3d 907 (D.C. Cir. 2015) ............................................................... 10, 40

*Hawkins v. Washington Metro. Area Transit Auth.*,
    311 F. Supp. 3d 94 (D.D.C. 2018) ............................................................... 34

*Hill v. Metropolitan African Methodist Episcopal Church*,
    779 A.2d 906 (D.C. 2001) ............................................................................. 36

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ...................................................................................... 42

*Int'l Action Ctr. v. United States*,
    365 F.3d 20 (D.C. Cir. 2004) .......................................................................... 7

*Jackson v. District of Columbia*,
   327 F. Supp. 3d 52 (D.D.C. 2018) ........................................................ 16

*Jograj v. Enter. Servs., LLC*,
   270 F. Supp. 3d 10 (D.D.C. 2017) ........................................................ 34

*Johnson v. District of Columbia*,
   490 F. Supp. 3d 144 (D.D.C. 2020) ...................................................... 40

*Jones v. Howard Univ., Inc.*,
   589 A.2d 419 (D.C.1991) ..................................................................... 35

*Joyner v. Sibley Mem. Hosp.*,
   826 A.2d 362 (D.C.2003) ..................................................................... 31

*Kimberlin v. Quinlan*,
   199 F.3d 496 (D.C. Cir. 1999) ............................................................. 26

*Knippen v. Ford Motor Co.*,
   546 F.2d 993 (D.C. Cir. 1976) ............................................................. 36

*Larijani v. Georgetown Univ.*,
   791 A.2d 41 (D.C. 2002) ...................................................................... 32

*Lawhon v. Edwards*,
   477 F. Supp. 3d 428 (E.D. Va. 2020) ................................................... 44

*Levy v. Schnabel Found. Co.*,
   584 A.2d 1251 (D.C.1991) ................................................................... 36

*Mackey v. United States*,
   8 F.3d 826 (D.C. Cir. 1993) ................................................................. 35

*Maldonado v. District of Columbia*,
   924 F. Supp. 2d 323 (D.D.C. 2013) ...................................................... 40

*Malley v. Briggs*,
   475 U.S. 335 (1986) ............................................................................. 42

*Martin v. Malhoyt*,
   830 F.2d 237 (D.C. Cir. 1987) ............................................................. 17

*Michigan v. Summers*,
   452 U.S. 692 .......................................................................................... 22

*Molina-Aviles v. D.C.*,
    824 F. Supp. 2d 4 (D.D.C. 2011) ........................................................................ 24

*Muehler v. Mena*,
    544 U.S. 93 (2005) ..................................................................................... 22, 27

*Muhammad v. District of Columbia*,
    584 F. Supp. 2d 134 (D.D.C. 2008) ..................................................................... 7

*Mullenix v. Luna*,
    136 S. Ct. 305 (2015) .................................................................................... 42

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) .............................................................................. 26, 28

*Novak v. Cap. Mgmt. & Dev. Corp.*,
    452 F.3d 902 (D.C. Cir. 2006) ......................................................................... 36

*Oberwetter v. Hilliard*,
    639 F.3d (D.C. Cir. 2011) .............................................................................. 17

*Pinson v. U.S. Dep't of Justice*,
    246 F. Supp. 3d 211 (D.D.C. 2017) ................................................................... 25

*Pitt v. District of Columbia*,
    491 F.3d 494 (D.C. Cir. 2007) ......................................................................... 31

*Rendall–Speranza v. Nassim*,
    107 F.3d 913 (D.C.Cir.1997) .......................................................................... 31

*Rice v. District of Columbia*,
    774 F. Supp. 2d 25 (D.D.C. 2011) .................................................................... 35

*Rodriguez v. Gay*,
    2014 WL 6853639 (D.D.C. Nov. 25, 2014) .......................................................... 7

*Roe v. Doe*,
    401 F. Supp. 3d 159 (D.D.C. 2019) ............................................................. 36, 38

*Rogala v. District of Columbia*,
    161 F.3d 44 (D.C. Cir. 1998) ..................................................................... 16, 17

*Saucier v. Katz*,
    533 U.S. 194 (2001) ..................................................................................... 23

*Saunders v. Nemati*,
    580 A.2d 660 (D.C.1990) ................................................................................. 31

*Scott v. District of Columbia*,
    101 F.3d 748 (D.C. Cir. 1996) ......................................................................... 40

*Sere v. Group Hospitalization, Inc.*,
    443 A.2d 33 (D.C. 1982) ................................................................................. 32

*Sherrod v. McHugh*,
    334 F. Supp. 3d 219 (D.D.C. 2018) ........................................................... 34, 35

*Silverman v. Barry*,
    845 F.2d 1072 (D.C. Cir. 1988) ....................................................................... 20

*Smith v. United States*,
    843 F.3d 509 (D.C. Cir. 2016) ..................................................................... 32, 33

*Thompson v. Clark*,
    142 S. Ct. 1332 (2022) ..................................................................................... 10

*United States v. Price*,
    2022 WL 16713060 (D.D.C. Nov. 3, 2022) ..................................................... 10

*United States v. Robinson*,
    414 U.S. 218 (1973) ......................................................................................... 15

*Washington v. Glucksberg*,
    521 U.S. 702, 720–21 (1997) ........................................................................... 17

*Wheeler v. Am. Univ.*,
    2022 WL 160226 (D.D.C. Jan. 18, 2022) ................................................... 14, 44

*White v. Pauly*,
    137 S. Ct. 548 (2017) ....................................................................................... 42

*Wilcox v. United States*,
    509 F. Supp. 381 (D.D.C. 1981) ...................................................................... 40

*Zhi Chen v. Monk*,
    701 F. Supp. 2d 32 (D.D.C. 2010) ................................................................... 31

**Statutes**

D.C. Code § 21-521 ................................................................................. 14, 23

## INTRODUCTION

Plaintiffs Malaika Lewis and her minor daughter, N.L., assert 26 claims against the District of Columbia and sixteen officers of the Metropolitan Police Department (MPD) relating to separate incidents that occurred in June 2020 and January 2022.  The account of these incidents included in Plaintiffs' Amended Complaint bears no resemblance to what in fact happened at either event, as the footage recorded by the officers' body-worn cameras will ultimately show, if the case is permitted to proceed.  But the Court should decline to open the gates to discovery—as this Memorandum explains—because the Amended Complaint is so rife with pleading deficiencies that it should be dismissed for failure to state a claim.

In June 2020, Ms. Lewis called MPD because her 16-year-old daughter was missing.  Ms. Lewis called from a street corner outside of her apartment.  Pursuant to policy, the responding officers sought to determine if the missing person was inside Ms. Lewis's residence.  However, Ms. Lewis refused to allow the officers to look inside of her residence for her daughter.  While the officers continued their investigation, Ms. Lewis was not permitted to re-enter the apartment, but was not otherwise restricted in her movement.  After the officers determined the whereabouts of the missing person, the incident ended.

In January 2022, Ms. Lewis was upset that N.L.'s father had not picked Plaintiff N.L. up from school.  Ms. Lewis called the District's Child and Family Services Agency (CFSA) to seek their assistance in her dispute with N.L.'s father.  When the CFSA employee who fielded Ms. Lewis's call told her that the agency would not be able to intervene in her dispute, Ms. Lewis was displeased and threatened suicide.  In response, the CFSA employee called 911, and MPD officers were dispatched to Ms. Lewis's apartment to conduct a wellness check.  When MPD officers arrived, they informed Ms. Lewis that they needed to confirm her well-being.  The officers repeatedly told Ms. Lewis that once they were able to confirm her well-being they would

leave.  But Ms. Lewis was steadfast in her refusal to allow the officers to check on her.  The officers informed Ms. Lewis that if she did not allow them to confirm her well-being they would have to involuntarily remove her from the apartment to conduct the wellness check.  Ultimately, out of options, the officers removed her from the apartment.

Based on those events, Plaintiffs allege that their First, Fourth, and Fifth Amendment rights were violated, and that several torts were committed against them, including inclusion upon seclusion, trespass, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, false arrest, and assault and battery.  As explained below, none of the allegations supporting those claims state a claim for relief, and therefore, they should be dismissed.  Further, even if Plaintiffs have alleged a violation of any of their constitutional rights, those claims should be dismissed because the individual defendants are entitled to qualified immunity.

## BACKGROUND

### I.   <u>The Incidents</u>

#### A.   <u>June 2020</u>

On June 24, 2020, at approximately 10:00 p.m., Ms. Lewis called MPD to report her 16-year-old daughter, K.R., missing.  Am. Compl. [13] ¶¶ 33, 34, 42.  Within 15 minutes, Defendant Kennedy arrived on the scene and Defendant Koenig arrived shortly thereafter, around 10:30 p.m.  *Id.* ¶¶ 46, 51.  Per Ms. Lewis's request, the officers met with her outside of her apartment on a street corner.  *Id.* ¶ 45.  The officers gathered information regarding the missing juvenile, including that K.R. had mental health issues and that Ms. Lewis had information regarding K.R.'s possible whereabouts in Riverdale, Maryland.  *Id.* ¶ 48.  Defendants Kennedy and Koenig subsequently searched MPD's Record Management System for prior records involving Ms. Lewis and K.R. and they alerted authorities in Riverdale, who began to search for K.R. around

the possible location provided by Ms. Lewis.  Am. Compl. ¶¶ 58, 59, 60.  Defendant Koenig also

informed Ms. Lewis that, pursuant to MPD policy, the officers needed to search Ms. Lewis's

apartment for the missing minor.  *Id.*  ¶ 54.  Ms. Lewis stated that she would not authorize a

search.  *Id.* ¶ 57.

Other officers arrived on the scene and continued gathering information regarding K.R.'s

possible location, including social media information.  *Id.* ¶ 66.  Defendant Hambrick called

someone who Ms. Lewis suggested may have knowledge of someone who could be with K.R. in

Maryland.  *Id.* ¶ 67.  He also informed Ms. Lewis that officers needed to search her apartment,

pursuant to MPD policy.  *Id.* ¶ 72.  In addition, officers offered to have a female officer conduct

the search of her apartment, but Ms. Lewis continued to refuse to consent to a search.  *Id.* ¶ 76.

Around 11:45 p.m., Ms. Lewis stated that she would rather abandon her efforts to file a

missing person report than allow the officers to search her apartment for her missing daughter.

