**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| MALAIKA LEWIS *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-03369-RDM |
| THE DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION ............................................................................................................. 1

SUMMARY OF ARGUMENT ......................................................................................... 1

FACTS .............................................................................................................................. 2

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 6

   I.   Plaintiffs Plausibly Allege Violations of Their Fourth Amendment Rights. ..................... 6

      A.   June 2020 ............................................................................................................... 6

      B.   January 2022 ........................................................................................................ 15

   II.   Plaintiffs Plausibly Allege Violations of Their Fifth Amendment Rights. ...................... 22

      A.   June 2020 (Count 4) ........................................................................................... 22

      B.   January 2022 (Count 16) ..................................................................................... 25

   III.   Plaintiffs Plausibly Allege Violations of Their First Amendment Rights. ................... 26

      A.   June 2020 (Count 5) ........................................................................................... 27

      B.   January 2022 (Count 17) ..................................................................................... 29

   IV.   Plaintiffs Plausibly Allege Intrusion Upon Seclusion (Counts 6, 20). ......................... 30

   V.   Plaintiffs Plausibly Allege Trespass (Counts 7, 21). ...................................................... 31

   VI.   Plaintiffs Plausibly Allege Intentional Infliction of Emotional Distress ("IIED"). ....... 31

A.    June 2020 (Count 8)................................................................................. 31

B.    January 2022 (Count 22)......................................................................... 33

VII.    Plaintiffs Plausibly Allege Negligent Infliction of Emotional Distress ("NIED")

(Counts 9, 23).................................................................................................... 34

VIII.    Plaintiffs Plausibly Allege Negligence (Counts 10-11, 25-26). .................................. 36

IX.    Plaintiffs Plausibly Allege False Arrest (Counts 18-19).............................................. 38

X.    Plaintiffs Plausibly Allege Assault & Battery (Count 24). ................................. 38

XI.    Defendant Officers Are Not Entitled to Qualified Immunity. ...................................... 39

A.    Fourth Amendment (Counts 1-3, 12-15) ...................................................... 39

B.    Fifth Amendment (Counts 4, 16)................................................................ 43

C.    First Amendment (Counts 5, 17) ............................................................... 43

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Addison v. City of Baker City*, 758 F. App'x 582 (9th Cir. 2018) ................................. 27

*Akinmboni v. United States*, 126 A.3d 694 (D.C. 2015) ............................................. 13

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001) .................................................. 39

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ......................................................... 27

*Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003) .................................................. 42, 43

*BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16 (D.D.C. 2015) .................................... 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 5

*Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021) .................... 29, 30, 45

*Brokaw v. Mercer Cnty.*, 235 F.3d 1000 (7th Cir. 2000) ............................................ 23

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015) ................................ 45

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) .................................................. 5

*Burruss v. Riley*, 192 F. Supp. 3d 655 (W.D. Va. 2016) ......................................... 17, 42

*Butera v. District of Columbia*, 83 F. Supp. 2d 15 (D.D.C. 1999) ............................. 24, 25

*Cady v. Dombrowski*, 413 U.S. 433 (1973) ............................................................ 15

*California v. Hodari D.*, 499 U.S. 621 (1991) .................................................. 12, 40, 41

*Caniglia v. Strom*, 141 S. Ct. 1596 (2021) ........................................... 15, 18, 19, 42

*Chesser v. Sparks,* 248 F.3d 1117 (11th Cir. 2001) .................................................. 39

*City of Houston v. Hill*, 482 U.S. 451 (1987) .................................................. 2, 27, 43

*City of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................ 22, 24

*Corrigan v. District of Columbia*, 841 F.3d 1022 (D.C. Cir. 2016) ........................ 18, 19, 20

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) .......................... 26

*Dalcour v. City of Lakewood*, 492 Fed. App'x 924 (10th Cir. 2012) ............................................ 7

*Daniels v. Dixon*, No. 8:21-CV-223-CJC (MAR), 2021 WL 4468940 (C.D. Cal. Aug. 13, 2021) ................................................................................................................................... 28

*David v. District of Columbia*, 436 F. Supp. 2d 83 (D.D.C. 2006) .............................................. 35

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)................................................................. 38, 45

*District of Columbia v. Harris,* 770 A.2d 82 (D.C. 2001) ........................................................... 37

*District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010) ........................................................... 32

*District of Columbia* v. *Wesby*, 138 S.Ct. 577 (2018) ................................................. 11, 13, 43, 45

*District of Columbia v. White*, 442 A.2d 159 (D.C. 1982) .......................................................... 30

*Dormu v. District of Columbia*, 795 F. Supp. 2d 7 (D.D.C. 2011)......................................... 21, 41

*Dow Chem. Co. v. United States*, 476 U.S. 227 (1986) ................................................................. 6

*Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977)................................................................. 23

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338 (D.D.C. 2020)...................... 31

*Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d 501 (5th Cir. 1992) ................................................ 27

*Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL 4747666 (S.D.N.Y. Sept. 30, 2019) ........................................................................................................................................... 7

*Fernandors v. District of Columbia*, 382 F. Supp. 2d 63 (D.D.C. 2005) ...................... 8, 9, 10, 13

*Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005) ......................................................................... 42

*Florida v. Royer*, 460 U.S. 491 (1983) ....................................................................................... 11

*Franz v. United States*, 707 F.2d 582 (D.C. Cir.), *supplemented,* 712 F.2d 1428 (D.C. Cir. 1983) ................................................................................................................................... 23, 26

*Garay v. Liriano*, 839 F. Supp. 2d 138 (D.D.C. 2012) ............................................................... 30

*Garay v. Liriano*, 943 F. Supp. 2d 1 (D.D.C. 2013) .............................................................. 30, 31

*Georgia v. Randolph*, 547 U.S. 103 (2006) ................................................................ 44

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016); ............................... 42

*Gooden v. Howard Cnty.*, 954 F.2d 960 (4th Cir. 1992) .............................................. 18

*Goolsby v. District of Columbia*, 317 F. Supp. 3d 582 (D.D.C. 2018) .......................... 40

*Goolsby v. District of Columbia*, 354 F. Supp. 3d 69 (D.D.C. 2019) ...................... 36, 37

*Graham v. Connor,* 490 U.S. 386 (1989) ..................................................................... 20

*Hawkins v. United States*, 663 A.2d 1221 (D.C. 1995) ......................................... 12, 15

*Hedgepeth v. Whitman Walter Clinic*, 22 A.3d 789 (D.C. 2011) ............................ 35, 36

*Holder v. District of Columbia*, 700 A.2d 738 (D.C. 1997) .......................................... 36

*Holt v. Walsh Grp.*, 316 F. Supp. 3d 274 (D.D.C. 2018) ............................................... 5

*Hunter v. District of Columbia*, 824 F. Supp. 2d 125 (D.D.C. 2011) ...................... 12, 34

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) ..................................... 5, 7

*Huthnance v. District of Columbia*, 793 F. Supp. 2d 183 (D.D.C. 2011) ..................... 27

*In re J.M.*, 619 A.2d 497 (D.C. 1992) ......................................................................... 14

*Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124 (D.D.C. 2017) ................................. 40

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011) ..................................................... 14, 32

*Jackson v. District of Columbia*, 327 F. Supp. 3d 52 (D.D.C. 2018) ............................. 9

*Jiron v. Roth*, 519 F. Supp. 3d 971 (D.N.M. 2021) ..................................................... 28

*Jones v. Kirchner*, 835 F.3d 74 (D.C. Cir. 2016) ........................................................ 24

*Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994) .................................. 23

*Katz v. District of Columbia*, 285 A.3d 1289 (D.C. 2022) ..................................... 21, 38

*Katz v. United States*, 389 U.S. 347 (1967) ........................................................... 2, 41

*Kotsch v. District of Columbia*, 924 A.2d 1040 (D.C. 2007). ................................. 33, 38

*Kowalevicz v. United States*, 302 F. Supp. 3d 68 (D.D.C. 2018). ................................................. 36

*Kyllo v. United States*, 533 U.S. 27 (2001) .................................................. 6, 7, 19, 40

*Lerner v. District of Columbia*, 362 F. Supp. 2d 149 (D.D.C. 2005) ..................................... 40, 42

*Mann v. Bahi*, 242 F. Supp. 3d 6 (D.D.C. 2017) ............................................. 32, 33, 34

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ...................................................... 21

*Matthews v. District of Columbia*, 730 F. Supp. 2d 33 (D.D.C. 2010)......................................... 8

*McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004) ......................................................... 39

*Minnesota v. Olson*, 495 U.S. 91 (1990).................................................................. 41

*Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015) ....................................... 24, 26

*Morrison v. Bd. of Trustees of Green Twp.*, 529 F. Supp. 2d 807 (S.D. Ohio 2007) .................. 21

*Muehler v. Mena*, 544 U.S. 93 (2005) .................................................................... 25

*Nazario v. Gutierrez*, No. 2:21-CV-169 (RCY), 2022 WL 3213538 (E.D. Va. Aug. 9, 2022).... 28

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ........................................................... 28, 44

*Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011) ................................................. 21

*Odom v. District of Columbia*, 248 F. Supp. 3d 260 (D.D.C. 2017) ............................................ 35

*Patterson v. United States*, 999 F. Supp. 2d 300 (D.D.C. 2015) ........................................... 44

*Payton v. New York*, 445 U.S. 573 (1980) ........................................................... 6, 20, 40

*Perry v. Sindermann,* 408 U.S. 593 (1972).............................................................. 44

*Peterson v. Jensen*, 371 F.3d 1199 (10th Cir. 2004)....................................................... 39

*Phillips v. Price*, No. CV 5:19-185-JMH, 2021 WL 3610039 (E.D. Ky. Aug. 13, 2021) 28, 29, 30

*Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007) ............................................ 32

*Reed v. District of Columbia*, 474 F. Supp. 2d 163 (D.D.C. 2007) ....................................... 10, 11

*Rendall-Speranza v. Nassim*, 107 F.3d 913 (D.C. Cir. 1997)....................................... 32

*Rice v. District of Columbia*, 774 F. Supp. 2d 25 (D.D.C. 2011) .................................................. 34

*Robinson v. District of Columbia*, 736 F. Supp. 2d 254 (D.D.C. 2010). ...................................... 22

*Rogala v. District of Columbia*, 161 F.3d 44 (D.C. Cir. 1998) ..................................................... 21

*Rudolph v. Babinec*, 939 F.3d 742 (6th Cir. 2019) ........................................................ 17, 42, 43

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ................................................................. 5

*Santosky v. Kramer*, 455 U.S. 745 (1982) ................................................................................. 23

*Saunders v. Nemati*, 580 A.2d 660 (D.C. 1990) .................................................................... 31, 32

*Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33 (D.C. 1982) .................................................. 33, 34

*Siedentop v. State*, 337 P.3d 1 (Alaska Ct. App. 2014) .............................................................. 7

*Silverman v. United States*, 365 U.S. 505 (1961) ............................................................... 6, 7, 40

*Simmons v. District of Columbia*, 750 F. Supp. 2d 43 (D.D.C. 2011) ......................................... 25

*Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) ........................................................... 23

*Steagald v. United States*, 451 U.S. 204 (1981) ....................................................................... 41

*Stevens v. Stover*, 727 F. Supp. 668 (D.D.C. 1990) .................................................................. 33

*Torres v. Madrid*, 141 S. Ct. 989 (2021) .................................................................................. 12

*Union Pacific R. Co. v. Botsford,* 141 U.S. 250 (1891) .............................................................. 26

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013) ................................................................ 14

*United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011) ..................................................... 14, 41

*United States v. Carter*, 985 F.2d 1095 (D.C. Cir. 1993) ......................................................... 44

*United States v. Duvall*, 740 F.3d 604 (D.C. Cir. 2013) ........................................................... 42

*United States v. Lowe*, 791 F.3d 424 (3d Cir. 2015) ................................................................ 14

*United States v. Maple*, 348 F.3d 260 (D.C. Cir. 2003) .............................................................. 8

*United States v. Mendenhall*, 446 U.S. 544 (1980) ......................................................... 14, 40, 41

*United States v. Smith*, 794 F.3d 681 (7th Cir. 2015) ............................................ 14, 41

*United States v. Villa-Gonzalez*, 623 F.3d 526 (8th Cir. 2010) .................................. 14

*United States v. Washington*, 490 F.3d 765 (9th Cir. 2007) .................................. 14, 41

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) ..................................................... 21

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015).................................................... 39

*Wheeler v. American University*, No. 20-cv-02735, 2022 WL 160226 (D.D.C. Jan. 18, 2022) . 16, 17, 18, 42, 43

*Wolf v. Regardie*, 553 A.2d 1213 (D.C. 1989) ......................................................... 30

*Wood v. Eubanks*, 25 F.4th 414 (6th Cir. 2022) ....................................................... 27

*Wooley v. City of Baton Rouge*, 211 F.3d 913 (5th Cir. 2000) .................................... 23

*Zhi Chen v. Monk*, 701 F. Supp. 2d 32 (D.D.C. 2010) .............................................. 32

**Statutes**

D.C. Code § 21-521 ................................................................................................ 18, 25

**Other Authorities**

MPD General Order, Interacting with Mental Health Consumers, OPS 308.04 (Feb. 9, 2015) .. 26

## INTRODUCTION

This is a case about a single, Black mother, Plaintiff Malaika Lewis, and her young daughter, Plaintiff N.L., who have been repeatedly harassed and abused by the District of Columbia Metropolitan Police Department ("MPD"). On two occasions, swarms of MPD officers illegally separated and detained Plaintiffs and illegally searched their home. The officers lied about what MPD policy "required," invaded the sanctity of Plaintiffs' home without a lawful basis, and retaliated against Ms. Lewis for refusing to consent to their unlawful demands.