*Id.* ¶ 77.  At that point, Defendant Wright arrived and asked a few more questions, including who

was watching N.L., Ms. Lewis's then six-year-old daughter, while Ms. Lewis was outside.  *Id.*

¶¶ 79–85.  Ms. Lewis told him that a friend was watching N.L. (a statement that was false), and

then freely left after informing officers that she was going back inside to check on N.L., get

water, and use the restroom.  *Id.* ¶¶ 79–89.

After Ms. Lewis exited her apartment again, Defendant Wright knocked on Ms. Lewis's

door while Defendant Charles stood nearby.  *Id.* ¶¶ 100, 103.  Defendant Wright heard a young

girl answer and pushed open the door.  *Id.* ¶¶ 104, 105.  He remained standing in the doorway,

without stepping inside the apartment, shining a flashing inside Ms. Lewis's apartment for less

than an hour while he questioned N.L.  *Id.* ¶ 106–112.  While Defendant Wright remained in the

doorway, Ms. Lewis was not permitted to re-enter her apartment.  *Id.* ¶ 122.  During that time,

Defendant Lockerman arrived on the scene around 12:30 a.m., and was able to see K.R. on a video call; after that, Defendant Lockerman relayed that she was satisfied K.R. was not in the apartment.  Am. Compl. ¶¶ 142, 143, 150.

    **B.**    <u>**January 2022**</u>

On January 13, 2022, around 5:00 p.m., four MPD officers went to Ms. Lewis's apartment in response to a report that she had called CFSA and told them she was going to commit suicide.  *Id.* ¶¶ 167, 169.  The officers asked Ms. Lewis to open the door so they could see her and verify that she was okay.  *Id.* ¶ 172.  She refused.  *Id.* ¶ 173.  Given the urgency of the situation, officers informed Ms. Lewis that they would need to break down the door if she did not open it.  *Id.* ¶ 178.  When Ms. Lewis cracked open the door, Defendant Owens placed his baton in the doorjamb to prevent the door from closing fully, and he kept it there for the remainder of the officers' time on the scene.  *Id.* ¶¶ 181, 182.

Officers knew that Ms. Lewis's daughter, N.L., was in the apartment with Ms. Lewis and requested that they see the child, initially telling Ms. Lewis that they would leave and return N.L. to Ms. Lewis after verifying that N.L. was okay.  *Id.* ¶¶ 184, 190.  After N.L. left the apartment, the officers did not permit her to go back in.  *Id.* ¶ 190.

At approximately 5:30 p.m., two paramedics arrived on the scene.  *Id.* ¶ 210.  Officers informed Ms. Lewis that she could step in the hallway to allow the paramedics to verify her well-being or the paramedics could go into her apartment without police present if she kept the door open during the examination.  *Id.* ¶¶ 212, 214.  Ms. Lewis refused.  *Id.* ¶¶ 213, 214. Around that time, Defendant Arhin, an officer trained in crisis management, arrived and talked with Ms. Lewis; he too attempted to convince Ms. Lewis to allow the officers to see her and verify her well-being.  *Id.* ¶¶ 224, 230.  She continued to refuse.  *Id.* ¶ 233.

Around 7:00 p.m., a Department of Behavioral Health (DBH) representative arrived and offered to go inside her apartment alone, without police present.  Am. Compl. ¶ 234.  Though she initially refused, Ms. Lewis finally allowed the DBH representative inside when the DBH representative informed her that, as a last resort, she would have to be taken to the hospital.  *Id*. ¶¶ 236–37.  Shortly thereafter, officers entered Ms. Lewis's apartment, handcuffed her, searched her, and transported her to a psychiatric facility.  *Id.* ¶¶ 246, 247, 249, 259

## II.   <u>Plaintiffs' Amended Complaint and Procedural History</u>

Plaintiffs filed their Amended Complaint in this case on November 21, 2022, alleging 26 constitutional and common law violations stemming from Plaintiffs' interactions with police in June 2020 and January 2022.  Am. Compl. ¶¶ 2, 9.  Specifically, Plaintiffs allege that the individual Defendants violated their Fourth Amendment rights by conducting unreasonable searches, using excessive force, and making unreasonable seizures/false arrests.  *See* Am. Compl., Counts 1, 2, 3, 12, 13, 14, 15, 18, 19.  Plaintiffs also allege that the individual Defendants violated their substantive due process rights under the Fifth Amendment (Counts 4, 16), and their First Amendment rights (Counts 5, 17).  Plaintiffs also bring a variety of common law claims, including intrusion upon seclusion (Counts 6, 20), trespass (Counts 7, 21), intentional infliction of emotional distress (Counts 8, 22), negligent infliction of emotional distress (Counts 9, 23), negligence (Counts 10, 11, 25, 26), and assault and battery (Count 24).  Plaintiffs seek to hold the District liable for their common law claims under the theory of respondent superior.  Plaintiffs seek declaratory relief, compensatory damages, punitive damages, and attorney's fees and costs.  Am. Compl. at 58.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

## ARGUMENT

### I.   Plaintiffs Fail To Allege a Violation of Their Fourth Amendment Rights.

#### A.   June 2020 Incident

With regard to the June 2020 incident, Plaintiffs allege that Defendants Wright, Charles, Hambrick, Kennedy, Koening, and Lockerman engaged in an unreasonable search of their apartment.  Am. Compl. ¶¶ 288–92.  Ms. Lewis alleges that the same officers, plus Officers Brooks and Hector, unlawfully seized her.  *Id*. ¶¶ 293–97.  And N.L. alleges that Officers Wright, Charles, Koenig, and Lockerman unlawfully seized her.  *Id*. ¶¶ 298–301.

#### 1.   Plaintiffs Fail To Allege an Unreasonable Search (Count 1)

The Fourth Amendment prohibits "unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  Determining whether a search is "unreasonable" within the meaning of the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  To that end, "[c]ourts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted."  *Id*.

Further, as with any claim that seeks to impose liability on multiple government officials for the same alleged constitutional violation, "a plaintiff must plead that each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

*Iqbal*, 556 U.S. at 676; *see, e.g.*, *Rodriguez v. Gay*, Civil Action No. 14-02033, 2014 WL

6853639, at *1 (D.D.C. Nov. 25, 2014) (dismissing claim because "Plaintiff has not stated any

facts connecting each named defendant to the alleged wrongdoing and, thus, has failed to provide

adequate notice of a claim").

There are two exceptions to the rule that a plaintiff must allege facts sufficient to show

that each defendant, through his own actions, has violated the plaintiff's rights.  First, under the

theory of bystander liability, an officer may be liable if he: "(1) knows that a fellow officer is

violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the

harm; and (3) chooses not to act." *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72

(D.D.C. 2005).  Second, under the supervisory theory of liability, an official may be held liable

for the actions of a subordinate if the official was "directly responsible for supervising the

wrongdoer." *Muhammad v. District of Columbia*, 584 F. Supp. 2d 134, 137 (D.D.C. 2008).  But

supervisory liability requires a plaintiff to establish "a high degree of fault." *Elkins v. District of*

*Columbia*, 610 F. Supp. 2d 52, 64 (D.D.C. 2009) (subsequent procedural history omitted).

"Mere negligence is not enough." *Id*.  For example, a supervisor "who merely fails to detect and

prevent a subordinate's misconduct … cannot be liable for that misconduct." *Int'l Action Ctr. v.*

*United States*, 365 F.3d 20, 28 (D.C. Cir. 2004).  "The supervisor must know about the conduct

and facilitate, approve, or condone it, or turn a blind eye for fear of what he might see." *Id*.

In Count 1, Plaintiffs attribute direct liability to Defendants Wright and Charles, alleging

that "Defendants Wright and Charles opened Plaintiffs' apartment door," and that "Defendant

Wright crossed the threshold and searched the apartment for several hours."  Am. Compl. ¶ 289.

With regard to Defendants Kennedy and Hambrick, Plaintiffs do not allege that these officers

ever approached their apartment, let alone entered it or searched it, nor do they allege that Defendants Kennedy or Hambrick supervised another officer at the scene.  Am. Compl. ¶¶ 61–67, 74, 96–102.  Therefore, any claim against these officers would depend on bystander liability.  But Plaintiffs never allege that Defendants Kennedy and Hambrick had knowledge of the alleged search or had an opportunity to prevent it.  Plaintiffs allege that Defendant Hambrick was aware that Defendant Wright "planned to go inside, knock on Ms. Lewis's door, and see who answered," *Id*. ¶¶ 96–97, and they fail to allege that Defendant Kennedy had any knowledge of Defendant Wright's intentions.

With regard to Defendant Koenig, as with Defendants Kennedy and Hambrick, Plaintiffs allege that he was aware that Defendant Wright intended to knock on Plaintiffs' door, but not that he was aware that Defendant Wright intended to allegedly open the door.  *Id*.  Plaintiffs then allege that, when Defendant Koenig entered the building and saw that Plaintiffs' door was open, he received conflicting information from Defendants Wright and Charles about the opening of the door.  *Id*. ¶¶ 123–28.  Nothing in those allegations suggests that Defendant Koenig approved or facilitated any search of Plaintiffs' apartment, and as a result, he cannot be held liable for the alleged search.

Similarly, with regard to Defendant Lockerman, Plaintiffs allege that she arrived *after* the alleged search happened and do not allege that she had any involvement in the situation prior to her arrival.  *Id*. ¶ 140.  Further, Plaintiffs allege that Defendant Lockerman was informed that a valid basis for the alleged search of the apartment existed.  *Id*. ¶ 144.  Those allegations fail to show that Defendant Lockerman approved any unconstitutional conduct.

As for Defendant Charles, although Plaintiffs allege in paragraph 289 of the Complaint that Defendant Charles opened the door herself, that allegation is directly contradicted by other

8

allegations in the Complaint.  For example, in paragraph 103, Plaintiffs allege that it was Defendant Wright who knocked on the door while Defendant Charles only "watch[ed]."  Am. Compl. ¶ 103.   Plaintiffs then allege that it was Defendant Wright who "stepped inside and shone his flashlight," *id*. ¶ 106, it was Defendant Wright who was "standing in the threshold," *id*. ¶ 107, and it was Defendant Wright who Ms. Lewis purportedly saw "standing in the threshold of her apartment," *id*. ¶ 119.  Similarly, Plaintiffs' allegations concerning Defendants Koenig and Lockerman's awareness of the situation indicate that, if anyone opened the door and searched the apartment (an allegation Defendants deny), it was Defendant Wright and not Defendant Charles. *Id*. ¶¶ 123–28, 144.  Therefore, Plaintiffs have failed to adequately allege that Defendant Charles personally engaged in any search of Plaintiffs' apartment or that she had any awareness or ability to stop the alleged search performed by Defendant Wright.