Plaintiffs' Amended Complaint, Dkt. 13 ("Compl."), alleges constitutional and D.C. tort claims against the sixteen MPD officers involved, as well as tort claims against the District of Columbia under the doctrine of *respondeat superior*. For the Court's convenience, Plaintiffs have summarized their claims in an Index of Claims. *See* Exhibit A. Defendants have moved to dismiss the Complaint in its entirety, arguing that they should bear no liability whatsoever for their repeated unlawful conduct. *See* Mem. of Points and Authorities in Support of Defs.' Mot. to Dismiss, Dkt. 19-1 ("MTD"). Plaintiffs now submit this Opposition.

## SUMMARY OF ARGUMENT

Defendants' Motion rests on mischaracterizations and omissions of the allegations in the Complaint. Defendants argue, based on their inaccurate and incomplete version of the allegations, that they acted legally under the circumstances. But at this juncture, Plaintiffs' factual allegations must be treated as true. And when viewed through that lens, Plaintiffs have plausibly pled that Defendants acted unlawfully by, among other things, twice entering and searching Plaintiffs' home without a lawful basis; twice separating and detaining Plaintiffs, again without a lawful basis; and retaliating against Ms. Lewis for asserting her constitutional rights. Defendants' qualified immunity arguments fall apart for similar reasons: Based on what is actually alleged, rather than

1

Defendants' selective retelling of the facts, Defendants violated Plaintiffs' clearly established rights to be free from searches and seizures "subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967), and to challenge the police, *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). As such, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

## FACTS

The relevant facts at this juncture are those alleged in the Complaint. Unfortunately, Defendants' MTD rests on mischaracterizations and omissions of the allegations in Plaintiffs' Complaint. As such, Plaintiffs provide a brief summary of the relevant facts here.

On June 24, 2020, around 10 P.M., Defendant Officers arrived at Plaintiffs' home in Washington, D.C. to help Ms. Lewis file a missing person's report for her teenage daughter, K.R. Compl. ¶¶ 43–46. Over the next three hours, until 1 A.M., eight MPD officers—Richard Kennedy, Chad Hambrick, John Wright, Natalie Charles, Diane Brooks, and Anthony Hector; Sergeant James Koenig; and Lieutenant LaShaun Lockerman—arrived at Ms. Lewis's apartment. *Id.* ¶¶ 46, 51, 61, 79, 87, 95, 140. Ms. Lewis immediately provided the officers with substantial evidence that K.R. was somewhere in Riverdale, Maryland, including K.R.'s "Find My iPhone" location and a tip from the aunt of one of K.R.'s friends. *Id.* ¶¶ 35–36, 48–49, 52–53, 63–64. Defendants responded by telling Ms. Lewis that MPD policy required them to search her residence before they could file a report. *Id.* ¶ 54. Unbeknownst to Ms. Lewis, MPD policy did not mandate a residence search. The relevant policy only requires a residence search when a missing person is younger than 12; otherwise, officers should only search their residence "if warranted." *Id.* ¶ 55. The officers admitted on the scene that they did not have probable cause to support a warrant. *Id.* ¶ 71. Nor, as the officers admitted in real time, were there exigent circumstances permitting them to search

Plaintiffs' home. *Id.* ¶ 99. The officers agreed that K.R. was probably not inside. *Id.* ¶¶ 74–75, 97. Ms. Lewis had initially met the officers outside, across the street from her building, and explained to them that police presence at her apartment had caused problems with her landlord and neighbors in the past. *Id.* ¶¶ 44, 57. Besides, all the available evidence pointed to K.R. being in Maryland.

But when Ms. Lewis exercised her constitutional right to refuse to consent, Compl. ¶¶ 73, 76–77, 87–88, the officers retaliated. Two officers hid in Ms. Lewis's lobby while the others lured her outside. *Id.* ¶¶ 98, 100. When the coast was clear, the officers opened her closed apartment door and stepped into her doorway. *Id.* ¶ 106. Inside, they found Ms. Lewis's younger daughter, then-six-year-old N.L., naked and alone. *Id.* The officers would remain in that threshold, questioning N.L., and separating the six-year-old from her mother, for nearly an hour. *Id.* ¶ 107. When Ms. Lewis came back inside and objected, the officers physically blocked Ms. Lewis from re-entering her apartment and re-joining N.L. *Id.* ¶¶ 118–22, 128, 134–35. Even after Defendant Lieutenant Lockerman finally arrived and confirmed via video call that K.R. was, as Ms. Lewis had said from the start, not in the apartment, the officers continued to detain Ms. Lewis outside, and N.L. inside, until nearly 1 in the morning. *Id.* ¶¶ 142–47, 151–55. One officer told Ms. Lewis, "Had you let me go in, none of this would have happened." *Id.* ¶ 154. The D.C. Office of Police Complaints ("OPC") later found that at least one of the officers had "recklessly violated" Ms. Lewis's constitutional rights. *Id.* ¶¶ 266–68. Unfortunately, this was not a one-time occurrence.

In January 2022, a swarm of MPD officers arrived at Plaintiffs' door, yelling that they had received a call that Ms. Lewis was suicidal. Compl. ¶¶ 167, 169. Over the next several hours, eight MPD officers—Johnathan Matthews, Stephen Owens, Monique Boyd, Jermaine Maubry, Benjamin Rubin, Benjamin Finck, and George Arhin; and Sergeant Albert Cipolari—arrived at Ms. Lewis's apartment. *Id.* ¶¶ 167, 191, 224. The officers demand to be let inside. Ms. Lewis was

bewildered; she was perfectly fine. *Id.* ¶ 170. She calmly assured the officers of her well-being, but told them that she did not want to engage with them face-to-face because of prior trauma from interacting with the police. *Id.* ¶ 173, 201. "You can make this easy, or you can make this hard," one of the officers told her. *Id.* ¶ 175. Ms. Lewis repeatedly invited the officers to video-call her or observe her through her floor-to-ceiling windows if they were still concerned. *Id.* ¶¶ 176, 183, 198. Defendants repeatedly refused. *Id.* ¶¶ 177, 183, 198.

Instead, they threatened to break down the door. Compl. ¶ 177. They screamed at her through the door. *Id.* ¶ 179. When Ms. Lewis cracked the door open in an attempt to resolve the situation, the officers shoved a baton into her doorjamb. *Id.* ¶ 181. They held it there for two hours. *Id.* ¶ 182. The officers lured N.L. into coming out into the hallway under false pretenses, then used N.L. as bait to try to entice Ms. Lewis outside. *Id.* ¶¶ 187, 190–94. When Ms. Lewis refused, they detained Ms. Lewis and N.L. separately—Ms. Lewis trapped in her doorway, N.L. surrounded by police officers in the lobby—for several hours. *Id.* ¶¶ 202–03, 223. Paramedics arrived, but the officers refused to allow them to examine Ms. Lewis without police present. *Id.* ¶¶ 210–14. They refused to allow N.L.'s father, or a trusted neighbor, to take care of her. *Id.* ¶¶ 219–21, 229. They refused to listen to a Child and Family Services Agency ("CFSA") social worker, who told them that Ms. Lewis had not mentioned suicide to her. *Id.* ¶¶ 195–96. (Ms. Lewis had not said anything worrisome to the officers themselves, either. *Id.* ¶¶ 204–06.) Instead, they threatened to put N.L. in CFSA custody if Ms. Lewis did not let police inside. *Id.* ¶ 215. "I do not feel safe with five cops at my door," Ms. Lewis told the officers. *Id.* ¶ 232.

Finally, while Ms. Lewis was in the middle of meeting with a Department of Behavioral Health ("DBH") representative inside her apartment, Defendants rammed through Ms. Lewis's door, tightly handcuffed her, exposed her bare breasts in a common hallway, and involuntarily

committed her to a psychiatric hospital. Compl. ¶¶ 246–59. N.L. watched her mother being led away in handcuffs, and texted her older sister that "the worst" had happened. *Id.* ¶¶ 257, 280. One of the officers taunted Ms. Lewis, "Had you spoken to me, all this would not have transpired." *Id.* ¶ 258. After Ms. Lewis and N.L. had both been removed from their home, two officers entered and searched it. *Id.* ¶ 248. The following morning, Ms. Lewis was seen by a doctor who promptly confirmed that there was no basis for her to be hospitalized and released her. *Id.* ¶ 259.

These incidents have left Ms. Lewis and N.L. with lasting trauma. Both have sought psychotherapy. Compl. ¶¶ 273, 279. Ms. Lewis suffers major dissociative episodes that interfere with her daily functioning. *Id.* ¶ 273. The handcuffs left her wrists purple and bruised; she could not carry her groceries for weeks after the incident. *Id.* ¶¶ 274–75. As she feared, her landlord has threatened to evict her because of the police activity at her unit. *Id.* ¶ 276. A few days after the January incident, Ms. Lewis wrote to CFSA, "I ask myself if I were a white woman would my experience have been different?" *Id.* ¶ 281. "I think we all know the answer." *Id.*

## LEGAL STANDARD

In ruling on a motion to dismiss, "the relevant facts are those alleged in the complaint, taken in the light most favorable to the plaintiff and with all reasonable inferences drawn in [her] favor." *Hurd v. District of Columbia*, 864 F.3d 671, 675 (D.C. Cir. 2017). The complaint should be construed "liberally." *Browning v. Clinton*, 292 F.3d 235, 240 (D.C. Cir. 2002). Plausibility is "a relatively low bar." *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018). It does not mean "that a claim is more likely to succeed than not, but rather that the claim at issue rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**ARGUMENT**

I.       **Plaintiffs Plausibly Allege Violations of Their Fourth Amendment Rights.**

        **A.  June 2020**

**1.  Defendants Unlawfully Searched Plaintiffs' Home (Count 1).**

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *Dow Chem. Co. v. United States*, 476 U.S. 227, 236 (1986) (emphasizing "the sanctity accorded an individual's home" (quotation omitted)). As Defendants conceded in real time, they did not have probable cause to obtain a warrant, nor did exigent circumstances exist, to enter Plaintiffs' home. Compl. ¶¶ 71, 97, 99, 141. Nevertheless, they entered. *Id.* ¶ 106.