Finally, as to Defendant Wright, the Court should not credit the allegations against him in Count 1 because they are contradicted by several other purported facts in the Amended Complaint.  In Count 1, Plaintiffs allege that Defendant Wright "crossed the threshold and searched the apartment for several hours."  *Id*. ¶ 289.  But, elsewhere, Plaintiffs allege that Defendant Wright was only "standing in the threshold" at the beginning and was still "standing in the threshold" when Ms. Lewis saw him by her apartment.  *See, e.g.*, *id*. ¶¶ 107, 119. Defendant Wright then allegedly "continued to stand in Ms. Lewis's doorway."  *Id*. ¶ 137. Given the conflicting and vague nature of Plaintiffs' allegations concerning Defendant Wright, the allegation that he entered Plaintiffs' apartment and searched it for several hours should not be credited.  For these reasons, Plaintiffs have failed to plead an unreasonable search against any Defendant and Count 1 should be dismissed.

### 2.   <u>Plaintiffs Fail To Allege an Unlawful Seizure.</u>

In Counts 2 and 3, Plaintiffs allege that they were falsely arrested, but do not specify whether they are asserting a violation of their common law rights or constitutional rights.  Am. Compl. ¶¶ 293–301.  Plaintiffs also do not distinguish between their false arrest and unreasonable seizure claims.  *Id*.  However, Defendants acknowledge that the elements of these claims are substantively identical.  An alleged false arrest requires Plaintiffs to show "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint."  *Harris v. U.S. Dep't of Veterans Affs*., 776 F.3d 907, 911–12 (D.C. Cir. 2015).  An alleged unreasonable seizure first requires Plaintiffs to show "a seizure, *i.e.*, an arrest or some other use of physical force or a show of authority that in some way restrains the liberty of a person."  *Thompson v. Clark*, 142 S. Ct. 1332, 1341–42 (2022) (internal quotations, brackets, and citations omitted).  However, "[n]ot every encounter between a police officer and a private person constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Price*, Criminal Action No. 22-4, 2022 WL 16713060, at *4 (D.D.C. Nov. 3, 2022).  Under the totality of the circumstances, a "reasonable person" must believe that they are not "free to leave" the encounter.  *Id*.  The alleged seizure must also have been "unreasonable." *Thompson*, 142 S. Ct. at 1341–42.  The reasonableness analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id*. at 396–97.

### a.   <u>Ms. Lewis Was Not Unlawfully Seized (Count 2)</u>

Ms. Lewis alleges that MPD officers unlawfully detained her for several hours.  Am. Compl. ¶ 293.  But her allegations are completely conclusory and unsupported by any credible factual allegations.  Relevant here, Ms. Lewis acknowledges that she was told that pursuant to MPD policy, because a minor was reported as missing, the officers needed to search her apartment to make sure the missing person was not inside.  *Id*. ¶ 72.

With regard to Defendant Wright, although Ms. Lewis alleges twice that he "stopped her" from leaving her current position, *id*. ¶¶ 84, 87, Ms. Lewis then admits that, despite Defendant Wright's alleged seizure of her, she was freely allowed to leave the officers' presence to "go[] inside to check on N.L., get water, and use the restroom."  *Id*. ¶ 89.  Given that Ms. Lewis provides no details concerning Defendant Wright's alleged seizure of her other than that he "stopped her" and she admits that, despite being allegedly "stopped" by Defendant Wright, she was allowed to move freely, the Court should not credit Plaintiffs' bare, seemingly contradicted conclusion that she was at some point seized within the meaning of the Fourth Amendment.

Similarly, with regard to Defendants Charles, Brooks, and Hector, although Ms. Lewis alleges that they took turns "detaining" her, *id*. ¶ 122, she provides no details concerning how she was "not free to leave."  "Detained" is a legal conclusion—or at best a conclusory, unsubstantiated, factual one—neither of which is entitled to an assumption of veracity at this stage.  *Iqbal*, 556 U.S. at 678 (noting that "tenet that a court must accept as true [complaint's] allegations … [is] inapplicable to legal conclusions"); *cf. Gudger v. District of Columbia*, 74 F. Supp. 3d 47, 52 (D.D.C. 2014).  Plus, considering the balance of the Amended Complaint's factual heft, it is clear from Ms. Lewis's allegations that the only restriction of her movement was not allowing her to re-enter the apartment at that time.  *See, e.g.*, Am. Compl. ¶ 122 ("Defendants Charles, Brooks, and Hector prevented Ms. Lewis from getting any closer to her

door"); Am. Compl. ¶ 134 (alleging Defendants Charles and Brooks acted "so she could not get close to her apartment"); *id*. ¶ 152 ("When Ms. Lewis asked if she could rejoin N.L. inside, Defendants Charles and Hambrick told her that she could not."). Her only allegation concerning Defendant Hambrick's alleged seizure of her is that he allegedly prevented her from entering the apartment. *Id*. ¶ 296. Those allegations cannot support an unlawful seizure claim against Defendants Charles, Brooks, Hector, and Hambrick. As for Defendant Kennedy, Ms. Lewis fails to allege he ever detained her or restricted her movement at all, so the claim against him should be dismissed.

Ms. Lewis's supervisory liability claims against Defendants Koenig and Lockerman fare no better. Ms. Lewis fails to allege any facts showing that Defendant Koenig was aware that Ms. Lewis was allegedly being "detained" by any officer or that Koenig approved or condoned any alleged detention. *Id*. ¶¶ 123–28. Similarly, not only is Defendant Lockerman alleged to have arrived on the scene near the end of the incident, *id*. ¶ 140, but no facts are alleged showing that she had knowledge or awareness of any seizure—apart from preventing Ms. Lewis from re-entering the apartment—let alone that she approved or condoned any seizure, *id*. ¶¶ 140–55.

**b.    Plaintiff N.L. Was Not Unlawfully Seized (Count 3).**

N.L. was allegedly unlawfully seized by virtue of the fact that Defendant Wright opened the door and stood in the threshold, which allegedly prevented N.L. from leaving. Am. Compl. ¶ 300. But the Complaint includes no allegations indicating that N.L. had any actual desire to leave the apartment. Nor does the Complaint include any allegations showing that a reasonable person in her situation would have been expected to want to leave the apartment under the circumstances such that the officers could have ever understood their actions to be a restraint of her movement. To the contrary, Plaintiffs allege that it was late at night when these events transpired, *id*. ¶ 117, that N.L. was 6 years old at the time, *id*. ¶ 33, and that N.L. was allegedly

12

unclothed in the apartment, Am. Compl. ¶ 106.  As for Defendants Koenig and Lockerman, Plaintiffs do not allege that they approved any actions that restricted the movement of N.L.

### B.   January 2022 Incident

With regard to the January 2022 incident, Plaintiffs allege again that they were subject to an unreasonable search and unlawful seizure, Am. Compl. ¶¶ 327–31, and Ms. Lewis alleges further that her seizure involved excessive force, *id*. ¶¶ 334–35.  The January 2022 incident was precipitated by Ms. Lewis calling CFSA and informing a CFSA employee that she intended to kill herself.  *Id*. ¶¶ 165, 169.  The CFSA employee then, appropriately, called 911 to report the threat of self-harm, and as a result, MPD officers were dispatched to Ms. Lewis's apartment.  *Id*. ¶ 169.  When MPD officers arrived at Ms. Lewis's apartment, they informed her that because she had threatened to commit suicide they needed to check on her well-being.  *Id*. ¶ 172.  The officers repeatedly explained to Ms. Lewis that they did not need to enter her apartment and that they only needed to physically see her so that they could confirm her well-being.  *Id*. ¶¶ 172–74. Ms. Lewis, however, was adamant that she was not willing to allow the officers to check on her well-being.  *Id*.  To ensure that Ms. Lewis could be properly evaluated, the officers removed Ms. Lewis from her apartment.  *Id*. ¶¶ 257–59.

As explained below, because the officers who responded to Ms. Lewis's apartment in January 2022 had been informed that she had threatened suicide, they had probable cause to enter her apartment and seize her.  And, because the officers had probable cause to seize Ms. Lewis, their alleged actions with regard to N.L. were reasonable.

### 1.   Plaintiffs Have Not Alleged an Unlawful Seizure.

Ms. Lewis alleges that Defendants Owens, Boyd, Rubin, Cipolari, Maubry, and Arhin unlawfully seized her, Am. Compl. ¶ 327, and N.L. asserts the same claim against Defendants Boyd, Owens, Cipolari, Maubry, and Finck, *id*. ¶ 330.  Neither claim has merit.

13

a.       **Ms. Lewis Was Not Unlawfully Seized (Count 12).**

In *Cady v. Dombrowski*, the Supreme Court acknowledged what has become known as

the "community caretaking" exception to the Fourth Amendment's warrant requirement, which

allows for warrantless searches relating to the police's "caretaking" function that are "totally

divorced from the detection, investigation, or acquisition of evidence relating to the violation of a

criminal statute." 413 U.S. 433, 441 (1973). When fulfilling their caretaking duties, in the

context of a mental health seizure, if officers have probable cause to believe that the individual

seized "poses a danger to herself," then searching or seizing that individual is reasonable and

does not violate the Fourth Amendment. *See Wheeler v. Am. Univ.*, Civil Action No. 20-02735,

2022 WL 160226, at *16 (D.D.C. Jan. 18, 2022) (citations omitted). "Whether probable cause

exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting

officer at the time of the arrest." *Id*. (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

"For mental-health seizures, probable cause requires a showing of only a 'probability or

substantial chance' of dangerous behavior." *Id*. (quoting *Fisher v. Harden*, 398 F.3d 837, 843

(6th Cir. 2005)). Further, "a person's denial that they want to harm themselves or others does

not by itself eliminate ... probable cause." *Id*.