**a.  Defendant Wright**

Plaintiffs allege that Defendants Wright and Charles opened their closed apartment door, stepped into their doorway, and searched their apartment—including via a flashlight—for nearly an hour, without any lawful basis. Compl. ¶¶ 102, 106–10, 122. Defendants quibble that the Complaint is "conflicting and vague" as to whether Defendant Wright "crossed the threshold" or stood "in the threshold" of Plaintiffs' home. MTD at 18. This attempted distinction makes no legal difference: "[A]ny physical invasion of the structure of the home, '*by even a fraction of an inch*,'" constitutes an entry for Fourth Amendment purposes. *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)) (emphasis added). Courts have regularly found that even placing a foot in the doorway of a person's home without a lawful basis—as Plaintiffs clearly allege Defendant Wright did, Compl. ¶¶ 106, 129, 137—violates the Fourth Amendment. *See, e.g.*, *Dalcour v. City of Lakewood*, 492 Fed. App'x 924, 932–34 (10th

6

Cir. 2012) (unpublished) ("placing a foot into the doorway amounted to an entry of the home for Fourth Amendment purposes" because "*any* intrusion into a home, *no matter how slight*, constitutes an entry of the home" (emphases added) (citation omitted)); *Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL 4747666, at *5 (S.D.N.Y. Sept. 30, 2019) (same); *Siedentop v. State*, 337 P.3d 1, *3 (Alaska Ct. App. 2014) (same); *id.* at *2 n.5 (collecting cases). In any case, all reasonable inferences must be resolved in Plaintiffs' favor for purposes of a motion to dismiss. *Hurd*, 864 F.3d at 675.

Here, Defendant Wright not only stood in Plaintiffs' doorway, but opened their previously closed front door to do so. Compl. ¶ 106. Supreme Court precedent is clear: "[O]btaining . . . any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' constitutes a search." *Kyllo*, 533 U.S. at 34 (quoting *Silverman*, 365 U.S. at 512). By opening Plaintiffs' apartment door and standing in their doorway for an hour, Defendant Wright obtained information that he could not have otherwise collected. *Id.* at 28 ("[I]n the sanctity of the home, *all* details are intimate details.") That, as OPC has already found, violated the Fourth Amendment. Compl. ¶¶ 266–67.

### b.  Defendant Charles

Defendant Charles, Defendant Wright's partner, argues that she should not be liable because she did not personally enter Plaintiffs' home. MTD at 17–18. As established above, by opening Plaintiffs' previously closed front door, stepping into Plaintiffs' doorway, and illuminating the intimate details of Plaintiffs' home with a flashlight, Wright and Charles unlawfully crossed the threshold of Plaintiffs' home to conduct a search. Compl. ¶ 106. The Complaint clearly alleges that Defendant Charles herself opened Ms. Lewis's closed apartment door, approached N.L.—who was, undisputedly, inside the apartment at all times—and questioned

the child. Compl. ¶¶ 102, 106, 110–12. As such, Defendant Charles also entered Plaintiffs' home. *See United States v. Maple*, 348 F.3d 260, 262 (D.C. Cir. 2003) ("[A]ny deliberate governmental intrusion into a closed space - opening a door or a closed compartment - is a search regardless of the reasons for the intrusion." (citation omitted)).

In the alternative, Defendant Charles is liable as a bystander to Wright's illegal entry. An officer is liable as a bystander if she: "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005). Defendant Charles argues that she had neither the "awareness" nor the "ability" to stop Defendant Wright. MTD at 18. But Defendant Charles was present while the officers discussed their belief that K.R. was not inside the apartment and that they did not have a "public safety exception" to enter. Compl. ¶¶ 97, 99. She entered the building and hid in the lobby alongside Defendant Wright. *Id.* ¶¶ 97, 98, 100. She stood watch while he knocked on Plaintiffs' door, she personally opened the door, and she approached and questioned N.L. *Id.* ¶¶ 103, 106, 110–12. When Ms. Lewis re-entered the building, Defendant Charles ushered Ms. Lewis away from the apartment and barricaded her at the end of the hallway for an hour. *Id.* ¶¶ 120, 122. And she covered for Defendant Wright when Defendant Koenig asked if the door had been open. *Id.* ¶ 127. These allegations clearly establish that Defendant Charles entered, or at least was a culpable bystander to Wright's entry, into Plaintiffs' home. *See Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 39 (D.D.C. 2010) (allowing claims to proceed on a bystander liability theory against officers who were present while another officer conducted strip searches but did not intervene). She was aware that the ongoing search had no legal basis, and she had the opportunity to stop it. *Id.* ¶¶ 97, 99. Yet she did not.

### c. Defendants Kennedy, Hambrick, and Koenig

Defendants Kennedy, Hambrick, and Koenig claim they cannot be held liable as bystanders because they were not aware of Defendant Wright's plan to search Plaintiffs' home. MTD at 16–17. They claim they only knew that he wanted to knock on Plaintiffs' door and had no opportunity to prevent the search. *Id.* at 17. These assertions misconstrue and obscure the officers' alleged involvement in Wright's scheming. Defendants Kennedy, Hambrick, and Koenig told Defendant Wright that the officers did not have a legal basis to search Plaintiffs' home and expressed hesitation when Defendant Wright said he wanted to proceed inside anyhow. Compl. ¶¶ 71, 74–75, 96–97, 99. Nevertheless, they helped lure Ms. Lewis outside. *Id.* ¶ 98. And later, when the officers went inside, Defendant Wright was still standing in Plaintiffs' doorway. *Id.* ¶ 117. They could have objected at that juncture. They could have pulled him back from the threshold. They could have closed the door. Yet they did not. *See Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 67 (D.D.C. 2018) (allowing assault claims against officers who stood by while a third officer performed the assault to proceed on bystander liability theory because one could infer that they could have "stopped the alleged . . . assault by speaking up," but did not); *Fernandors*, 382 F. Supp. 2d at 75 (allowing claims to proceed against officers who "surrounded" the plaintiff, thereby "enabling" another officer to search the plaintiff, to proceed on bystander liability theory because the surrounding officers were "integral participants" in the search). Defendants Kennedy, Hambrick, and Koenig's acquiescence was integral to Defendant Wright's illegal behavior. These specific factual allegations clearly establish their culpability as bystanders.

### d. Defendants Koenig and Lockerman

A supervisor is liable for a constitutional violation if (1) there was "a grave risk of harm," (2) the supervisor "actual[ly] or constructive[ly]" knew of that risk, and (3) the supervisor "fail[ed]

to take available measures to address that risk." *Reed v. District of Columbia*, 474 F. Supp. 2d 163, 168 (D.D.C. 2007) (internal citation omitted). Defendants Koenig and Lockerman were not only culpable bystanders; they are also liable through their responsibilities as supervisors.

Defendant Koenig claims he was unaware of Defendant Wright's intention to search Plaintiffs' apartment when Wright first entered the building. MTD at 17–18. But Koenig knew that the officers were exceeding their authority; he stated, from the start, that he did not think that the officers could get a warrant or that a "public safety" exception to the warrant requirement applied, because K.R. was likely not in the apartment. Compl. ¶¶ 96, 99. He expressed hesitation when Defendants Wright and Charles proceeded inside anyhow. *Id.* ¶ 97. Nevertheless, Defendant Koenig facilitated their unlawful entry by helping lure Ms. Lewis back outside. *Id.* ¶ 98. When Koenig proceeded inside, he saw Wright still standing in Plaintiffs' doorway. *Id.* ¶ 123. Even after Koenig received shifting explanations about whether Wright and Charles had opened Plaintiffs' apartment door, *id.* ¶¶ 124–27, Koenig told Wright not to back down, *id.* ¶ 137. Indeed, the OPC examiner found it "concerning" that Koenig did not "reign in" Wright. *Id.* ¶ 268.

Defendant Lockerman argues that she cannot be held liable as a supervisor because she arrived after the search occurred and was informed of a valid basis for it. MTD at 17. But when Lockerman arrived, Defendant Wright was still standing in Plaintiffs' doorway, illegally searching Plaintiffs' apartment. Compl. ¶ 144. Even after Defendant Hector informed Defendant Lockerman that the officers did not have a lawful basis for a search, and Lockerman debunked Defendant Wright's "public safety" explanation by video-calling K.R., Lockerman "did not instruct Defendant Wright to stand back or to allow Ms. Lewis back inside her apartment." *Id.* ¶¶ 141–44. Lockerman instead led Ms. Lewis outside, *id.* ¶¶ 145–46, "enabling" the search to continue. *Fernandors*, 382 F. Supp. 2d at 75. As such, Defendants Koenig and Lockerman both "fail[ed] to

10

take available measures" to stop an unlawful search ongoing in their presence, even though they knew it was unlikely unlawful. *Reed*, 474 F. Supp. 2d at 168.

### 2. Defendants Unlawfully Seized Plaintiffs.[1]

#### a. Defendants Unlawfully Seized Malaika Lewis (Count 2).

For several hours in the middle of the night, Defendants interrogated Ms. Lewis and physically blocked her from entering her home. That seizure was "unreasonable" "under the circumstances." *District of Columbia* v. *Wesby*, 138 S.Ct. 577, 585 (2018). Defendant Officers themselves admitted this in real time. Compl. ¶¶ 71, 74–75 (Kennedy, Hambrick, and Koenig discussing their belief that K.R. was not in the apartment and that they could not get a warrant to search the apartment); *id.* ¶¶ 96, 99 (Wright, Charles, Kennedy, Hambrick, and Koenig discussing the lack of a "public safety exception" that would permit a search); *id.* ¶¶ 131–32 (Hector telling Wright that the officers did not have a legal basis to continue searching Plaintiffs' apartment); *id.* ¶ 141 (Hector informing Lockerman of the same).

Defendants dispute that Ms. Lewis was seized for purposes of the Fourth Amendment. MTD at 20–21. Defendants' arguments fail. First, Defendant Wright argues he did not seize Ms. Lewis because, at some point, he permitted her to go inside. MTD at 20. But a person "may not be detained *even momentarily*" without a legal basis. *Florida v. Royer*, 460 U.S. 491, 498 (1983) (emphasis added). Defendant Wright arrived as Ms. Lewis was preparing to leave and began questioning her after three other officers had already done so. Compl. ¶¶ 77–80. Twice, she attempted to leave; twice, Defendant Wright stopped her. *Id.* ¶¶ 83–87. That he eventually allowed Ms. Lewis to go inside does not erase the fact that he had previously seized her.

---

[1] Defendants protest that the Complaint does not specify whether Counts 2 and 3 arise under constitutional or common law. MTD at 19. *But see* Compl. ¶¶ 293–301 (specifying that Counts 2 and 3 arise under the Fourth Amendment).

Second, Defendants Charles, Brooks, Hector, and Hambrick argue that they did not seize Ms. Lewis because the "only restriction of her movement was not allowing her to re-enter the apartment." MTD at 20–21. But this is precisely the legal definition of a seizure: "depriv[ing]" a person of their "freedom of locomotion" via "actual force, or by fear of force, or even by words." *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 137 (D.D.C. 2011) (internal citation & quotations omitted); *see also Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (defining a seizure as "a show of authority that in some way restrains the liberty of the person"). "[T]aking into account all of the circumstances surrounding the encounter," Defendants' "conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business." *Hawkins v. United States*, 663 A.2d 1221, 1225 (D.C. 1995) (citations omitted). In fact, even though Ms. Lewis did not want to interact with the officers, she "submit[tted] to the assertion of authority," *California v. Hodari D.*, 499 U.S. 621, 626 (1991), and remained in their presence for several hours. These factual allegations establish that Ms. Lewis was seized within the meaning of the Fourth Amendment.

Third, Defendants Charles, Brooks, Hector, and Hambrick accuse Ms. Lewis of pleading detention merely as "a legal conclusion." MTD at 20. This is untrue; she alleges specifically that each of these officers "in some way restrain[ed]" her. *Torres*, 141 S. Ct. at 995. *See* Compl. ¶ 122 ("Defendant Charles ushered Ms. Lewis away from her apartment."); *id.* ¶ 134 ("Defendants Charles and Brooks continued to barricade Ms. Lewis at the end of the hallway . . . ."); *id.* ¶ 135 ("Defendants Hambrick and Hector continued to question Ms. Lewis at the far end of the hallway."); *id.* ¶ 136 ("Defendant Hector . . . told Ms. Lewis that . . . they would just have to wait."); *id.* ¶ 152 ("When Ms. Lewis asked if she could rejoin N.L. inside, Defendants Charles and Hambrick told her that she could not."); *id.* ¶ 154 ("Defendant Hambrick continued to detain Ms.