District law empowers police officers to detain individuals without a warrant who are

likely to injure themselves. *See* D.C. Code § 21-521. Here, MPD was informed that Ms. Lewis

had threatened to commit suicide. Am. Compl. ¶ 169. In conjunction with the suicide threat, the

responding officers were aware that a young child was in the residence, and they were also

concerned for the welfare of the child. *Id*. ¶ 184. As a reasonable response to a situation where

an individual has threatened to commit suicide, the officers were insistent that they have an

opportunity to personally confirm her well-being. *Id*. ¶ 172. The officers were obviously

concerned about a situation where they failed to personally confirm Ms. Lewis's well-being and

14

then she harmed herself or her child.  For example, if the officers had been permitted to visually confirm her well-being, they could have checked for marks or other evidence of self-harm. Despite the officers' reasonable requests that Ms. Lewis simply allow them to see her, she refused, placing them in an untenable situation:  Either leave and risk failing to prevent a suicide or involuntarily remove Ms. Lewis for evaluation.  Acting in an abundance of caution, the officers chose to not risk a potential suicide and to remove Ms. Lewis so that she could be properly examined.  On the alleged facts, the officers acted reasonably when they seized Ms. Lewis for evaluation and, therefore, she has failed to allege an unlawful seizure.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").[1]

**b.      Plaintiff N.L. Was Not Unlawfully Seized (Count 13).**

In January 2022, the responding officers faced a situation where a potentially suicidal individual was alone in an apartment with a 7-year-old child, and the suicidal individual was refusing to open her door so that the officers could check on her well-being.  Am. Compl. ¶¶ 167–93.  In response, the officers facilitated the removal of the minor from the apartment for her safety until it could be confirmed that the suicidal individual was not a danger to the child. *Id*.  Even assuming that N.L. has alleged a seizure, the seizure was reasonable on the facts alleged.  N.L. was not left alone or abandoned, but was instead only down the hall from her

---

[1]      The Supreme Court's recent decision in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), is not to the contrary.  Unlike the facts alleged here, in *Caniglia* the potentially suicidal individual voluntarily agreed to go to the hospital for a psychiatric evaluation, and because the issue had been forfeited below, the Supreme Court did not address whether any recognized exigent circumstances justified the officers' decision to search the individual's home and seize items. *Id*. at 1598–99.  Further, both Justice Alito and Justice Kavanaugh noted in concurring opinions that they did not understand the Court's opinion to be addressing a situation where police enter a residence without a warrant to prevent a potential suicide. *Id*. at 1601–03.

mother and in the company of a female officer who watched over her while the situation with her mother was resolved.  Am. Compl. ¶¶ 184–203.  Given the officers' reasonable concern that Ms. Lewis was potentially a danger to herself or her daughter, it would have been *unreasonable* for the officers to not ensure the well-being of N.L. while her mother's well-being was confirmed. Therefore, N.L. has failed to allege that she was unlawfully seized.

### 2. Plaintiffs Have Not Alleged an Unreasonable Search (Count 14).

In Count 14, Plaintiffs allege that Defendants Owens and Cipolari unreasonably searched their apartment.  Am. Compl. ¶ 332.  However, all of the alleged actions of Defendants Owens and Cipolari were directly related to ensuring the well-being of Ms. Lewis and preventing a potential suicide.  As explained above, under the circumstances, the officers had probable cause to fear for Ms. Lewis's well-being, and therefore, the incident searches and seizures were reasonable and not violative of Plaintiffs' Fourth Amendment rights.

### 3. Ms. Lewis Has Not Alleged That She Was Seized Using Excessive Force (Count 15).

Ms. Lewis alleges that Defendants Cipolari, Boyd, and Ahrin used excessive force when they unlawfully seized her.  Am. Compl. ¶ 334.  "An officer may use some degree of physical coercion or threat to arrest a suspect, even if the force used might appear unnecessary in hindsight."  *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 64 (D.D.C. 2018) (citations and quotations omitted).  "Whether a particular use of force is excessive depends on the facts of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.  "An officer will only be held liable if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998).

16

Ms. Lewis alleges that, after she threatened to commit suicide and after she refused to voluntarily allow herself to be examined, Defendants Cipolari and Ahrin "slammed her against the hallway wall, handcuffed her, and violently placed her in a police vehicle."  Am. Compl. ¶ 335.  Under the circumstances, those allegations do not constitute the use of excessive force.  Ms. Lewis provides no details to support her conclusory allegation that she was "violently" placed into a police vehicle, and the fact that she was handcuffed was entirely appropriate given her refusal to comply with the officers' instructions.  With regard to her allegation that she was "slammed" into the wall, even if credited, courts in this District have not found similar force to be excessive.[2]  Because the force allegedly used against Ms. Lewis was reasonable, her claim that the seizure involved excessive force fails.

## II.    <u>Plaintiffs Fail To Allege a Violation of Their Fifth Amendment Rights.</u>

Plaintiffs fail to state a plausible claim that police officers violated her Fifth Amendment due process rights in June 2020 or January 2022.[3]  Fifth Amendment due process protects substantive liberty interests.  *E.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).

---

[2]    *See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d at 548, 555 (D.C. Cir. 2011) (finding no excessive force where the officer allegedly shoved the plaintiff against a pillar, and violently twisted her arm); *Rogala*, 161 F.3d at 54–55 (finding no excessive force where the officer allegedly pulled the plaintiff out of a car, bruised her arm, and hit her head against the car); *Martin v. Malhoyt*, 830 F.2d 237 262 (D.C. Cir. 1987) (finding no excessive force where the officer allegedly threw the plaintiff into a car, slammed the door on one of his legs, grabbed his arms and pulled them behind his back, and forced him to sit in a painful position in the case).

[3]    Plaintiffs bring a substantive due process claim against the June 2020 Defendant Officers, including Defendants Brooks, Charles, Hambrick, Hector, Koenig, Lockerman, and Wright. Am. Compl. at 38 n.1, 41.  Ms. Lewis also brings a substantive due process claim against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Ahrin, and "at least two other January 2022 Defendant Officers" regarding the January 2022 incident.  *Id* ¶ 336.  Plaintiffs fail to make any allegations regarding the anonymous "two other January 2022 Defendant Officers" and claims against them should be dismissed for failure to "plead[] factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.

"[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotations and citations omitted).  Importantly, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id*. at 846 (quoting *Collins*, 503 U.S. at 129).

    When determining whether official conduct meets this "stringent requirement," the "threshold question" is whether the challenged action is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 847 n.8.  This "stringent requirement" serves "to differentiate substantive due process ... from local tort law." *FOP Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (internal quotations and citations omitted).  Courts have generally found conscience-shocking conduct only when there has been some "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*. 523 U.S. at 849.  And when the State has a "heightened obligation toward the individual"—for example, an inmate in custody—a plaintiff satisfies the conscience-shocking standard by showing that the State acted at least with "deliberate indifference" to her safety and security. *Fraternal Ord. of Police Dep't of Corr. Lab. Comm.*, 375 F.3d at 1145–46.  In other words—and as the Supreme Court has repeatedly made clear—"the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.," *Lewis*, 523 U.S. at 848; the bar is much higher.

    But before even reaching the threshold "conscience-shocking" inquiry, Plaintiffs' due process claims cannot get off the ground because the Fifth Amendment is the wrong vehicle for their claims.  "'Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a

claim.'"  *Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (quoting *Albright v. Oliver*, 510 U.S. 266 (1994)) (cleaned up).

Here, Plaintiffs base their due process claim concerning the June 2020 incident on allegations that officers "unlawfully entered and searched [Plaintiffs'] home" and "detained" them.  Am. Compl. ¶ 303.  Similarly, Ms. Lewis's claims that officers violated her substantive due process rights in January 2022 by "unlawfully detain[ing]" her and using "excessive force against her."  *Id*. ¶ 337.  But these alleged violations—unlawful search, unlawful detention, and excessive force—fall squarely within the purview of the Fourth Amendment, *see* Section I above, and are, thus, improperly brought as Fifth Amendment claims.  *See Elkins*, 690 F.3d at 552; *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 541 (D.C. Cir. 2015); *Graham,* 490 U.S. at 394.  In this way, Plaintiffs' attempt to their plead due process claims and Fourth Amendment claims "in the alternative" misses the mark:  The Fifth Amendment is not, as Plaintiffs contend, an alternative ground for finding liability under the Fourth Amendment.  *See* Am. Compl. ¶¶ 302, 336; *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 50 (D.D.C. 2021) ("[A] claim need not be certain to succeed under the more specific amendment to foreclose substantive due process analysis.").  Thus, Plaintiffs have failed to state any claim under the Fifth Amendment and Counts 4 and 16 should be dismissed.

A.      **June 2020 Incident (Count 4).**

Even if the Court evaluates the officers' conduct during the June 2020 incident under the rubric of substantive due process, Plaintiffs fail to state a claim because there is nothing about that interaction that amounts to egregious, conscience-shocking behavior.  Am. Compl. ¶ 302.

In support of their claim that officers "unlawfully entered and searched [Plaintiffs'] home," Plaintiffs allege that Defendants Charles and Wright stood in Plaintiffs' doorway for less

than an hour, pursuant to their understanding of the MPD's policy of searching homes of minor

children when a missing person report is made.  Am. Compl. ¶¶ 7, 107, 303.  Plaintiffs allege

that the officers' conduct was not justified by the MPD Missing Persons Policy because a

residence search is only required for reports of missing minors under the age of 12, and Ms.

Lewis informed the officers that the missing child was 16 years old.  *Id.* ¶¶ 55, 56, 303.

Plaintiffs further alleges that this conduct shows that officers did not "follow the proper

investigative steps" and "exceeded their authority."  *Id.* ¶¶ 303, 304.

  But these scattershot allegations are not underpinned by a valid interest under substantive

due process.  The Missing Person's Policy does not entitle Plaintiffs to hold officers to particular

"investigative steps" or procedures under the Due Process Clause because the agency policies

cannot create a substantive due process right.  *See Duckett v. Quick*, 282 F.3d 844, 848–49 (D.C.

Cir. 2002) ("[Plaintiff's] argument that due process required the [Bureau of Prisons] to follow its

own regulations must fail" because the "the procedures required before a person may be deprived

of his constitutional right to liberty are derived not from the regulation but from the Constitution

itself").

  Moreover, even if, as Plaintiffs allege, Defendants Charles and Wright were mistaken in

their belief that their actions were justified by MPD policy, their actions would still not approach

the level of "egregious" behavior necessary for a finding of a substantive due process violation.