Lewis outside."). As for Defendant Kennedy, he was present while his colleagues took turns restricting Ms. Lewis's movement and had several hours to intervene, but did not. *Id.* ¶¶ 98, 102. As such, he is liable as a bystander. *Fernandors*, 382 F. Supp. 2d at 72.

Fourth, Defendants emphasize that "the officers *needed* to search [Plaintiffs'] apartment" pursuant to MPD policy. MTD at 20 (emphasis added). But the policy at issue did not require any such thing: MPD's missing person policy for people over age 12 merely authorizes a residence search "if warranted." Compl. ¶ 55.[2] Nor does policy require the residence's occupants to be detained. And even if policy had "required" the officers to search the apartment, "the fact that the search was conducted in accordance with an applicable policy [would] not by itself establish that [the officers' actions were] reasonable." *Akinmboni v. United States*, 126 A.3d 694, 700 (D.C. 2015). Their actions must be analyzed under the totality of the circumstances, to which policy may "potentially" be "relevant." *Id.* Here, MPD policy offers Defendants no quarter.

Finally, Defendants Koenig and Lockerman argue they should not be liable as supervisors because they either did not know Ms. Lewis was being detained or did not condone her detention. MTD at 21. But both supervisors saw their subordinates standing in Plaintiffs' doorway and confining Ms. Lewis down the hall. Compl. ¶¶ 123, 142. Defendant Koenig stated from the start that the officers would not be able to get a warrant, *id.* ¶ 71, nor did an exception to the warrant requirement apply, *id.* ¶ 99, but still, he told Defendant Wright not to back down, *id.* ¶ 137. Defendant Lockerman, even after personally verifying that K.R. was not in the apartment, did not

---

[2] To the extent that Defendants suggest that the officers mistakenly thought that policy required them to search the apartment, what Defendants said about policy does not conclusively answer whether they actually *believed* what they were saying. To the contrary, OPC "found it suspicious that the officers had been attempting to justify their actions aloud in real time." *Id.* ¶ 267. Furthermore, probable cause is assessed "from the standpoint of an *objectively* reasonable police officer." *Wesby*, 138 S. Ct. at 586 (emphasis added, citation omitted). Would an objectively reasonable police officer misstate department policy?

release Ms. Lewis; in fact, Defendant Lockerman escorted Ms. Lewis outside against her wishes while Defendant Wright was still standing in her doorway. *Id.* ¶¶ 146–47. Both supervisors not just condoned but actively abetted Ms. Lewis's unlawful detention.

### b.  Defendants Unlawfully Seized N.L. (Count 3).

Defendants argue, again citing no law, that N.L. was not "seized" while Defendant Wright stood in her apartment doorway, because the Complaint does not allege that: (1) N.L. wanted to join her mother; or (2) a child in her situation would have wanted to join her mother. MTD at 21–22. These arguments run contrary to the applicable legal test, which is purely objective: Would "a reasonable person," "in view of all of the circumstances surrounding the incident," "have believed that [s]he was not free to leave"? *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Children are "[es]special[ly] vulnerabl[e] . . . to intimidation by figures of authority." *In re J.M.*, 619 A.2d 497, 502 (D.C. 1992); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) ("[E]vents that would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." (citation omitted)). In June 2020, N.L. was six years old. Compl. ¶ 33. She was confronted, in the middle of the night, by several uniformed police officers. Compl. ¶¶ 104–12. Courts have repeatedly noted that the "threatening presence of several officers" indicates a seizure. *Mendenhall*, 446 U.S. at 554; *see also United States v. Lowe*, 791 F.3d 424, 431–32 (3d Cir. 2015); *United States v. Black*, 707 F.3d 531, 538 (4th Cir. 2013); *United States v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010). Those officers stood in her doorway, separating the six-year-old from her mother, for nearly an hour. Compl. ¶ 107. Courts have regularly found that, when officers "obstruct[]" a person's path, they have seized that person. *United States v. Smith*, 794 F.3d 681, 685 (7th Cir. 2015); *see also United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011); *United States v. Washington*, 490 F.3d 765, 773 (9th Cir. 2007). No reasonable child with several

uniformed police officers at her door questioning her and standing between her and her mother for hours in the middle of the night would feel "at liberty to ignore the police presence and go about [her] business." *Hawkins*, 663 A.2d at 1225.

Furthermore, Defendants Koenig and Lockerman argue that they should not be liable as supervisors because they did not "approve[] any actions that restricted" N.L.'s movement. MTD at 22. Not so. Defendant Koenig instructed Defendant Wright to remain in the doorway. Compl. ¶ 137. Defendant Lockerman ushered Ms. Lewis outside, away from N.L. *Id.* ¶¶ 144–47. Both supervisors not only approved the other officers' actions, but furthered N.L.'s detention.

### B.  January 2022

#### 1.  Defendants Unlawfully Seized Plaintiffs.

##### a.  Defendants Unlawfully Seized Malaika Lewis (Count 12).

Defendants argue that they had a lawful basis to detain Ms. Lewis under the community caretaking exception to the warrant requirement. MTD at 23–24. This exception allows for warrantless searches "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). *Cady* was about a warrantless automobile search; "[w]hat is reasonable for vehicles is different from what is reasonable for homes." *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021). As such, the Supreme Court held well before January 2022 that the community caretaking exception cannot justify warrantless searches and seizures in the home. *Id.* at 1599–1600.

Accordingly, the community caretaking exception does not provide Defendants any cover here. Ms. Lewis was detained from the moment the officers arrived and threatened to break down her door. Compl. ¶ 177. The officers made it clear from the outset that she was not "at liberty to ignore the police presence and go about [her] business." *Hawkins*, 663 A.2d at 1225. As soon as

Ms. Lewis cracked open her door, Defendant Owens shoved his baton into the doorjamb and held it there for hours, preventing her from closing the door. Compl. ¶¶ 181–82. Ms. Lewis was trapped: She could not close the door, both because of Defendant Owens's baton and because that would leave N.L. alone in the lobby with the officers. *Id.* ¶ 223. And she could not leave her post at the door, because that would allow Defendant Owens to further push the door open. *Id.* After detaining her at the door for more than two hours, the Defendant Officers forced their way into Ms. Lewis's apartment, dragged Ms. Lewis out, slammed her against the hallway wall, tightly handcuffed her, and involuntarily committed her to a psychiatric facility. *Id.* ¶¶ 246–47, 259. The community caretaking exception does not excuse any of this.

Defendants contend that *Caniglia* does not foreclose their arguments because two concurring Justices left open the possibility that police could seize a "potentially suicidal individual" in their home. MTD at 24 n.1 (citing Alito and Kavanaugh concurrences). Defendants cite no binding law for this suggestion. This is likely because decisions applying *Caniglia* to mental health crises have set the bar far above what Defendants can meet in this case. For example, in *Wheeler v. American University*, police were sent to check on a student with a history of mental illness after she had an altercation with another student. No. 20-cv-02735, 2022 WL 160226, *1 (D.D.C. Jan. 18, 2022). When officers walked into Wheeler's apartment to conduct the wellness check, she "appeared calm," "told them she didn't wish to hurt herself or anyone else," and "asked them to leave." *Id.* Yet the police stayed on for several hours, during which time Wheeler became "increasingly agitated." *Id.* The police eventually "forcibly remove[d]" Wheeler and involuntarily committed her to a hospital for six days. *Id.* Wheeler sued, alleging, *inter alia*, that she was unlawfully seized. In denying a motion to dismiss, the court wrote that "it is clearly established that officers may not detain someone for an emergency mental evaluation based on an initial report

of concerning behavior, where the officers were able to observe the person alleged to be suicidal . . . and *observed nothing indicating that to be the case*." *Id.* at *17 (cleaned up, citations omitted, emphasis added). It reasoned that mental-health seizures require "a showing of a probability or substantial chance," "based on the facts known to the officers at the scene," that a person "pose[s] an *imminent* risk of harm to herself or others." *Id.* at *2 (emphasis added).

When the officers arrived and found no indication that Ms. Lewis was in distress, they were not permitted to "simply assume a threat without exploring whether the situation reflected some misunderstanding" with CFSA. *Id.* at *17. The officers did not observe "'danger signals' of potential violence." *Id.* at *21 (citations omitted). They found no indication that Ms. Lewis "was under the influence of any controlled substance," "had visible weapons," "was being treated for a mental illness," or "any other evidence of suicide preparations." *Burruss v. Riley*, 192 F. Supp. 3d 655, 663 (W.D. Va. 2016). Rather, Ms. Lewis assured them multiple times that she was perfectly fine and offered them multiple unobtrusive ways to observe and check on her. Compl. ¶¶ 173, 176, 183. A CFSA social worker told the police that Ms. Lewis had not made any mention of self-harm to her. *Id.* ¶ 195.

As hours passed, Ms. Lewis, understandably, became frustrated. But "[e]xpressing frustration by itself does not mean someone is a danger to themselves or others due to a mental illness." *Wheeler*, 2022 WL 160226, at *17. Indeed, some officers said on the scene that they were not sure they had authority to engage with Ms. Lewis any further as she had not made any statements about self-harm directly to the police. Compl. ¶¶ 204–06. *Compare Rudolph v. Babinec*, 939 F.3d 742, 750 (6th Cir. 2019) (mental health seizure was unconstitutional because the subject, whom a third party had told police was suicidal, told officers who spoke to her directly that she was fine, and officers did not personally observe any indicia of imminent self-harm), *with Gooden*

17

*v. Howard Cnty.*, 954 F.2d 960, 966 (4th Cir. 1992) (mental health seizure was constitutional because officers "did not just act on [the third-party caller's] complaint" but rather "waited until the substance of that complaint had been confirmed no less than three times by their personal observations").

Put differently, while officers who "must make split second judgments" should be afforded a "wide berth for reasonableness," officers may not "ignore what they learn as their own investigation progresses." *Wheeler*, 2022 WL 160226 at *20 (cleaned up, citations omitted). The longer officers spend investigating a situation and finding nothing to be amiss, the less it would appear that "exigent circumstances" require immediate action. *See Caniglia*, 141 S.Ct. at 1602 (Alito, J., concurring) ("[C]ircumstances are exigent only when there is not enough time to get a warrant."); *Corrigan v. District of Columbia*, 841 F.3d 1022, 1034 (D.C. Cir. 2016) (differentiating between "circumstances requiring immediate action," and a case in which MPD had been on the scene for hours and had "ample time and opportunity" to seek a warrant). Defendants spent several hours at Ms. Lewis's door, yelling, threatening her, and declining to take immediate action. Compl. ¶¶ 167–246. Presumably, if they had believed that Ms. Lewis was an imminent threat to herself or others, they would not have dawdled.[3]

### b.  Defendants Unlawfully Seized N.L. (Count 13).

Defendants argue that their seizure of N.L. was not unreasonable because they thought Ms. Lewis might be a danger to herself or others. MTD at 24–25. As outlined above, Defendants'

---

[3] Defendants also argue that they had a lawful basis to detain Ms. Lewis under D.C. Code § 21-521, MTD at 23, which permits officers "who [have] reason to believe that a person is . . . likely to injure himself or others if he is not immediately detained" to apply for the person to be involuntarily committed. But whether Defendants complied with D.C. law and whether they complied with the Constitution are separate questions. Furthermore, Defendants do not suggest that they submitted an application to commit Ms. Lewis, as § 21-521 requires.

actions with regard to Ms. Lewis's mental health were unlawful. *See supra* section I.B.1.a. As such, Defendants had no lawful basis for tricking N.L. into leaving her home, detaining her in the lobby for hours, surrounding her with police officers, denying her access to her father, denying her access to childcare with a trusted neighbor, and forcing her to watch them shove her mother into the back of a police car. Compl. ¶¶ 194, 202–03, 219, 228–29, 242, 257.

### 2. Defendants Unlawfully Searched Plaintiffs' Home (Count 14).

Defendants entered Plaintiffs' home first by wedging a baton into their doorjamb for two hours, and, second, by walking inside and searching their living room after Ms. Lewis was handcuffed in a patrol car. Compl. ¶¶ 182, 248; *Kyllo*, 533 U.S. at 37 ("[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much." (citation omitted)). Defendants contend that their entry into and search of Plaintiffs' home was lawful because "the alleged actions were directly related to ensuring the well-being of Ms. Lewis." MTD at 25.