*See* Am. Compl. ¶ 303.  It is well established that "'[i]nadvertent errors, honest mistakes, agency

confusion, even negligence in the performance of official duties, do not warrant redress'" under

the Fifth Amendment's substantive due process guarantee.  *Elkins*, 690 F.3d at 562 (quoting

*Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)); *Elkins v. District of Columbia*, 527

F. Supp. 2d 36, 49–50 (D.D.C. 2007) ("A mere … deviation from regulations and procedures

has been found insufficient to support a substantive due process claim.) (citing *Am. Fed'n of Gov't Employees, Local 446*, 475 F.3d 341, 353 (D.C. Cir. 2007)).  And Plaintiffs' repeated allegations that officers informed them that the officers needed to search the apartment pursuant to the Missing Persons Policy shows that officers believed they were following MPD policy; Plaintiffs offer no allegations to the contrary.  *See* Am. Compl. ¶ 7 ("the officers asserted that they were required to search the apartment under department policy"); *id*. ¶ 54 ("Defendant Koenig … told Ms. Lewis that pursuant to MPD policy the officers needed to search Ms. Lewis's apartment."); *id*. ¶ 72 (Defendant Hambrick informed Ms. Lewis of the same).

Indeed, while the Missing Person Policy *requires* officers to conduct a thorough search of the residences of missing juveniles under the age of 12, the policy *gives officers discretion* to conduct a thorough search of the residence "if warranted" for missing persons aged 12 and older.  *See* MPD General Order, Missing Person Report, OPS 304.03 (Nov. 1, 2012), *available at* https://go.mpdconline.com/GO/GO_304_03.pdf.  Notably, the Missing Persons Policy specifically grants discretion to officers to conduct a "thorough search," which includes, but is not limited to, "closets, under beds, attics, crawl spaces, and garages."  *Id.*  Plaintiffs do not even allege that such a search was conducted.  Plaintiffs only allege that officers stood in a doorway without stepping foot inside.  Am. Compl. ¶ 107.  Thus, at most, Plaintiffs have alleged only that officers should not have used the discretion given to them by Missing Person Policy to minimally search the home of the missing juvenile at issue here.

Plaintiffs also allege that they were "detained" for several hours.  But this is a legal conclusion, which the Court need not accept as true.  *See Iqbal*, 556 U.S. at 678 (holding that "[a] pleading that offers 'labels and conclusions' … cannot survive a motion to dismiss (quoting *Twombly*, 550 U.S. at 555)).  Indeed, Plaintiffs have only pled facts that suggest that officers

restricted Ms. Lewis's movement for an hour during the time she alleges Defendants Wright and Charles stood in her threshold; Plaintiffs have not alleged facts to show that they were similarly restricted at any other point, let alone for "several hours." *See* Am. Compl. ¶¶ 46–89 (detailing the time Ms. Lewis responded to questions outside her apartment building after calling the police regarding her missing child, but failing to allege that her presence was involuntary); *id*. ¶ 122 (alleging that she was detained and questioned "against her will" for approximately one hour during the time the Officers stood in her doorway). This distinction is important because, even if Plaintiffs were detained during that hour, officers have an absolute right to detain occupants of the residence they are searching. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'") (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n. 19 (1981)). The officers' alleged detention of Ms. Lewis cannot fairly be described as "conscience-shocking" when they have the categorical right to do so when conducting a search of her residence. Thus, Plaintiffs have failed to state a plausible claim for relief, and Count 4 should be dismissed.

**B.      January 2022 Incident (Count 16).**
.

Even if Ms. Lewis's unlawful detention and excessive force claims are properly brought under the Fifth Amendment, her allegations regarding the January 2022 incident are not conscience-shocking in light of the circumstances, and the officers' actions accorded with laws and policies governing law enforcement responses to mental health consumers.

Plaintiffs have not alleged facts sufficient to show that her alleged detainment was "so egregious" that it "shocks the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. District law grants MPD officers "who ha[ve] reason to believe that a person is mentally ill and … is

22

likely to injure himself or others if he is not immediately detained" the authority to "take that person into custody" and "transport him to a public or private hospital" "without a warrant." D.C. Code § 21-521.  Here, the officers' decision to take Ms. Lewis into custody is within their discretion and reasonable in light of the officer's knowledge at the time:  Ms. Lewis had told CFSA that she was going to commit suicide, and Ms. Lewis would not allow officers to verify that she was not a danger to herself or others.  Am. Compl. ¶¶ 169, 172.  The officers' decision to transport Ms. Lewis to a hospital was far from conscience-shocking; it was a reasonable exercise of officers' discretion to ensure Ms. Lewis's safety.

Ms. Lewis's allegation that officers used "excessive force" during this interaction are also insufficient to support a substantive due process claim.  Am Compl. ¶ 337, *see* Section I above. Ms. Lewis alleges that officers "slammed her against the hallway wall, handcuffed her, and violently placed her in a police vehicle."  Am. Compl. ¶ 335.  But the Supreme Court has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396; *see Saucier v. Katz,* 533 U.S. 194, 208 (2001) (finding that a police officer's "gratuitously violent shove" of an arrestee when he was placed in a police vehicle did not amount to excessive force).  Additionally, Ms. Lewis fails to allege any facts that support her characterization of being "slammed" or "violently" placed into a vehicle that would show the resulting force was egregious.

Moreover, the officers' use of handcuffs follows MPD policy *requiring* the use of handcuffs when transporting "mental health consumers … who are being transported for mental health services in an MPD vehicle."  MPD General Order, Interacting with Mental Health

Consumers, OPS 308.04 (Feb. 9, 2015).  Indeed, the officers' use of restraints is reasonable and prudent, given the threats of self-harm.  These allegations do not shock the conscience.

Ms. Lewis's other allegations supporting her due process claim are equally unavailing. She suggests that the officers allegedly "yell[ing] at Ms. Lewis about personal matters" and "trick[ing] N.L. into leaving the apartment" amounts to behavior that shocks the conscience, but none of these allegations show egregious behavior, even if they are true.  Am. Compl. ¶ 337. Raised voices were at least necessary to communicate with Ms. Lewis through her closed door; and—because Ms. Lewis refused to cooperate—it is reasonable to assume that officers had to repeatedly explain why they were there and what they needed Ms. Lewis to do.  *See, e.g., id.* ¶¶ 169, 172.  And even if officers had lied to get N.L. out of the apartment, a reasonable person would consider those actions justifiable, considering that she had threatened suicide directly to a government employee during a conversation she initiated, refused to allow officers to verify her safety, and was alone with a young child.  *Id.* ¶¶ 169, 172, 173.  Moreover, Ms. Lewis identifies no interest derived from a constitutional right underlying these alleged violations that, even if they were true, could underpin a due process claim.  *See Molina-Aviles v. D.C.*, 824 F. Supp. 2d 4, 9 (D.D.C. 2011) ("a plaintiff must show that the state actor was deliberately indifferent to his constitutional rights such that the conduct shocks the conscience.") (quoting *Estate of Phillips*, 455 F.3d at 403).  Thus, Plaintiffs have failed to state a plausible claim for relief, and Count 16 should be dismissed.

**III.    Plaintiffs Fail To Allege a Violation of Their First Amendment Rights.**

Ms. Lewis fails to state a First Amendment claim because she does not plausibly allege officers retaliated against her for exercising her First Amendment rights in June 2020 or January

2022. [4]  *See* Am. Compl. ¶¶ 305–309, 338–341.  To state a claim for retaliation against First

Amendment activities, a plaintiff must show that:

> (1) he or she engaged in conduct protected under the First Amendment, (2) the
> defendant took some retaliatory action sufficient to deter a person of ordinary
> firmness in plaintiff's position from speaking again; and (3) a causal link between
> the exercise of a constitutional right and the adverse action taken against him or
> her.

*Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 221 (D.D.C. 2017) (quoting *Aref v.

Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)).  Here, Ms. Lewis has failed to plead sufficient facts

to support these requirements, and her First Amendment claims should therefore be dismissed.

A.     **June 2020 Incident (Count 5)**

Ms. Lewis cannot satisfy the first prong of the First Amendment analysis for her claim

related to the June 2020 incident.  She alleges that her stated refusal to allow officers to enter her

home and stated desire to be "free from government harassment" during the June of 2020

incident are protected First Amendment activities.  Am. Compl. ¶ 306.  But they are not.  When

she refused officers' repeated pleas to search her apartment in accordance with the Missing

Person Policy, she was not engaging in a protected First Amendment activity—like protesting or

expressing a particular message or viewpoint—she was refusing to cooperate with the officers'

investigation into the reported missing minor.  *See* Am. Compl. ¶¶ 7, 54, 72, 73, 76.  This is not

the type of speech the First Amendment is designed to protect.  *See Cox v. State of La.,* 379 U.S.

559, 563 (1965) (explaining the principal that "conduct"—even if it is "intertwined with

---

[4]     Plaintiffs Lewis bring a First Amendment retaliation claim against the June 2020
Defendant Officers, including Defendants Brooks, Charles, Hambrick, Hector, Koenig,
Lockerman, and Wright.  Am. Compl. at 38 n.1, 42.  Ms. Lewis also brings a First Amendment
retaliation claim against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Ahrin, and
"at least two other January 2022 Defendant Officers" regarding the January 2022 incident.  *Id.*
¶ 338.

expression or association"—is not protected by the First Amendment); *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) ("[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (internal quotation marks omitted).  As a result, Ms. Lewis's First Amendment arguments cannot succeed.

But even if the Court reached the third prong of the retaliation analysis, Ms.  Lewis's claim would still be doomed.  To satisfy this third prong of the retaliation analysis, a plaintiff must not only allege that the defendant had an "improper motive," but also show "evidence of causation." *Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) (quoting *Crawford-El v. Britton*, 523 U.S. 574 (1998)); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.") (emphasis in original).  In other words, it is plaintiff's burden to show that the officers acted based on an improper motivation to chill plaintiff's First Amendment rights.  *See Kimberlin v. Quinlan*, 199 F.3d 496, 502–03 (D.C. Cir. 1999) (citing *Crawford-El*, 523 U.S. at 600).  And "[t]he improper motive must be a but-for cause of the government action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) (quoting *Nieves*, 139 S. Ct. at 1722).