As explained above, *Caniglia* held that the community caretaking doctrine does not permit a warrantless entry into a home. 141 S.Ct. at 1599–1600. The D.C. Circuit has also addressed this issue in *Corrigan v. District of Columbia*, 841 F.3d 1022 (D.C. Cir. 2016). Police responded to Corrigan's home after a hotline worker told 911 that Corrigan was at risk of harming himself or others. *Id.* at 1026. Following a lengthy interaction, police transported Corrigan to a psychiatric facility. *Id.* at 1027. After he left, police performed a brief sweep of his apartment for injured persons, because they had been told that his girlfriend's whereabouts were unknown and that he kept guns at home. *Id.* They found nothing. They then re-entered and conducted a more protracted search for weapons. *Id.* at 1027–28. The D.C. Circuit reversed the District Court's grant of qualified immunity with respect to the latter search because the officers had not been "presented with circumstances requiring *immediate* action," nor was their search "characterized by *brevity*

*and circumspection.*" *Id.* at 1034 (emphases added, citations omitted). MPD had been on the scene for several hours, "Corrigan was in MPD custody," and there had been "ample time and opportunity for the MPD to investigate further and, as appropriate, to seek a search warrant." *Id.*

The same is true here. Defendants did not take "immediate action;" Defendant Owens held his baton in Plaintiffs' doorway for two hours and declined all of the means Ms. Lewis offered to check on her well-being. Compl. ¶ 182. The officers did not observe any evidence that Ms. Lewis was an imminent threat to herself or others. *See supra* section I.B.1.a. When Defendants Cipolari and Owens entered and searched Plaintiffs' home, the officers had already removed both Plaintiffs from the apartment. Compl. ¶¶ 202, 246. They had no evidence that any other person might be inside, or in danger. They had no evidence that Plaintiffs kept any weapons in their home. They had been on the scene for nearly three hours. *Id.* ¶¶ 146, 246. "[T]his was not a case in which officers had to make a split-second decision that, judged with the benefit of hindsight, is revealed to be mistaken. Rather, this is a case in which officers disregarded the long-established 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Corrigan*, 841 F.3d at 1037 (citing *Payton*, 445 U.S. at 586).

### 3.  Defendants Used Excessive Force Against Malaika Lewis (Count 15).

Defendants contend that the force they used in dragging Ms. Lewis out of her apartment and handcuffing her was not excessive because she "threatened to commit suicide." MTD at 26. In scrutinizing excessive force claims, one must give "careful attention" "to the facts and circumstances of [the] particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). Here, Ms. Lewis was not suspected of any crime. Nor did she pose an immediate

threat; in fact, Defendants spent several hours questioning her. Ms. Lewis was not resisting or attempting to evade arrest; Defendants had no reason to arrest her, and she stood in the doorway for several hours. *See Morrison v. Bd. of Trustees of Green Twp.*, 529 F. Supp. 2d 807, 830–31 (S.D. Ohio 2007), *aff'd*, 583 F.3d 394 (6th Cir. 2009) (finding that officers used excessive force because plaintiff "was not suspected of committing a crime but was being seized for the purpose of a mental health evaluation;" any threat posed by plaintiff "was not imminent because she had no weapon or other means of doing immediate harm to herself;" and plaintiff was not attempting to flee when officers seized her). All of the *Graham* factors counsel in Ms. Lewis's favor.

The severity of any injuries also "provide[s] some indication of the degree of force." *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993). Defendants handcuffed Ms. Lewis so tightly that they left bruises and impeded her ability to do household tasks for weeks after. Compl. ¶¶ 247, 274; *see also id.* ¶ 275 (photograph of bruises). "Almost every Court of Appeals has held that overly tight handcuffing can constitute excessive force." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 23–24 (D.D.C. 2011) (collecting cases); *Katz v. District of Columbia*, 285 A.3d 1289, 1320 (D.C. 2022) (denying qualified immunity on excessive handcuffing claim).

The cases cited by Defendants, MTD at 26 n.2, are inapposite. In each case, the officers had probable cause to arrest the plaintiffs for criminal offenses, and the courts held that the force used in effecting each arrest was not unreasonable under those circumstances. *See Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011); *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998); *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987). Furthermore, in each case, the plaintiffs were accompanied by one or more accomplices, such that "it was not clearly unreasonable" for the officers "to take decisive action to subdue" them "quickly and forcefully, thereby reducing the risk of interference or escape." *Oberwetter*, 639 F.3d at 555. Here, Ms. Lewis

21

was not suspected of any crime, and the officers did not have a lawful basis to seize her. *See supra* section I.B.1.a. Furthermore, the officers greatly outnumbered Ms. Lewis; her only companion was her eight-year-old child. Under the totality of the circumstances, it was objectively unreasonable for the officers to drag Ms. Lewis out of her apartment, slam her against the hallway wall, and handcuff her so tightly that she sustained injuries. Compl. ¶¶ 246–47. The force that Defendants used against Ms. Lewis was excessive.

## II.     Plaintiffs Plausibly Allege Violations of Their Fifth Amendment Rights.

At the outset, Defendants argue that the Fifth Amendment is the wrong vehicle for Plaintiffs' claims. MTD at 26–28. If this Court finds that the Fourth Amendment encompasses all of the alleged conduct, Plaintiffs' Fifth Amendment claims may fall aside. But "[d]etermining where a Fourth Amendment . . . claim ends and a Fifth Amendment substantive due process claim begins is not always straightforward." *Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 261 (D.D.C. 2010). If this Court finds that "no [search or] seizure occurred for purposes of a Fourth Amendment violation, [D]efendants may still be held liable for police misconduct via a substantive due process claim." *Id.*; *see also id.* at 262–63 (allowing Fifth Amendment claim to proceed "as an alternative theory" to Fourth Amendment claim, because complaint plausibly alleged that defendants acted with "no legitimate law-enforcement purpose," and citing Fed. R. Civ. P. 8(d)(3)); *City of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1998) (finding that alleged conduct was not "covered by" the Fourth Amendment because no seizure occurred, and allowing substantive due process claim to proceed).

### A.  June 2020 (Count 4)

Defendants first argue that Plaintiffs' allegations "are not underpinned by a valid interest under substantive due process" because MPD's missing person's policy "cannot create a

substantive due process right." MTD at 29. That is not what Plaintiffs allege. The substantive due process right at issue arises not under any policy, but under the Constitution itself. In particular, "[i]t is beyond dispute that 'freedom of personal choice in matters of family life is a fundamental liberty interest' protected by the Constitution." *Franz v. United States*, 707 F.2d 582, 594 (D.C. Cir.), *supplemented,* 712 F.2d 1428 (D.C. Cir. 1983) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). "That freedom encompasses a wide variety of choices and activities," "[a]mong the most important" of which "is the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship." *Id.* at 594–95 (citations omitted). "[A]bove all," this right "is manifested in the reciprocal rights of parent and child to one another's 'companionship.'" *Id.* at 595 (citation omitted); *see also Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000) ("finding constitutional protection for the relationship between [a child] and his natural mother"); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000); *J.B. v. Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997); *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds*; *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). Defendants' actions threatened this fundamental interest: Ms. Lewis sought help bringing one of her daughters home, and Defendants responded by separating Ms. Lewis from her other daughter for several hours.

Defendants next argue that Plaintiffs' allegations do not amount to "conscience-shocking behavior" in violation of the Fifth Amendment because Defendants genuinely believed that MPD policy allowed them to search Plaintiffs' apartment. MTD at 29–30. As a threshold matter, Defendants' on-the-scene statements that they were acting pursuant to policy are not conclusive as to what they actually were thinking; in fact, OPC found it "suspicious" that the officers were trying to justify their actions in real time. Compl. ¶ 267; *see also supra* at 13 n.2. *Cf. Jones v.*

*Kirchner*, 835 F.3d 74, 80 (D.C. Cir. 2016) ("Credibility determinations are not for the district court, especially at the motion to dismiss stage . . . .").

Substantive due process "demands an exact analysis of circumstances," including whether the defendant enjoyed the "luxury" "of having time to make unhurried judgments," "the chance for repeated reflection," or owed any special duty of care to the plaintiff. *Lewis*, 523 U.S. at 850, 853; *see also Moore v. District of Columbia*, 79 F. Supp. 3d 121, 131 (D.D.C. 2015). "Whether the alleged deliberate indifference of the police officers here was sufficient to 'shock the conscience' and thereby offend constitutional guarantees, is a subject upon which reasonable minds could differ and, therefore, is left properly to the jury." *Butera v. District of Columbia*, 83 F. Supp. 2d 15, 19–20 (D.D.C. 1999), *aff'd in relevant part,* 235 F.3d 637 (D.C. Cir. 2001). Here, officers violated Plaintiffs' substantive due process right to remain together as parent and child when they tricked Ms. Lewis into leaving N.L alone inside; detained Ms. Lewis outside while they questioned a naked N.L. inside; ignored Ms. Lewis's unequivocal statement that she did not consent to having officers in her home with N.L.; prevented Ms. Lewis from rejoining N.L. for an hour; and, even after the officers had verified that K.R. was not in the apartment, took Ms. Lewis back outside and continued to prevent her from being with N.L., at 1 o'clock in the morning. Compl. ¶¶ 98, 106–12, 117–22, 138, 151–52.

Finally, Defendants suggest that they did not detain Plaintiffs except for the hour that they were searching their apartment. MTD at 31. This is not true; Defendant Wright detained Ms. Lewis outside her building, before the search commenced. Compl. ¶¶ 84–87. And Defendants' assertion that they have an "absolute right" to detain occupants during a residence search, MTD at 31, is immaterial when the residence search is without a lawful basis. *See Muehler v. Mena*, 544 U.S.

93, 98 (2005) (finding the plaintiffs' "detention for the duration of the search" to be "reasonable" "*because a warrant existed* to search [her residence]" (emphasis added)); *see supra* section I.A.1.

### B. January 2022 (Count 16)[4]

Defendants argue that their conduct was not conscience-shocking because D.C. law permits the police to involuntarily hospitalize people experiencing mental health crises. MTD at 31–32. In reality, D.C. Code § 21-521 permits MPD officers who have "reason to believe" that "a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained" to involuntarily hospitalize that person. That is, the statute permits, but does not require, detention—and only under specific and narrow circumstances. Defendants cannot rely on this statute to justify detaining a person whom they had no reason to believe was an imminent threat. Defendants spent hours standing at Ms. Lewis's door. Compl. ¶¶ 184–233. Ms. Lewis told them at least four times that they could video-call her or observe her via her floor-to-ceiling, ground floor window to confirm her well-being. *Id.* ¶¶ 176–77, 183, 198, 236. They repeatedly refused. *Id.* ¶¶ 177, 183, 198. They prevented her from being evaluated by paramedics. *Id.* ¶¶ 210–14. And once Ms. Lewis was actually meeting with a DBH professional, the officers stormed into her apartment and violently interrupted that wellness check. *Id.* ¶ 246. These allegations make out a substantive due process claim. Whether Defendants' actions shock the conscience, in light of the totality of the circumstances, is properly left to a finder of fact. *Butera*, 83 F. Supp. 2d at 19–20.

---

[4] Defendants argue that "Plaintiffs fail to make any allegations regarding the anonymous 'two other January 2022 Defendant Officers' and claims against them should be dismissed." MTD at 26 n.3. But the Complaint specifically alleges that Defendants Arhin, Boyd, and Cipolari, "along with at least two other Defendant Officers" handcuffed Ms. Lewis, paraded her through the lobby, and shoved her into the back of a police car. Compl. ¶¶ 246, 257. Plaintiffs intend to confirm in discovery which officers participated in each particular violation of their rights. Doe Defendants are not properly dismissed until "after the completion of discovery." *Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011).

Defendants also argue that the force they used was not so excessive as to shock the conscience because "the right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion." MTD at 32. But Defendants did not have a right to detain Ms. Lewis in the first instance. *See supra* at I.B.1.a. As such, the use of *any* force was unlawful. *See Moore*, 79 F. Supp. 3d at 132–34. Defendants similarly point out that MPD policy allows them to handcuff "mental health consumers" during transport. MTD at 32. But nowhere does the policy allow officers to excessively tighten handcuffs to the point of causing lasting injury, Compl. ¶¶ 247, 275, or to use force against persons who pose no threat of danger in the first instance, *see supra* at I.B.1.a; *see also* MPD General Order, Interacting with Mental Health Consumers, OPS 308.04 (Feb. 9, 2015), at V.C.2.