Here, Ms. Lewis does not present any facts showing the officers had any animus towards her First Amendment activity, let alone that they acted on such beliefs.  Instead, the facts alleged show officers acted based on their understanding that "they were required to search the apartment based on department policy."  *See* Am. Compl. ¶¶ 7; *see id.* ¶ 54 ("Defendant Koenig

stating the same); *id*. ¶ 72 (Defendant Hambrick stating the same).  Ms. Lewis specifically cites

Defendant Hambrick's statement that "[h]ad [she] let [him] go in, none of this would have

happened" as evidence of retaliation.  Am. Compl. ¶ 308.  But Defendant Hambrick's statement

is consistent with the officers' alleged belief that they needed to search Plaintiffs' apartment and,

if she had permitted them to do so, they would not have had to enter without her permission.

That officers believed they were compelled to search Ms. Lewis's apartment forecloses a First

Amendment claim because Ms. Lewis cannot plausibly allege that the search would not have

happened "but for" a retaliatory motive.  *See Comm. on Ways & Means, United States House of*

*Representatives*, 45 F.4th at 340 (finding plaintiffs could not show that the executive action

"would not have happened absent a retaliatory motive" because a statute compelled the agency to

take the challenged action).

Similarly, Ms. Lewis has not plausibly alleged that her detention during the search of her

residence was a retaliatory act.  In fact, during a search, officers have the absolute right to detain

occupants of the residence they are searching.  *See Muehler*, 544 U.S. at 98.  Again, Ms. Lewis

has failed to allege any retaliatory motive for the officers' actions.

**B.     January 2022 Incident (Count 17)**

As with the June 2020 incident, Ms. Lewis does not assert that she was exercising any

First Amendment right in January 2022 when the officers allegedly retaliated against her speech.

Ms. Lewis alleges that her refusal to engage with the police officers during the January 2022

incident is a protected First Amendment activity.  Am. Compl. ¶ 308.  But, as explained above,

*see* Section III.A, it is not, and Ms. Lewis cannot satisfy the first prong of the First Amendment

analysis.

Ms. Lewis has also failed with respect to the January 2022 incident to allege facts sufficient to satisfy the third prong of the First Amendment retaliation standard.  As explained above, the alleged retaliatory actions—entering Ms. Lewis's apartment, convincing her to let N.L. out of the apartment, placing Ms. Lewis in handcuffs, and taking her to a hospital after officers were unable to verify her safety via voluntary compliance—all emanate from statutes and policies that guide police officers' interactions with mental health consumers when officers are concerned about a risk of self-harm.  *See* Section II.B.  Ms. Lewis cites Defendant Ahrin's statement during the January 2022 incident that "[h]ad [she] spoken to [them], all this would not have transpired."  Am. Compl. ¶ 341.  Rather than supporting Ms. Lewis's argument of an untoward motivation, this statement shows that the officers' actions are the natural consequence of Ms. Lewis's actions and the officers' safety concerns; it is not a plausible admission of retaliatory intent.  *See Comm. on Ways & Means, United States House of Representatives*, 45 F.4th at 340.  Ms. Lewis's claim of First Amendment retaliation should thus be dismissed based on a lack of facts tending to show "improper motive" or other "evidence of causation." *Daugherty,* 891 F.at 391.

Moreover, the circumstances alleged here are similar to those of a retaliatory arrest claim, in which a plaintiff must establish the absence of probable cause: "[t]he causal inquiry is complex because protected speech is often a wholly legitimate consideration for officers … ." *Nieves*, 139 S. Ct. at 1723–74.  Here, for the reasons described above, *see* Section I.B.1.a., Ms. Lewis cannot establish an absence of probable cause for taking into custody and transporting her to a hospital.

## IV.   **Plaintiffs Fail To Allege Intrusion Upon Seclusion (Counts 6 and 20).[5]**

Plaintiffs allege that the tort of intrusion upon seclusion was committed during the June 2020 incident by Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman, Am. Compl. ¶ 310, and during the January 2022 incident by Defendants Owens and Cipolari, *id*. ¶ 349.  Plaintiffs allege that Defendant District of Columbia should be held liable for the actions of those Defendants under the doctrine of respondeat superior.  *Id*. ¶¶ 310, 351

"The tort of intrusion upon seclusion has three elements: (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person."  *Garay v. Liriano*, 839 F. Supp. 2d 138, 144 (D.D.C. 2012)

For the same reasons that Plaintiffs have failed to allege that an unreasonable search occurred during either the June 2020 or January 2022 incidents, Plaintiffs have failed to allege an intrusion upon seclusion during either incident.  Because the officers' actions were reasonable, they necessarily would not be "highly offensive" to a reasonable person, and Plaintiffs claim of intrusion upon seclusion fails as to all of them.  And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.

---

[5]     If the Court dismisses Plaintiffs' constitutional claims, it need not address their common law claims because the exercise of supplemental jurisdiction would not be appropriate here. "When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider judicial economy, convenience, fairness, and comity."  *Betz v. Howard Univ. Hosp.*, Civil Action No. 22-1578, 2023 WL 130734, at *4–5 (D.D.C. Jan. 9, 2023).  Here, as in *Betz*, *see id*., because no discovery has occurred, the Court has no particular familiarity with the issues presented, and Plaintiffs would not be prejudiced, the Court should not exercise supplemental jurisdiction over their common law claims

## V.     Plaintiffs Fail To Allege Trespass (Counts 7 and 21).

Plaintiffs allege that the tort of trespass was committed during the June 2020 incident by Defendants Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman, Am. Compl. ¶ 312, and during the January 2022 incident by Defendants Owens and Cipolari, *id*. ¶ 352.  Plaintiffs allege that Defendant District of Columbia should be held liable for the actions of those Defendants under the doctrine of respondeat superior.  *Id*. ¶¶ 314, 354

"The tort of trespass in the District of Columbia is the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property." *Morgan v. Barry*, 12  Fed. Appx. 1, 3 (D.C. Cir. 2000) (internal quotation marks and citations omitted).

For the same reasons that Plaintiffs have failed to allege that an unreasonable search occurred during either the June 2020 or January 2022 incidents, Plaintiffs have failed to allege a trespass during either incident.  Because the officers' alleged actions were reasonable, they did not invade or disrupt Plaintiffs' exclusive possession of their property, and Plaintiffs' trespass claim fails as to all of them.  And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.

## VI.    Plaintiffs Fail To Allege Intentional Infliction of Emotional Distress.

Plaintiffs allege the tort of intentional infliction of emotional distress (IIED) was committed during the June 2020 incident by the District and Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, Lockerman, and Wright, Am. Compl. ¶ 315, and during the January 2022 incident by the District and Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 defendant officers, *id.* ¶ 355. Plaintiffs allege that Defendant District of Columbia should be held liable for the actions of those

Defendants under the doctrine of respondeat superior.  *Id.* ¶ 317.

"Under District of Columbia tort law, a plaintiff seeking relief for IIED must offer proof of 'extreme or outrageous conduct' that intentionally or recklessly causes the plaintiff to suffer 'severe emotional distress.'"  *Pitt v. District of Columbia*, 491 F.3d 494, 505–06 (D.C. Cir. 2007) (quoting *Joyner v. Sibley Mem. Hosp.,* 826 A.2d 362, 373 (D.C.2003)).  "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)).  Additionally, to satisfy the "severe emotional distress" requirement, a plaintiff cannot merely show that she "suffer[ed] from mental anguish and stress."  *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93–94 (D.D.C. 2015).  Instead, plaintiffs must show "the level of severe emotional distress," which is "so acute ... that harmful physical consequences [are likely] to result."  *Id.* (cleaned up).

### A.   <u>June 2020 Incident (Count 8)</u>

As a threshold issue, Count 8 should be dismissed because it is time barred.  A one-year statute of limitations applies to IIED claims when the "nature of the action rest[s]  … on the other torts and the emotional distress aspect of the claim was essentially an outgrowth of the other pleaded torts." *Saunders v. Nemati*, 580 A.2d 660, 662 (D.C.1990).  Here, the IIED claim arises out of the same events for which plaintiff alleges a number of other torts, and the one-year statute of limitations bars Plaintiffs from bringing it here.  *See Rendall–Speranza v. Nassim*, 107 F.3d 913, 920 (D.C.Cir.1997) (applying a one year statute of limitations to a an intentional infliction of emotional distress claim that was intertwined with a battery claim);  *Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 37 (D.D.C. 2010) (applying a one year statute of limitations to an

IIED claim because it "is based on the same events as her claims for assault, battery, false arrest and false imprisonment").

Even if it were not time barred, Ms. Lewis has failed to plead allegations that, even if true, would support an IIED claim. For starters, the challenged conduct in June 2020—officers standing in the doorway of Ms. Lewis's apartment and allegedly detaining her during a search compelled by a credible report of missing 16-year-old girl with mental health issues—were not "beyond all bounds of decency" and "utterly intolerable in a civilized community;" they were reasonable, responsive to the circumstances, and consistent with every rational parents' expectations of how the police should operate under the circumstances. *See* Section II.A. above (analyzing whether officers' actions were so egregious they shocked the contemporary conscience under the substantive due process standard). At a minimum, Plaintiffs have not alleged facts showing that officers acted with the purpose of causing severe emotional distress or recklessly caused it. On the contrary, the only allegations Plaintiffs identify as motivation for the officers' conduct is their repeated statements that they needed to search Plaintiffs' apartment pursuant to the Missing Person Policy. *See* Am. Compl. ¶¶ 7, 54, 72.

Because officers' conduct was not "reckless, extreme, and outrageous," Plaintiffs' alleged resulting distress—regardless of its severity—is insufficient to support an IIED claim. *See Smith v. United States*, 843 F.3d 509, 515–16 (D.C. Cir. 2016) ("[Plaintiff's] distress from the arrest would not suffice [for a IIED claim] because the officers had probable cause to arrest him."). Even if the Court reached that element, Plaintiffs have not pled that their distress was sufficient to meet the standard of it being "so acute" that harmful physical consequences are likely to result; rather, they only vaguely assert that they have suffered "lingering trauma." Am. Compl. ¶ 316; *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982); *Cf. Larijani v.*

*Georgetown Univ.*, 791 A.2d 41, 42 (D.C. 2002), 791 A.2d at 43 (finding severe emotional distress because plaintiff suffered severe and permanent injuries including involuntary body tremors, cold sweats, hysteria, muscular pain, hyperventilation, depression, and a traumatized psyche).