Finally, Defendants claim that Plaintiffs have failed to identify an "interest derived from a constitutional right underlying these alleged violations." MTD at 33. To the contrary, Ms. Lewis had a "constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *see also Union Pacific R. Co. v. Botsford,* 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person . . . ."). Furthermore, "the reciprocal rights of parent and child to one another's 'companionship'" are also firmly protected by the Constitution. *Franz*, 707 F.2d at 595; *see supra* at 23. As such, the facts alleged in the Complaint permit a finding that Defendants violated Plaintiffs' clearly established substantive due process rights.

**III.    Plaintiffs Plausibly Allege Violations of Their First Amendment Rights.**

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory

26

action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;

and (3) a causal link" between the two. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (internal

citation omitted). Ms. Lewis exercised her lawful right to challenge police action. Compl. ¶¶ 306,

339. In response, Defendants unlawfully detained Plaintiffs and searched their home. *See supra*

sections I.A., I.B.1–2. Defendants told Ms. Lewis that, had she acquiesced to their demands, "none

of this would have happened." Compl. ¶ 154; *see also id.* ¶ 258 ("Had you spoken to me, all this

would not have transpired."). That is the textbook definition of retaliation.

### A.  June 2020 (Count 5)

Defendants argue that Ms. Lewis's refusal to allow officers to search her home is not

conduct protected by the First Amendment. MTD at 34–35. To the contrary, "[t]he freedom of

individuals verbally to oppose or challenge police action without thereby risking arrest is one of

the principal characteristics by which we distinguish a free nation from a police state." *City of

Houston*, 482 U.S. at 462–63. "[T]he First Amendment protects a significant amount of verbal

criticism and challenge directed at police officers." *Id.* at 461; *see also Huthnance v. District of

Columbia*, 793 F. Supp. 2d 183, 203 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013) (noting

that the First Amendment protects a right "to protest unlawful arrests and criticize the police");

*Wood v. Eubanks*, 25 F.4th 414, 425 (6th Cir. 2022) (same); *Addison v. City of Baker City*, 758 F.

App'x 582, 584 (9th Cir. 2018) (unpublished) (same); *Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d

501, 510 (5th Cir. 1992) (same). "[T]he right of freedom of thought protected by the First

Amendment against state action includes both the right to speak freely and the right to refrain from

speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

Courts have repeatedly held that a person's assertion of their Fourth Amendment rights is

"conduct" protected by the First Amendment. *See, e.g.*, *Nazario v. Gutierrez*, No. 2:21-CV-169

(RCY), 2022 WL 3213538, at *18 (E.D. Va. Aug. 9, 2022) (plaintiff who questioned lawfulness of traffic stop and was subsequently arrested plausibly alleged a retaliation claim, because the First Amendment protects a "right to orally challenge police officers"); *Phillips v. Price*, No. CV 5:19-185-JMH, 2021 WL 3610039, at *7 (E.D. Ky. Aug. 13, 2021) (plaintiff who alleged that defendant prison guards had revoked his permission to visit his incarcerated brother because plaintiff refused to allow guards to search his vehicle plausibly alleged a retaliation claim); *Daniels v. Dixon*, No. 8:21-CV-223-CJC (MAR), 2021 WL 4468940, at *11 (C.D. Cal. Aug. 13, 2021) (plaintiff who questioned lawfulness of traffic stop plausibly stated retaliation claim because she was "engaged in the constitutionally protected activity of criticizing and verbally challenging police officers"); *Jiron v. Roth*, 519 F. Supp. 3d 971, 1000–03 (D.N.M. 2021) (plaintiff plausibly stated that defendant police officers retaliated against her when they threatened to arrest her after she refused to consent to a search of her home).

Defendants also argue that Ms. Lewis has not sufficiently pled a "causal link" between her refusal to consent to a search and Defendants' conduct. MTD at 34–35. But the Complaint clearly alleges that, after Ms. Lewis exercised her constitutional right to challenge police action by refusing to consent to a search of her home, Defendants unlawfully seized Ms. Lewis and searched it anyways. *See supra* sections I.A.1, I.A.2.a. No policy required Defendants to do so. Compl. ¶ 55. Defendants had no "absolute right to detain" Plaintiffs while searching their home, MTD at 36, because Defendants' search of Plaintiffs' home was unlawful in the first instance. *See supra* sections I.A.1, II.A. Defendant Hambrick told Ms. Lewis that, "[h]ad [she] let [him] go in, none of this would have happened." Compl. ¶ 308. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (shifting burden to defendant to show that an arrest "would have been initiated without respect to

retaliation" where plaintiff had made a *prima facie* case that arrest was without probable cause and retaliation "was a substantial or motivating factor").

Finally, Defendants argue that Ms. Lewis has not shown that they "had any animus toward her First Amendment activity." MTD at 35–36. But "direct evidence of retaliatory animus is not required" to show First Amendment retaliation, "especially at this early stage of the proceedings." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46–47 (D.D.C. 2021). "Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (internal quotations omitted); *see also id.* (plaintiff plausibly pled retaliation where two weeks elapsed between plaintiff's exercise of First Amendment rights and the defendant's retaliatory action).  In any case, whether Defendants' statements convey retaliatory animus is "a matter best suited for the jury." *Phillips*, 2021 WL 3610039, at *6.

### B.  January 2022 (Count 17)

On January 13, 2022, Defendants threatened to break down Ms. Lewis's door, remove N.L. from Ms. Lewis's care, and involuntarily hospitalize Ms. Lewis—who showed no signs of being an imminent danger to herself or anyone else—because Ms. Lewis exercised her right to challenge police action. Compl. ¶¶ 177, 215, 238, 240. Defendants again argue that Ms. Lewis was not engaging in conduct protected by the First Amendment. MTD at 36. As established above, refusing to consent to an invasion of one's Fourth Amendment rights is protected conduct. *See supra* at 27–28. Defendants also argue that Ms. Lewis has not plausibly pled causation because their actions "emanate from statutes and policies." MTD at 37. To the contrary, neither law nor policy demanded Defendants act as they did. *See supra* section II.B.  Defendants further argue that they had probable cause to seize Ms. Lewis. MTD at 37. They did not. *See supra* section I.B.1.a. Finally,

Defendants argue that Defendant Arhin's declaration that "[h]ad [Ms. Lewis] spoken to [him], all of this would not have transpired," Compl. ¶ 341, was a statement of fact, not of retaliatory animus. But, again, direct evidence of animus is not required at this stage. *Black Lives Matter D.C.*, 544 F. Supp. 3d at 46–47. Judging Defendant Arhin's intent is "a matter best suited for the jury." *Phillips*, 2021 WL 3610039, at *6. Ms. Lewis has plausibly alleged that Defendants retaliated against her for exercising her constitutional rights.[5]

### IV.     Plaintiffs Plausibly Allege Intrusion Upon Seclusion (Counts 6, 20).[6]

Defendants contend that these claims should fail for the same reason that, they say, Plaintiffs' Fourth Amendment unlawful search claims (Counts 1, 14) should fail. MTD at 38. To the contrary, Plaintiffs have plausibly alleged that Defendants entered and searched their home in violation of the Fourth Amendment. *See supra* sections I.A.1, I.B.2. "'[T]he types of invasion intrinsic in [intrusion upon seclusion]' include 'entering a plaintiff's home without permission or searching his or her belongings.'" *Garay v. Liriano*, 839 F. Supp. 2d 138, 144 (D.D.C. 2012) (citing *Wolf v. Regardie*, 553 A.2d 1213, 1217–18 (D.C. 1989)). "As this is precisely what Plaintiffs have alleged here, dismissal is not appropriate." *Id. See also Garay v. Liriano*, 943 F. Supp. 2d 1, 25 (D.D.C. 2013) (collecting cases). As such, Counts 6 and 20 should not be dismissed for the same reasons that Counts 1 and 14 should not be dismissed.

---

[5] Even if the Court dismisses all of Plaintiffs' constitutional claims, it should exercise supplemental jurisdiction over their tort claims. This Court has already begun familiarizing itself with Plaintiffs' claims. The United States District Court for the District of Columbia is not an inconvenient forum for Defendant District of Columbia. The issues raised here involve local laws and standards well-known to this court. Indeed, Defendants acknowledge that some of Plaintiffs' tort claims are governed by federal law standards. MTD at 49 (explaining that Fourth Amendment unlawful seizure and D.C. tort false arrest share a legal standard).

[6] Defendant District of Columbia argues that it should not be held vicariously liable for any of Plaintiffs' tort claims. MTD at 38, 39, 42, 43, 44, 47, 49. Because at least one Defendant Officer is liable for each of Plaintiffs' tort claims, *see infra* sections IV–X, the District bears *respondeat superior* liability for each. *District of Columbia v. White*, 442 A.2d 159, 162 n.7 (D.C. 1982).

### V.     Plaintiffs Plausibly Allege Trespass (Counts 7, 21).

Trespass is "simply an unauthorized entry by one person upon the land of another." *Garay*, 943 F. Supp. 2d at 25 (citation omitted). While police officers who lawfully enter a house are not trespassing, "[t]his protection . . . does not extend to *unlawful* entries." *Id.* (collecting cases). Defendants argue that they are not liable for trespass because they had a lawful basis to enter Plaintiffs' home. MTD at 39. But as outlined above, no such lawful basis existed. *See supra* sections I.A.1, I.B.2. As such, Plaintiffs have plausibly pled claims for trespass for the same reasons that they have plausibly pled claims for unlawful entry.

### VI.    Plaintiffs Plausibly Allege Intentional Infliction of Emotional Distress ("IIED").

"[T]he tort of intentional infliction of emotional distress requires (1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Garay*, 943 F. Supp. 2d at 23 (internal citations omitted). "[T]he extreme and outrageous determination is in the first instance of question of law, [but] . . . should proceed to trial where reasonable people could differ on the question." *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 406 (D.D.C. 2020) (citations omitted).

#### A.   June 2020 (Count 8)

Defendants argue that this claim is time-barred by D.C. Code § 12–301(a)(4)'s one-year statute of limitations for certain intentional torts. MTD at 40–41. IIED claims generally have a three-year limitation, but may be subject to a one-year limitation where "the emotional distress aspect of the claim [i]s essentially an outgrowth of . . . other pleaded torts" for which the statute prescribes a one-year limitation. *Saunders v. Nemati*, 580 A.2d 660, 662–63 (D.C. 1990) (declining to apply one-year limitation to an IIED claim because the only other alleged count had a three-year limitation). The cases that Defendants cite applied the one-year limitation where an IIED

31

claim "utterly depended" on a claim with a one-year limitation. *Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997) (battery); *Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 37 (D.D.C. 2010) (assault, battery, false arrest, and false imprisonment). Whereas here, as in *Saunders*, "on the face of the complaint," there are no tort claims regarding the June 2020 incident "with distinct limitation periods so as arguably to constrict the time period otherwise applicable to [IIED]." 580 A.2d at 663. Plaintiffs' IIED claim is based on allegations of fraud and invasion of privacy. *See* Compl. ¶ 315 (alleging an IIED claim because officers tricked Ms. Lewis into leaving her building so they could search her apartment). The only other torts alleged regarding the June 2020 incident are intrusion upon seclusion, trespass, negligent infliction of emotional distress, and negligence. *See* Exhibit A. None of these are subject to § 12–301(a)(4)'s one-year limitation.