Accordingly, Plaintiffs' IIED claim related to the June 2020 incident fails as to each of the individual officers. And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.

**B.      January 2022 Incident (Count 22)**

Similarly, Plaintiffs have failed to plead allegations that would support an IIED claim for the January 2022 incident. Plaintiffs allege that the officers unlawfully detained Ms. Lewis, used excessive force against her, tricked Plaintiffs into leaving their apartment, and yelled about personal matters. For the reasons stated above, *see* Section II.B, these actions were not "beyond all bounds of decency" and "utterly intolerable in a civilized community;" they were responsive to the circumstances and followed statutes and protocol guiding officers' actions in a mental health crisis. Plus, as above, Plaintiffs pled no facts that could show that the officers acted with the purpose of causing severe emotional distress or recklessly caused it.

Plaintiffs' allegations regarding their "severe emotional distress" following the January 2020 incident are likewise insufficient for the same reasons as her June 2020 allegations. Again, because the officers' conduct was not "reckless, extreme, and outrageous," Plaintiffs' alleged resulting distress—regardless of its severity—is insufficient to support an IIED claim. *See Smith*, 843 F.3d at 515–16. And, for the reasons described above, the "lingering trauma" that they allege resulted from the January 2022 incident is insufficient to state an IIED claim.

Accordingly, Plaintiffs' IIED claim related to the January 2022 incident fails as to each of the individual officers. And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.

**VII.  Plaintiffs Fail To Allege Negligent Infliction of Emotional Distress.**

Plaintiffs allege the tort of negligent infliction of emotional distress (NIED) was committed during the June 2020 incident by the District and Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, Lockerman, and Wright, Am. Compl. ¶ 318, and during the January 2022 incident by the District and Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other January 2022 defendant officers, *id.* ¶ 359. Plaintiffs allege that the District should be held liable for the actions of those Defendants under the doctrine of respondeat superior. *Id.* ¶¶ 320, 362.

To prove a NIED claims in the District, a plaintiff must show "'that he or she was (1) in the 'zone of danger;' which was (2) created by the defendant's negligence; (3) making the plaintiff fear for his or her own safety; resulting in (4) emotional distress that was serious and verifiable.'" *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 106 (D.D.C. 2018) (quoting *Jograj v. Enter. Servs., LLC*, 270 F.Supp.3d 10, 26–27 (D.D.C. 2017)).

Regarding the second prong, because Plaintiffs' NIED claims are predicated on their negligence claims, Plaintiffs' NIED claims cannot succeed for the reasons described below. *See* Section VIII. Regarding the first and third prong, Plaintiffs' conclusory statements that they were placed "in a zone of danger wherein Plaintiffs feared for their own safety" does not suffice to state a valid claim. Am. Compl. ¶¶ 319, 360. "Considering the 'strong public policy considerations [that] counsel against imposing virtually infinite liability for negligent conduct,' the 'zone of danger' test is stringent." *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 262 (D.D.C.

2018) (quoting *Mackey v. United States*, 8 F.3d 826, 831 (D.C. Cir. 1993)).  For example, the fear "may be based upon a high risk of physical impact" and the "classic example is that of the reckless driver who speeds by a pedestrian, missing her by only inches." *Id.* (internal quotation marks and citations omitted).  Plaintiffs have pled no facts to suggest they "feared for [their] safety" during either incident.

Regarding the fourth prong, Plaintiffs have not supplied facts showing that their alleged injuries are serious and verifiable.  "'Serious and verifiable' means that the distress must have manifested in an external condition or physical symptoms." *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) (quoting *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C.1991)).  For the June 2020 incident, Plaintiffs only vaguely allege that they have suffered "emotional and mental turmoil." Am. Compl. ¶ 319.  Similarly, Plaintiffs allege that they were "distressed, angry, anxious" and "humiliated" *during* the January 2022 incident and have experienced "lingering traumas" since then.  *Id.* ¶ 361.  None of these allegations show that the alleged distress rose to the level of manifesting in "an external condition or physical symptom."

Accordingly, Plaintiffs' NIED claim fails as to each of the individual officers.  And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.  Counts 9 and 23 should be dismissed accordingly.

**VIII.  <u>Plaintiffs Fail To Allege Negligence (Counts 10-11, 25-26).</u>**

Plaintiffs allege the tort of negligence was committed during the June 2020 incident by the District and Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, Lockerman, and Wright, Am. Compl. ¶ 321, and during the January 2022 incident by the District and Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022

defendant officers, *id.* ¶ 365.  Plaintiffs allege that Defendant District of Columbia should be held liable for the actions of those Defendants under the doctrine of respondeat superior.  *Id.* ¶¶ 323, 367.

Negligence claims require that the plaintiff to show "'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'"  *Hill v. Metropolitan African Methodist Episcopal Church,* 779 A.2d 906, 908 (D.C. 2001) (quoting *Levy v. Schnabel Found. Co.,* 584 A.2d 1251, 1255 (D.C.1991)); *see also Butera v. District of Columbia,* 235 F.3d 637, 659 (D.C. Cir. 2001).  "It is axiomatic that under a negligence regime, one has a duty to guard against only foreseeable risks."  *Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 911–12 (D.C. Cir. 2006) (internal citation and quotation marks omitted).  But "[w]hether a duty exists is not simply a question of foreseeability [either]," rather, it "involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution."  *Gilbert*, 990 A.2d at 995 n.16 (quoting *Knippen v. Ford Motor Co.*, 546 F.2d 993, 1000 (D.C. Cir. 1976)) (internal quotation marks omitted).  For negligence claims against law enforcement officers, "the inquiry is whether the officer's conduct violated the standard of care of a reasonably prudent police officer."  *District of Columbia v. Chinn*, 839 A.2d 701, 706–07 (D.C. 2003).  Plaintiffs have failed to plead sufficient facts to support the elements of a negligence claim for either the June 2020 or the January 2022 incidents, and these claims should be dismissed in their entirety.

A.    **June 2020 Incident (Counts 10-11)**

As an initial matter, Plaintiffs fail to state negligence claims regarding officers' conduct during the June 2020 incident because they have not identified any duty that was breached.  *Roe v. Doe*, 401 F. Supp. 3d 159, 165 (D.D.C. 2019) ("The foundation of modern negligence law is

the existence of a duty owed by the defendant to the plaintiff.") (quoting *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010)).  Ms. Lewis broadly contends that the officers had a duty "to properly respond to her request for aid," and the officers allegedly breached this duty by failing to "follow credible leads to find K.R."  Am. Compl. ¶ 322.  But this conclusory statement conflicts with the specific allegations in the Amended Complaint.  Namely, Plaintiffs allege that Defendants Kennedy and Keonig alerted authorities in Riverdale, Maryland of K.R.'s potential location within approximately half an hour of the officers' arrival on the scene; and, at the officers' request, the Riverdale authorities went to look for K.R. around the location that Ms. Lewis's Find My iPhone application indicated K.R. could be.  *See* Am. Compl. ¶¶ 46, 60, 61. During the first thirty minutes of their arrival, Defendants Kennedy and Koenig also questioned Ms. Lewis, searched MPD's Record Management System for prior records involving Ms. Lewis or K.R., and informed Ms. Lewis that officers also needed to search her apartment.  *Id.* ¶¶ 46–54, 59.  Ms. Lewis has not identified any "credible lead" the officers failed to pursue or any way in which they should have "properly responded" to her request for assistance.  *Id.* ¶ 322.  Indeed, even assuming the "lead" Ms. Lewis supplied was gold, common sense dictates that any reasonable prudent officer would still follow department policy and pursue all potential avenues of locating the missing child unless and until the child's location is confirmed.

Ms. Lewis only includes several conclusory allegations in support of her negligence claim—that officers "detained [Plaintiffs] for four hours," "breach[ed] the sanctity of their home," and "traumatized them in front of their neighbors"—but these allegations are, as discussed above, mischaracterizations of the facts actually alleged and not evidence of the police officers breaching any standard of care.  *See* Sections I, II.A; *Rice*, 626 F. Supp. 2d at 24 ("The trial court is not bound by a plaintiff's characterization of an action …") (quoting *Chinn*, 839

A.2d at 708).  Without more, Plaintiffs have not—and cannot—identify any way in which

officers breached a duty to Ms. Lewis or how a deviation from that duty caused harm to her.  *See*

*Roe v. Doe*, 401 F. Supp. 3d 159, 165 (D.D.C. 2019) ("Negligence is a breach of duty; if there is

no duty, there can be no breach, and hence no negligence.") (quoting *Gilbert v. Miodovnik*, 990

A.2d 983, 988 (D.C. 2010)).  Thus, Count 10 should be dismissed.

     Similarly, N.L, broadly contends that officers "owed [her] a duty of care in entering her

home," but she fails to define this duty.  Am. Compl. ¶ 325.  N.L. only alleges that officers woke

her up "in the middle of the night," questioned her, and separated her from her mother.  *Id.*  But

these allegations are untethered to any identifiable duty that could give rise to a negligence

claim.  Indeed, Ms. Lewis called 911 for assistance around 10:00 PM at night while N.L. slept.

*Id.* ¶ 42.  And officers did not cross the threshold of the apartment to conduct their search and

talk with N.L. for under an hour.  *Id.* ¶ 107.  Without more, N.L. has failed to plead a duty that

officers breached and how a deviation from that duty caused N.L harm.  *Rice*, 626 F. Supp. 2d at

24.  And, because Plaintiffs have failed to state a claim against any individual Defendant, there is

no claim for which the District could be vicariously liable.  Thus, Count 11 should be dismissed.

    **B.**    **<u>January 2022 Incident (Counts 25-26)</u>**

     Ms. Lewis also fails to define the duty of care owed to her during the January 2022

incident; Ms. Lewis only alleges that officers have a duty to "act reasonably" regarding an

allegation that she was going to harm herself, but Plaintiff does not specify what that would

entail.  Indeed, as explained above, *see* Section I, II.B, officers acted in accordance with MPD

policy and District statutes for responding to mental health consumers in crisis who threatened

self-harm.  *See District of Columbia v. Harris*, 770 A.2d 82, 91 (D.C. 2001) (finding that an

MPD handbook and "[r]ules of this type may provide evidence of a standard of reasonable care

in negligence actions").  Additionally, Ms. Lewis's allegation that officers used excessive force—"dragging [her] from her home"—is not properly included in a negligence claim.  *See Chinn*, 839 A.2d at 705, 711 ("negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care").