Substantively, Defendants argue that the alleged conduct is not sufficiently "extreme and outrageous" to sustain an IIED claim. MTD at 41. Courts have found that law enforcement officers who make false statements have engaged in "extreme and outrageous" conduct. *See, e.g.*, *Pitt v. District of Columbia*, 491 F.3d 494, 506 (D.C. Cir. 2007); *District of Columbia v. Tulin*, 994 A.2d 788, 800–01 (D.C. 2010). Defendants lied to Ms. Lewis twice: first, by telling her that policy "required" them to search her apartment, when it did not; second, by luring her outside so Defendants Wright and Charles could search her apartment, Compl. ¶¶ 54, 72, 98. That Defendants knew that Plaintiffs were "peculiarly susceptible to emotional distress," *Mann v. Bahi*, 242 F. Supp. 3d 6, 11 (D.D.C. 2017), makes their conduct all the more extreme: Ms. Lewis told the officers that she wanted to meet them outside because of stress caused by prior interactions with the police. Compl. ¶ 44, 65. Ms. Lewis was concerned for K.R.'s well-being. *Id.* ¶ 40. And N.L., like all children, was uniquely vulnerable to people of authority. *J.D.B.*, 564 U.S. at 272. To top it all off, the searches and seizures carried out by Defendants were unlawful. *See supra* section I.A.

*Cf. Stevens v. Stover*, 727 F. Supp. 668, 672–73 (D.D.C. 1990) (force used during arrest was not outrageous because arrest was lawful). Such abuses of power are extreme and outrageous.

Defendants also argue that they did not act with intent to cause harm or recklessness because they were following department policy. MTD at 41. But policy did not compel Defendants' actions. Compl. ¶ 55. OPC has already found that at least Defendant Wright acted recklessly. *Id.* ¶ 266. And a jury may infer recklessness from the "outrageousness" of the allegations. *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007).

Finally, Defendants contend that Plaintiffs have not suffered distress sufficient to sustain an IIED claim because they have not pled physical harm. MTD at 41–42. But under D.C. law, IIED does not have a physical injury requirement. *Mann*, 242 F. Supp. 3d at 12. Plaintiffs have alleged acute emotional upset—major dissociative episodes, psychological trauma that still interferes with daily functioning, and threats of eviction, Compl. ¶¶ 273, 277—from which "harmful physical consequences might be not unlikely to result." *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982). That is enough. Count 8 should not be dismissed.

### B. January 2022 (Count 22)

Defendants contend that their actions on the evening of January 13, 2022 were reasonable under the circumstances. MTD at 42–43. Again, Defendants lied to Plaintiffs about why they wanted N.L. to step out of the apartment, whether they would let her back in, and whether they would remove Ms. Lewis from her apartment if she complied with their demands. Compl. ¶¶ 184 –209, 237–46, 254–56. They were on notice that Plaintiffs were acutely vulnerable; from the start, Ms. Lewis told the officers that she had been traumatized by prior police interactions. *Id.* ¶ 201. The very cause of the interaction was that CFSA had told MPD that Ms. Lewis mentioned self-harm. *Id.* ¶ 166. Defendants knew that N.L. was young and susceptible. Yet they ignored Ms.

Lewis's attempts to deescalate the situation, unlawfully seized and separated Plaintiffs, and unlawfully searched their home. That conduct was extreme and outrageous.

Defendants also contend that the emotional trauma Plaintiffs allege is insufficient to support their IIED claim. Again, IIED claims do not require evidence of physical injury. *Mann*, 242 F. Supp. 3d at 12. Even so, the Complaint provides photographic evidence of physical injury resulting from this incident and alleges ongoing psychological trauma from which "harmful physical consequences might be not unlikely to result." *Sere*, 443 A.2d at 37; Compl. ¶¶ 272–81.

### VII. Plaintiffs Plausibly Allege Negligent Infliction of Emotional Distress ("NIED") (Counts 9, 23).

To prevail on a claim for negligent infliction of emotional distress, a plaintiff must show that: "(1) the plaintiff was in the zone of physical danger; (2) the zone was created by the defendant's negligence; (3) [the] plaintiff feared for his own safety; and (4) the resulting emotional distress was serious and verifiable." *Hunter*, 824 F. Supp. 2d at 139 (internal citation omitted).

Defendants first argue that Plaintiffs have not adequately pled negligence. MTD at 43. That is debunked *infra*, section VIII. Defendants also suggest that Plaintiffs' distress is not serious and verifiable. MTD at 44. "'Serious and verifiable' means that the distress must have manifested in an external condition *or* physical symptoms." *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) (internal citation omitted) (emphasis added). In other words, there is no physical injury requirement. *Hunter*, 824 F. Supp. 2d at 139. Plaintiffs have pled verifiable external conditions, including photographed bruises and major dissociative episodes that interfere with daily functioning. Compl. ¶¶ 272–81.

Defendants then argue that Plaintiffs' allegations regarding the first and third NIED prongs are not sufficient to state a valid claim. MTD at 43. The crux of these prongs is that the plaintiff must have *herself* been within a zone of danger, wherein she feared for "*her own* safety or health."

*Hedgepeth v. Whitman Walter Clinic*, 22 A.3d 789, 799 (D.C. 2011) (emphasis added). With respect to the June 2020 incident, Plaintiffs have pled that the presence of eight police officers entering their home when Ms. Lewis asked them not to and searching it unlawfully, while they were both present—and in fact, detained—caused them both to fear for their safety. Compl. ¶¶ 65, 115, 145, 148–49; *see also id.* ¶ 149 ("'We have a child who's traumatized, I'm traumatized.'"). With respect to the January 2022 incident, Ms. Lewis has pled that given her past experience with MPD, she was afraid of what would happen if she opened her door to Defendants, and once she cracked the door, was trapped for several hours, fearful of what officers might do she either retreated or opened the door further. *Id.* ¶¶ 176, 223. *See Odom v. District of Columbia*, 248 F. Supp. 3d 260, 266 (D.D.C. 2017) (finding first and third NIED prongs were satisfied when defendant officers were using "unwarranted and unpredictable force" against the plaintiff's son in her presence). N.L. has pled that she too feared for her safety; after she watched Ms. Lewis be led away in handcuffs, N.L. texted her older sister K.R. that "the worst" had happened. Compl. ¶ 280. *See David v. District of Columbia*, 436 F. Supp. 2d 83, 90–91 (D.D.C. 2006) (finding that the plaintiff was in a zone of danger where the defendants separated the plaintiff from her mother, forcibly removed her mother from the room, and threw her mother against the wall).

Furthermore, there is an alternate way of proving NIED claims in the District. A plaintiff may recover for NIED if: "(1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth*, 22 A.3d at 810–11. With regard to the January 2022 incident, the "very subject and purpose of the

35

engagement" between Plaintiffs and Defendants was, allegedly, "care for [Plaintiffs'] emotional well-being." *Id.* at 813. Defendants were conducting a "wellness check." Compl. ¶ 169. It was "extremely likely" that Defendants' negligence would cause serious emotional distress, given that the police had been told that Ms. Lewis mentioned self-harm to CFSA, and Ms. Lewis herself explained to the officers that she had been traumatized by past experiences with the police. *Id.* ¶¶ 166, 201. And Defendants' negligence did in fact cause serious emotional distress, including major dissociative episodes that interfere with Ms. Lewis's daily functioning. *Id.* ¶¶ 272–81. As such, Plaintiffs have plausibly pled NIED.

### VIII.   Plaintiffs Plausibly Allege Negligence (Counts 10-11, 25-26).

"The elements of a cause of action for negligence are" (1) "a duty of care owed by the defendant to the plaintiff," (2) "a breach of that duty by the defendant," and (3) "damage to the interests of the plaintiff," (4) "proximately caused by the breach." *Goolsby v. District of Columbia*, 354 F. Supp. 3d 69, 74 (D.D.C. 2019) (citation omitted). When the defendant is a law enforcement officer, "the inquiry is whether the officer's conduct violated the standard of care of a reasonably prudent police officer.'" *Holder v. District of Columbia*, 700 A.2d 738, 742 (D.C. 1997). Here, Plaintiffs allege that Defendants did not act as reasonably prudent police officers would in responding to calls about a missing person or a person who has mentioned self-harm. "Because [] Plaintiff[s] here ha[ve] adequately plead separate counts alleging both negligent and intentional conduct, [their] negligence claim[s] [should] survive[] the motion to dismiss." *Kowalevicz v. United States*, 302 F. Supp. 3d 68, 75–76 (D.D.C. 2018).

Defendants argue that Plaintiffs have "fail[ed] to define" the duties of care that Plaintiffs allege were breached, or, in the alternative, that there was no breach because Defendants responded appropriately to both incidents. MTD at 45–48. Those arguments are premature. Would reasonably

prudent officers responding to a missing person's report invent a "policy" to justify searching a residence they know they do not have a lawful basis to search?[7] Compl. ¶¶ 70–71, 74–77, 97, 99. Would a reasonably prudent officer continue to conduct a search he knows to be unlawful even after encountering a naked, unaccompanied child? *Id.* ¶ 106. Would reasonably prudent officers scream at and threaten a woman they think may be suicidal? *Id.* ¶¶ 172–75. Or threaten to take her child away? *Id.* ¶ 215. If Plaintiffs' negligence claims are permitted to reach discovery, Plaintiffs "will develop evidence, presumably through expert testimony, to support [their] allegations that the officers deviated from the standard of care." *Goolsby*, 354 F. Supp. 3d at 78; *see also id.* at 78–79 (allowing discovery on claim that officers breached duty "to use reasonable measures in their investigation of a 911 call," even though plaintiff did not "expound on the sources or requirements of" standard of care at motion to dismiss stage, so that standard could be developed in discovery).

Defendants' suggestion that they "acted in accordance with MPD policy and District statutes" is inapposite. MTD at 47. The appropriate standard of care may be "established, *in part*" by MPD policy. *District of Columbia v. Harris,* 770 A.2d 82, 90 (D.C. 2001) (emphasis added). But department policy is not the whole picture, especially where policy did not require the officers to act as they did. *See supra* at 13, 25–26. Because the appropriate standard of care is "distinctly related" to an occupation so "as to be beyond the ken of the average layperson," expert testimony is required. *Harris,* 770 A.2d at 90 (citation omitted).

Finally, Defendants argue that "Plaintiffs failed to identify the injury allegedly caused by the negligence and how Defendants' actions caused the injury." MTD at 48. But Plaintiffs have

---

[7] Defendants argue that they did not breach the relevant standard of care because they took steps to find K.R. by, for example, notifying the Riverdale police. MTD at 46. Even if some of the steps that Defendants took were appropriate, that does not define whether other steps that Defendants took (such as searching Plaintiffs' home and detaining them, knowing they had no lawful basis to do so) were reasonable.

enumerated the injuries that they continue to suffer as a result of these incidents. Compl. ¶¶ 272–81. And they have explained how these prolonged interactions with police caused their injuries. *Id.* ¶ 273 ("Ms. Lewis's mental health has been demonstrably worsened because of these incidents. She has experienced, among other things, major dissociative episodes."); *id.* ¶ 276 ("As Ms. Lewis feared . . . [s]he has been warned by her building management company that she is on thin ice because of police activity at her unit."); *id.* ¶¶ 322, 325, 366, 368. Plaintiffs' negligence claims should not be prematurely dismissed.

### IX.    Plaintiffs Plausibly Allege False Arrest (Counts 18-19).

The elements of a tort claim for false arrest are identical to the elements of a constitutional claim for false arrest. *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977). Defendants argue that Plaintiffs' tort claims fall because, Defendants say, Plaintiffs' constitutional claims fail. MTD at 49. To the contrary, Plaintiffs' constitutional claims are plausibly alleged. *See supra* section I.B.1. As such, their tort claims are, too, plausibly alleged.

### X.    Plaintiffs Plausibly Allege Assault & Battery (Count 24).

Defendants point out that they have a "qualified privilege" to use reasonable force in affecting a seizure. MTD at 49–50. But *unlawful* seizures are another story. "[C]onsidering the facts and circumstances of this particular case," Defendants' use of force "was not reasonably necessary." *Katz*, 285 A.3d at 1312–13. "It might be a different story if [Ms. Lewis] had been handcuffed pursuant to a lawful arrest. But [Ms. Lewis] has put forward facts that would permit a reasonable juror to conclude that MPD officers handcuffed [her] without probable cause, even though [s]he did not resist arrest or attempt to escape, and that they did so not in 'standard fashion' but with a level of force that left [Ms. Lewis] in pain for days . . . ." *Id.* at 1313; *see also Kotsch*, 924 A.2d at 1050 (declining to grant summary judgment to officers on assault & battery claim

where plaintiff did not resist arrest, plaintiff sustained physical injuries, officers arrested plaintiff for a non-violent misdemeanor (unlawful entry), and charges against plaintiff were eventually dropped). Defendants dragged Ms. Lewis out of her apartment, slammed her against the hallway wall, and handcuffed her so tightly that they left bruises and she could not carry her grocery bags for several weeks. Compl. ¶¶ 246–47, 274; *see also id.* ¶ 275 (photograph of bruises). Ms. Lewis did not attempt to flee, resist officers' efforts to handcuff her, or otherwise physically struggle with officers. Defendants unlawfully seized Ms. Lewis using excessive force. *See supra* sections I.B.1.a, I.B.3. As such, Defendants did not have a qualified privilege to use the force that they did.