N.L.'s negligence claim suffers from many of the same defects as Ms. Lewis's claim. She too alleges a vague duty of care—"a duty to act in the interests of her well-being when conducting [the officers'] wellness check"—but fails to identify how the officers should have ensured her well-being.  Am. Compl. ¶ 368.  N.L. suggests officers should not have "tricked her into leave her house … , threatened to take her away from her mother if her mother did not comply with the officers' demands … , and detained [her] in the lobby for several hours."  *Id.* But, as explained above, *see* Section I, II.B, the officers' actions were reasonable in light of the information they had:  Ms. Lewis had threatened to kill herself, she was alone with a young child, and she was refusing to allow officers to see her in person to verify her safety.  Plaintiff N.L has failed to identify an applicable standard of care and—even if she had—any conduct breaching that duty during the January 2022 incident.

Both Plaintiffs also fail to properly plead the remaining elements of the of a negligence claim.  They merely state in conclusory fashion that the officers' "unlawful acts directly and proximately caused [their] compensable injuries … ."  Am. Compl. ¶¶ 366, 368.  Such a "formulaic recitation of the elements of a cause of action" does not suffice to state a claim for relief.  *Iqbal,* 556 U.S. at 678.  Here, Plaintiffs failed to identify the injury allegedly caused by the negligence and how Defendants' actions caused the injury.  And, because Plaintiffs have

failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.  Accordingly, Counts 25 and 26 should be dismissed.

## IX.    **Plaintiffs Fail To Allege False Arrest (Counts 18-19).**

"The tort action of false arrest, both in common law and as a constitutional variant, requires resolution of whether the arresting officer was justified in ordering the plaintiffs' arrest. If so, the conduct of the arresting official is privileged and the action fails." *Wilcox v. United States*, 509 F. Supp. 381, 384 (D.D.C. 1981).  "The focal point of a false arrest claim is 'whether the arresting officer was justified in ordering the arrest of the plaintiff.'"  *Maldonado v. District of Columbia*, 924 F. Supp. 2d 323, 330 (D.D.C. 2013) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C. Cir. 1996)).  "A plaintiff may not allege a § 1983 claim for false arrest unless the arresting officer lacked probable cause to believe a crime was committed." *Id.*

For the same reasons that Ms. Lewis has failed to allege she was unlawfully seized in January 2022, she has failed to allege a false arrest.  And, because Plaintiffs have failed to state a claim against any individual Defendant, there is no claim for which the District could be vicariously liable.

## X.    **Plaintiffs Fail To Allege Assault and Battery (Count 24).**

Ms. Lewis fails to allege a common law assault and battery claim stemming from the January 2022 incident.  In the District, assault is defined as "an intentional attempt or threat to do physical harm to another" and battery is defined as "an intentional act that causes harmful or offensive bodily contact." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 913 (D.C. Cir. 2015) (citing *Evans–Reid v. District of Columbia,* 930 A.2d 930, 937 (D.C. 2007)).  Every time police use force to make an arrest, they are committing an assault and battery. *Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 168 (D.D.C. 2020).  But the police have a qualified

privilege to commit both torts when using "reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006) (quoting *Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C.1993)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

Here, the officers' actions satisfy the requirements for qualified privilege. "[T]he test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 90–91 (D.D.C. 2015) (internal quotation marks and citation omitted). Ms. Lewis alleges that officers "dragged [her] from her home, violently placed her in handcuffs, conducted an intrusive … search of her person, and involuntarily transported her to a psychiatric facility." Am. Compl. ¶ 363. For the reasons described above, *see* Section I, II.B, the officers deployed a reasonable amount of force when taking Ms. Lewis into custody. And a hypothetical reasonable police officer would have exercised the same judgment in that situation, given the circumstances and the policies and statutes that inform officers' work during a mental health crisis. *See* Section II.B above. As a result, Ms. Lewis fails to state an assault and battery claim, and Count 24 should be dismissed.

XI.    **Plaintiffs' Constitutional Claims Should Be Dismissed Because the Individual Defendants Are Entitled to Qualified Immunity.**

In Counts 1–5, and 12–19, Plaintiffs allege that their constitutional rights were violated. Even assuming that those claims are adequately pleaded—they are not, as explained at the outset—the claims should still be dismissed because the individual Defendants are entitled to qualified immunity.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (explaining that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and that, "[w]hen properly applied, it protects all but the plainly incompetent or those who knowingly violate the law").

To defeat this second prong of a claim of qualified immunity, a plaintiff must show that the hypothetical constitutional infringement violated clearly established statutory rights of which a reasonable person would have known.  *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *see also Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (noting that plaintiff bears the burden of showing that the constitutional right in question was clearly established).  Crucially, the "clearly established law" must not be defined "at a high level of generality," and instead must address the particular facts and circumstances of the individual case.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Wesby*, 138 S. Ct. at 590.  In sum, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

A.     **The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' Fourth Amendment Claims.**

Plaintiffs cannot show that it was clearly established that the actions of the individual Defendants violated their Fourth Amendment rights during either the June 2020 or January 2022 incidents.

1.     **June 2020 Incident**

With regard to the June 2020 incident, Plaintiffs must show with as to their allegations against each specific individual Defendant that it was clearly established that their respective actions were unconstitutional.  They clearly cannot meet that burden with respect to Defendants Hambrick, Kennedy, Koening, and Lockerman, given that Defendants Hambrick and Kennedy are not alleged to have approached or entered the apartment, and that there are no allegations indicating that Defendants Koening or Lockerman entered the apartment or that they approved or condoned any searches of the apartment.  Further, with regard to Defendant Charles, although there is a conclusory allegation that she opened Plaintiffs' door, the remaining allegations clearly portray Defendant Wright as the officer who alleged opened the door, while Defendant Charles watched.  Therefore, the question is whether it is clearly established that an officer who watches another officer alleged engage in an unreasonable search, absent any prior knowledge or warning, is liable for the underlying violation as a bystander.  Because it is not clearly established that bystander liability exists in that situation, Defendant Charles is entitled to qualified immunity.

As for the alleged unlawful seizure of N.L. by Defendants Koenig and Lockerman, it is not clearly established that their general awareness that Defendant Wright was standing in the threshold of a door, late at night when a young child was inside, is approval or condoning of an unlawful seizure.  Similarly, because Defendant Charles is not alleged to have stood in the

doorway or in any way obstructed movement in or out of the apartment, it is not clearly established that her actions constituted an unlawful seizure of someone inside the apartment. Finally, under the circumstances, it is not clearly established that a reasonable person in the position of N.L., given her age and the late hour, would have believed her movement was being restricted by Defendant Wright standing in the doorway.

2.    **January 2022 Incident**

The Supreme Court's recent decision in *Caniglia v. Strom*, 141 S.Ct. 1596 (2021), demonstrates that it is not clearly established that the officers' actions in responding to a potentially suicidal person were violative of their constitutional rights.  In *Caniglia*, a husband expressed suicidal thoughts to his wife.  *Id*. at 1598.  After the wife could not reach her husband the following day, she called police and asked them to check on his well-being.  *Id*.  The husband agreed to go to the hospital for an examination.  *Id*.  However, after the husband had left, the officers entered his house and seized weapons.  *Id*.  The Supreme Court found that the warrantless search conducted by the officers was unconstitutional and was not covered under a "community caretaking" rule.  *Id*. at 1599.  Relevant here, in his concurrence, Justice Alito observed that "[t]his case falls within one important category of cases that could be viewed as involving community caretaking: conducting a search or seizure for the purpose of preventing a person from committing suicide."  *Id*. at 1601.  Justice Alito noted further that "we have not addressed Fourth Amendment restrictions on seizures like the one that we must assume occurred here, i.e., a short-term seizure conducted for the purpose of ascertaining whether a person presents an imminent risk of suicide."  *Id*.  District courts have also noted the unsettled nature of the law in this area.  *See, e.g.*, *Wheeler*, 2022 WL 160226, at *15; *Lawhon v. Edwards*, 477 F. Supp. 3d 428, 438–39 (E.D. Va. 2020), affd sub nom. *Lawhon v. Mayes*, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021) (citations, quotations, and brackets omitted).

44

Given that officers had credible information that Ms. Lewis had threatened to commit suicide, especially in the face of her refusal to allow her well-being to be checked, it was not clearly established that entering her apartment and involuntarily removing her so that she could be evaluated was a violation of her constitutional rights.

**B.**     **The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' Fifth Amendment Claim.**

For the same reasons that Plaintiffs cannot show that individual Defendants violated the Fourth Amendment, Plaintiffs cannot show that it was clearly established that the actions of the individual Defendants violated their Fifth Amendment rights during either the June 2020 or January 2022 incidents.

**C.**     **The Individual Defendants Are Entitled To Qualified Immunity on Plaintiffs' First Amendment Claim.**

Plaintiffs cannot show that it was clearly established that the actions of the individual Defendants violated their First Amendment rights during either the June 2020 or January 2022 incidents.  Officers present at these incidents had no reason to believe that Ms. Lewis's refusal to cooperate with them constituted a clearly established exercise of a First Amendment right.  Ms. Lewis was not, for example, expressing a particular viewpoint, attending a protest, or handing out flyers expressing a message.  Nor would officers have reasonably believed that taking actions they believed to be consistent with MPD policy and their statutory obligations could chill speech and violate constitutional rights.  There was no clearly established First Amendment right at issue in either of these incidents, and individual Defendants are entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

45

Date: January 27, 2023.                    Respectfully Submitted,


                                           BRIAN L. SCHWALB
                                           Attorney General for the District of Columbia

                                           STEPHANIE E. LITOS
                                           Interim Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Matthew R. Blecher*
                                           MATTHEW R. BLECHER [1012957]
                                           Chief, Civil Litigation Division, Equity
                                           Section

                                           */s/ Richard P. Sobiecki*
                                           RICHARD P. SOBIECKI [500163]
                                           PAMELA A. DISNEY [1601225]
                                           Assistant Attorneys General
                                           Civil Litigation Division
                                           400 6th Street, NW
                                           Washington, D.C. 20001
                                           Phone: (202) 805-7512
                                           Email: richard.sobiecki@dc.gov

                                           *Counsel for Defendants*

46