## XI.   Defendant Officers Are Not Entitled to Qualified Immunity.

"[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *see also McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004) (stating that a qualified immunity defense "faces a formidable hurdle" when advanced in a Rule 12(b)(6) motion); *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (stating that a district could should not grant a Rule 12(b)(6) motion on qualified immunity grounds "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim"); *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal." (citation omitted)); *Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir. 2001) (noting that "qualified immunity is typically addressed at the summary judgment stage").

### A.  Fourth Amendment (Counts 1-3, 12-15)

#### 1.   June 2020

Regarding Defendants' unlawful seizure of Ms. Lewis (Count 2), Defendants do not raise qualified immunity. And Defendant Wright does not raise qualified immunity at all. Because

qualified immunity is an affirmative defense, Defendants have thus waived it with respect to these counts/officers. *See Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 162 (D.D.C. 2005). As for Defendant Charles, she suggests that she has qualified immunity because she did not personally participate in the search or seizure of N.L. MTD at 52–53. As described above, that is untrue. *See supra* section I.A.1.b.

Defendants Kennedy, Koenig, Hambrick, and Lockerman protest that they have qualified immunity because it was not "clearly established" that to stand by or supervise the search of Plaintiffs' home (Count 1) or seizure of N.L. (Count 3) was wrong. MTD at 52–53. But the relevant inquiry is whether the action itself (*i.e.*, the search/seizure) was clearly established to be unconstitutional, *not* whether it was clearly established that being a bystander to/supervisor of such action is unconstitutional. *See, e.g.*, *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 147 (D.D.C. 2017) ("[I]f a jury concluded that [the principal officer] [violated the plaintiff's clearly established rights], it could also reasonably conclude that the other officers knew that [the principal officer] was violating [the plaintiff's] constitutional rights."); *Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 595 n.3 (D.D.C. 2018). Put differently, because the test for qualified immunity asks what a "reasonable officer" would know, all officers are equally positioned to know whether conduct is unconstitutional and whether they have an obligation not to engage in such conduct, whether as the principal, bystander, or supervisor.

It has long been clearly established that *any* physical intrusion into the home, however slight, is a search that triggers Fourth Amendment scrutiny. *Kyllo*, 533 U.S. at 37; *Payton*, 445 U.S. at 590; *Silverman*, 365 U.S. at 512. It is also clearly established that, where "a reasonable person" "believe[s] that [s]he [is] not free to leave," *Mendenhall*, 446 U.S. at 554, or "submit[ts] to the assertion of authority," *Hodari D.*, 499 U.S. at 626, that person has been seized within the

meaning of the Fourth Amendment.[8] It is clearly established that warrantless searches and seizures are "per se unreasonable under the Fourth Amendment —subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357. It is clearly established that there are only two exceptions to the warrant requirement for a residence search: consent and exigent circumstances. *Steagald v. United States*, 451 U.S. 204, 216 (1981). And it is clearly established that exigent circumstances exist only where there is imminent danger of serious injury, destruction of evidence, or a fleeing felon. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

As such, it was clearly established in June 2020 that to search a person's home absent a warrant, probable cause, consent, or exigent circumstances—and to detain that person attendant to the search—violated the Constitution. Defendants themselves admitted as much in real time. Compl. ¶¶ 71, 97, 99, 141. They do not have qualified immunity.

### 2.   January 2022

Defendants do not raise qualified immunity with respect to N.L.'s unlawful seizure (Count 13), or Ms. Lewis's excessive force claim (Count 15).[9] Nor do Defendant raise qualified immunity with regard to their initial entry into Plaintiffs' home via Defendant Owens's baton, their detention of Ms. Lewis at her apartment door for several hours, or Defendants Owens and Cipolari's search of Plaintiffs' home after they had been "involuntarily remove[d]" from it (Counts 12, 14). MTD

---

[8] Defendants suggest that it was not "clearly established" that standing in the threshold of a person's home, such that they cannot leave, constitutes a seizure. MTD at 52. A clear consensus of courts has found that, where officers block a person's path, that person has been seized within the meaning of the Fourth Amendment. *See Smith*, 794 F.3d at 685; *Camacho*, 661 F.3d at 725; *Washington*, 490 F.3d at 772; *supra* section I.A.2.b. No reasonable person would feel free to breeze past an officer standing in their doorway, *see Mendenhall*, 446 U.S. at 554, and in fact N.L. submitted to Defendants' show of force and remained inside, *see Hodari D.*, 499 U.S. at 626.

[9] *See Dormu*, 795 F. Supp. 2d at 23–24 (finding plaintiff had a clearly established right to be free from a police officer's injury-inducing application of handcuffs because "[a]lmost every Court of Appeals has held that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury," and collecting cases).

at 11; Compl. ¶¶ 181, 223, 248. As such, Defendants have waived qualified immunity with regard to these Fourth Amendment violations. *Lerner*, 362 F. Supp. 2d at 162.

Defendants raise qualified immunity in only one narrow context: they argue that they did not violate clearly established law by entering Ms. Lewis's home and "involuntarily removing her" from it. MTD at 54. Defendants rely on Justice Alito's concurrence in *Caniglia*, in which he wrote that he did not understand the Court to be forbidding the invocation of the community caretaking exception to allow for "a *short-term* seizure conducted for the purpose of whether a person presents an *imminent* risk of suicide." 141 S. Ct. at 1601 (emphases added). No other Justices joined this concurrence, nor did the concurrence address searches (as opposed to seizures). Concurrences, of course, "do not bind lower courts in cases where there is a majority opinion," *United States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J.)—as there was in *Caniglia*. And the only two other cases that Defendants cite in support of their argument that they did not violate clearly established law are District Court cases involving events that occurred before *Caniglia* was decided. MTD at 53.

*Caniglia* clearly established that the "community caretaking" exception does not permeate the sanctity of the home. 141 S. Ct. at 1599–1600. Even before *Caniglia*, a clear consensus of cases "clearly establishe[d] the importance of officers' on-the-scene observations and underscore[d], absent an emergency, the need for further inquiry when responding to reports of alleged concerning behavior." *Wheeler*, 2022 WL 160226 at *17 (citing *Rudolph*, 939 F.3d at 747, 749–50; *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 170–71 (4th Cir. 2016); *Fisher v. Harden*, 398 F.3d 837, 843–44 (6th Cir. 2005); *Bailey v. Kennedy*, 349 F.3d 731, 741–42 (4th Cir. 2003); *Burruss*, 192 F. Supp. 3d at 664). "[I]t is 'clearly established' that officers 'may not detain someone for an emergency mental evaluation' based on an initial report of concerning behavior,

'where the officers were able to observe the person alleged to be suicidal [or a danger to others] and observed nothing indicating' that to be the case." *Id.* at *17 (quoting *Bailey*, 349 F.3d at 741).

Defendants detained Ms. Lewis based on a call that their factual investigation did not corroborate. *See supra* section I.B.1.a. It was clearly established at the time that officers performing a wellness check should "question the veracity of a suicide report based on the facts at the scene." *Rudolph*, 939 F.3d at 747. As such, Defendants do not have qualified immunity.

### B.  Fifth Amendment (Counts 4, 16)

Defendants argue that they have qualified immunity from Plaintiffs' Fifth Amendment claims "[f]or the same reasons that Plaintiffs cannot show that individual Defendants violated the Fourth Amendment." MTD at 54. Because Plaintiffs have plausibly alleged violations of their clearly established Fourth Amendment rights, *see supra* sections I, XI.A, Defendant Officers do not have qualified immunity from Plaintiffs' Fifth Amendment claims.

### C.  First Amendment (Counts 5, 17)

Defendants devote a single paragraph to, and cite no law in support of, their arguments that they should have qualified immunity from Plaintiffs' First Amendment claims. MTD at 54. First, Defendant argue that it is not clearly established that Ms. Lewis's refusal to consent to a search or seizure was conduct protected by the First Amendment. *Id.*[10] It is clearly established that the right to criticize and challenge the police is protected by the First Amendment. *City of Houston*, 482 U.S. at 461. It is also clearly established that retaliation by public officials against the exercise of constitutional rights is *itself* a violation of the First Amendment. *Perry v. Sindermann,* 408 U.S.

---

[10] Defendants also argue that because the officers acted in accordance with MPD policy and law, they could not have believed that they were acting in violation of the First Amendment. MTD at 45. But the relevant policies and laws did not compel the officers to act as they did. *See supra* at 13, 25–26. And the qualified immunity standard is one of objective reasonableness, not subjective intent. *Wesby*, 138 S. Ct. at 590; *see also supra* at 13 n.2.

593, 598 (1972). The constitutional right to refuse consent to a search specifically has been clearly established for centuries. *See, e.g.*, *Georgia v. Randolph*, 547 U.S. 103, 123–24 (2006) (Stevens, J., concurring) (since 1791 under the Fourth Amendment, and even longer under the common law); *United States v. Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1993) (collecting cases). As such, any reasonable officer would know that retaliating against a person because they refuse to consent to a search violates the First Amendment.

As now-Justice Kentaji Brown Jackson explained in a case in this District, in which the plaintiff alleged that he had been arrested in retaliation for using profanity in a public park, "it is clear beyond cavil that, in order to arrest someone in a manner that satisfies the Fourth Amendment, a police officer must have a warrant or probable cause to believe that the person has committed, or is engaged in committing, a crime." *Patterson v. United States*, 999 F. Supp. 2d 300, 313 (D.D.C. 2015) (citations omitted). "Significantly, the First and Fourth Amendment are both implicated simultaneously in a situation in which a speaker is allegedly arrested in retaliation for speech alone in the absence of any likelihood of violence, provocation, or disruption. *Such an arrest would clearly violate the First Amendment*." *Id.* at 314 (emphasis added).

*Patterson* held that police officers did not have qualified immunity from the plaintiff's retaliatory arrest claim because no reasonable officer could conclude that there was probable cause to arrest him. *Id.* at 316–17; *cf. Nieves*, 139 S. Ct. at 1725. So too here. Defendants did not have a lawful basis to seize Ms. Lewis or search her apartment. *See supra* section I. They knew as much. Compl. ¶¶ 70–71, 74–77, 97, 99. As such, "the complaint ably supports the claim" that she was detained, and her home searched, "in retaliation for [her] protected speech and that the individual officers therefore violated [her] clearly established First and Fourth Amendment rights." *Patterson*, 999 F. Supp. 2d at 317; *see also id.* ("[I]n the D.C. Circuit, a police officer is

unquestionably on notice that arresting a speaker solely based on the content of his speech and without probable cause to believe that he has committed a crime is a violation of the First Amendment." (citing *Dellums,* 566 F.2d at 194–95)). And "[e]ven if the case law were insufficient to provide notice . . . the right to be free from government violence for the peaceful exercise of protected speech is so fundamental to our system of ordered liberty that it is 'beyond debate." *Black Lives Matter D.C.*, 544 F. Supp. 3d at 47 (citing *Wesby*, 138 S. Ct. at 589); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.) ("[S]ome things are so obviously unlawful that they don't require detailed explanation . . . .").

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted this 22nd day of February, 2023.

 /s/ Ellora Thadaney Israni
Ellora Thadaney Israni (D.C. Bar 1740904)*
Leonard J. Laurenceau (D.C. Bar 90007729)*
Brittany Francis (New York Bar 5337555)*†
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
ellora@civilrightscorps.org
Phone: (202) 894-6132

* Not a member of the Bar of this Court. Appearing without compensation from clients, pursuant to Local Civil Rule 83.2(f).
† Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. (49)(c)(8), with supervision by members of the D.C. Bar.

*Counsel for Plaintiffs*