**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MALAIKA LEWIS, *et al*.,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA, *et al*.,<br><br>    *Defendants*. | Civil Action No. 22-3369 (RDM) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

  This case involves two separate encounters that Plaintiff Malaika Lewis and her minor daughter, Plaintiff N.L., had with the Metropolitan Police Department ("MPD"). Alleging that the responding officers unlawfully entered and searched their home, unlawfully seized them, and caused them unjustified trauma, Plaintiffs assert 26 constitutional and common law claims against the District of Columbia and sixteen MPD officers.[1]

  The first encounter occurred on June 24, 2020, when Defendants Diane Brooks, Natalie Charles, Chad Hambrick, Anthony Hector, Richard Kennedy, James Koenig, Lashaun Lockerman, and John Wright ("June 2020 Defendant Officers") arrived at Plaintiffs' apartment building (at different times throughout the evening) in response to a call from Lewis reporting that her sixteen-year-old daughter, K.R., was missing and was likely somewhere near Riverdale, Maryland. Dkt. 13 at 6 (Am. Compl. ¶ 33–42). According to Plaintiffs, the June 2020

---

[1] The officers identified in Plaintiffs' amended complaint are George Ahrin, Monique Boyd, Diane Brooks, Natalie Charles, Albert Cipolari, Benjamin Finck, Chad Hambrick, Anthony Hector, Richard Kennedy, James Koenig, Lashaun Lockerman, Jonathan Matthews, Jermaine Maubry, Stephen Owens, Benjamin Rubin, John Wright. The complaint also seeks relief from 6-10 unnamed ("Jane Doe") defendants.

Defendant Officers did little to locate K.R. and, instead, focused their attention on Lewis and N.L.  Among other things, Plaintiffs allege that the officers unlawfully searched and entered their apartment, unlawfully detailed them, and caused both of them significant trauma.

The second encounter occurred on January 13, 2022.  That confrontation began when Lewis called the District of Columbia's Child and Family Services Agency ("CFSA") to report that N.L.'s father, with whom Lewis shared custody, had failed to pick up N.L. at school.  When the CFSA employee who answered the call indicated that the agency could not help Lewis under the circumstances, Lewis became upset and said something (which is not specified in Plaintiffs' amended complaint, but one can infer involved a threat of suicide) that led the employee to believe that Lewis might harm herself.  The employee reported that concern to the MPD, leading Defendants George Arhin, Monique Boyd, Albert Cipolari, Benjamin Finck, Jonathan Matthews, Jermaine Maubry, Stephen Owens, and Benjamin Rubin ("January 2022 Defendant Officers") to go to Lewis's apartment to conduct a welfare check.  According to Plaintiffs, the responding officers unlawfully entered their apartment (and unlawfully remained there after Lewis was arrested), unlawfully detained both Lewis and N.L., physically assaulted Lewis, and, once again, traumatized both Lewis and N.L.

Plaintiffs' 371-paragraph amended compliant alleges that Defendants violated their Fourth Amendment rights by conducting unreasonable searches, using excessive force, conducting unreasonable seizures or false arrests (Counts 1–2, 12–15 & 18–19); violated their Fifth Amendment (Counts 4 & 16) and First Amendment (Counts 5 & 17) rights; and committed various common law torts, including intrusion on seclusion (Counts 6 & 20), trespass (Counts 7 & 21), intentional infliction of emotional distress (Counts 8 & 22), negligent infliction of emotional distress (Counts 9 & 23), negligence (Counts 10–11 & 25–26), and assault and battery

(Count 24).  As explained, the alignments of specific plaintiffs and defendants varies from count to count.  In general, though, all or a subset of the June 2020 Defendant Officers and the District of Columbia are named as defendants in Counts 1–11, and all or a subset of the January 2022 Defendant Officers and the District of Columbia are named as defendants in Counts 12-26.

Defendants move to dismiss all 26 claims pursuant to Rule 12(b)(6), asserting both that Plaintiffs have failed to allege facts sufficient to state a claim for relief and that, in any event, the defendant officers are entitled to qualified immunity.  Dkt. 19.  For the reasons explained below, the Court will **GRANT** in part and **DENY** in part their motion to dismiss.

Beginning with Plaintiffs' claims premised on the June 2020 incident, the Court will **GRANT** the motion to dismiss as to Counts 2, 4–5, 8–9, and 11; will **DENY** the motion to dismiss Count 1 against Defendants Wright, Charles, Hambrick, Kennedy, and Koenig, but will **GRANT** the motion to dismiss Count 1 against Defendant Lockerman; will **DENY** the motion to dismiss Count 3 against Defendants Wright, Charles, and Koenig, but will **GRANT** the motion to dismiss Count 3 against Defendant Lockerman; **DENY** the motion to dismiss as to Counts 6 and 7 against Defendants Wright, Charles, and the District of Columbia, but will **GRANT** the motion to dismiss Counts 6 and 7 against Defendants Hambrick, Kennedy, Koenig, and Lockerman; and will **DENY** the motion to dismiss Count 10 against Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, and Wright, but will **GRANT** the motion to dismiss Count 10 against Defendant Lockerman.

For Plaintiffs' claims related to the January 2022 incident, the Court will **GRANT** the motion to dismiss as to Counts 16–17, 22–23, and 25–26 and will **DENY** the motion to dismiss Counts 12–14 and 18–21.  With respect to Counts 15 and 24, the Court will **GRANT** the motion

to dismiss, except to the extent Plaintiff Lewis alleges that Cipolari instructed the other officers

to overly-tighten the handcuffs, and those officers complied with that direction.

## I. BACKGROUND

For purposes of deciding Defendants' motion to dismiss, the Court will accept Plaintiffs'

factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Those allegations

focus on two distinct episodes.

### A.    **June 2020 Incident**

On the evening of June 24, 2020, Lewis was home with her daughter, Plaintiff N.L., who

was then six years old.  Dkt. 13 at 6 (Am. Compl. ¶ 33).  Lewis's other daughter, K.R., who at

the time was 16 years old and living with Lewis, had not been home for nearly 48 hours.  *Id.*

(Am. Compl. ¶ 34).  Earlier that same day, Lewis received a call from the aunt of one of K.R.'s

friends indicating that K.R. and the caller's nephew were "together in Mayland and might be

getting into trouble."  *Id.* (Am. Compl. ¶ 35).  Lewis then tracked K.R.'s phone to Riverside,

Maryland using "the Find My iPhone application," and "[s]he also saw pictures of K.R. on social

media."  *Id.* (Am. Compl. ¶ 36).  "K.R. had previously been diagnosed with clinical depression

and anxiety, for which she had been committed to a psychiatric facility a few months prior," and,

since her release, she had "stopped taking her medications."  *Id.* at 7 (Am. Compl. ¶ 37).

"Lewis was hesitant to call the police" for two reasons: first, she was concerned that they

"would mistreat her," and, second, the "police had shown up at [her] door" a few weeks earlier

"for reasons unrelated to . . . Lewis herself," and that event caused her embarrassment in front of

her neighbors and led her to fear "that the building manager" would evict her "for causing

'trouble' in the building."  *Id*. at 7 (Am Compl. ¶¶ 38–40).  Those concerns, however, were

secondary to her concern for her daughter's safety, so Lewis "decided to call MPD and [to] file a

missing person's report."  *Id.* (Am. Compl. ¶ 40).  But "[t]o mitigate the embarrassment and possible retaliation by her landlord and neighbors," Lewis decided to call the police on her cell phone from outside her building.  *Id.* (Am. Compl. ¶¶ 41–42).

At approximately 10:00 p.m., Lewis called 911 and told the dispatcher that her daughter was missing, that she had tracked her phone to Riverdale, Maryland, that her daughter "was mentally unwell," and that "Lewis preferred to meet the police outside because police coming to her apartment had caused problems with her neighbors and her landlord in the past."  *Id.* at 7–8 (Am. Compl. ¶ 44).  Defendant Kennedy arrived on the scene first, at approximately 10:15 p.m., and Lewis told him what she had told the 911 operator, before showing him K.R.'s location on her phone.  *Id.* at 8 (Am. Compl. ¶¶ 46–49).  About 15 minutes later, Defendant Koenig arrived, and asked Lewis the same questions that Kennedy had just posed.  *Id.* (Am. Compl. ¶¶ 51–53).  At that point, Koenig informed Lewis that "MPD policy" required the officers to "search [her] apartment."  *Id.* at 9 (Am. Compl. ¶ 54).  That policy, MDP General Order 304.03, governs "missing persons reports" and provides that officers should "canvass" the residence of the missing person when "[r]esponding to [m]issing [p]erson [c]alls for [s]ervice."  GO-OPS-3.04.03 § V.A.6(c)(1), (2) (available at https://go.mpdconline.com/GO/GO_304_03.pdf).  Specifically, the policy states that the "missing person's residence" be canvassed, and

> [f]or cases involving juveniles under the age of twelve (12), a thorough search shall be conducted of the residence to include any location the subject may be located including, but not limited to, closets, under beds, attics, crawl spaces, and garages, regardless if the reporting person states a search has already been conducted.

§ V.A.6(c)(1).  But that strict requirement does not apply to those, like K.R., who are age twelve and over.  For that group, and contrary to Koenig's representation, a search of the residence was required only "if warranted."  *Id.*

In response to Koenig's request to search her apartment, Lewis "explained that she was uncomfortable having police in her apartment and would not authorize the search." Dkt. 13 at 9 (Am. Compl. ¶ 57). At that point, it was approximately 10:45 p.m., and Kennedy and Koenig returned to their vehicles and checked the MPD's Record Management System ("COBALT") for records involving Lewis and K.R. *Id.* (Am. Compl. ¶ 59). That search returned no results. *Id.* Kennedy and Koenig then, forty-five minutes into the encounter, notified the authorities in Riverdale about K.R. *Id.* (Am. Compl. ¶ 60).

At around 10:50 p.m., Defendant Hambrick, who knew Lewis because he had helped transport K.R. to a psychiatric facility earlier that year, arrived, and Lewis once again explained that she had tracked K.R.'s phone to Riverdale, Maryland; that K.R. had stopped taking her medication; that she had been in touch with the aunt of one of K.R.'s friends; and that she was concerned about "the negative attention" that the police presence would draw "to her family in the eyes of her neighbors and her landlord." *Id.* at 9–10 (Am. Compl. ¶ 61–65). She also showed Hambrick K.R.'s social media account and provided him with the contact information for K.R.'s friend's aunt. *Id.* at 10 (Am. Compl. ¶ 66). Hambrick, in turn, called the friend's aunt, who provided him with the name and phone number of the friend that K.R. was with in Riverdale. *Id.* (Am. Compl. ¶ 67).

Hambrick confirmed to Koenig that he knew Lewis and had previously responded to the apartment. *Id.* at 11 (Am. Compl. ¶ 69). Despite Hambrick's familiarity with Lewis and K.R. and their circumstances, and despite the fact that law enforcement officers were searching for K.R. in Maryland, Koenig responded that "as the senior officer on the scene he would not allow a missing person's report to be filed unless MPD searched" the apartment." *Id.* (Am. Compl. ¶ 70). Notably, Koenig acknowledged that he "did not think they could get a warrant to search

the apartment, which is why they needed . . . Lewis's consent." *Id.* (Am. Compl. ¶ 71).  In turn, Hambrick once again informed Lewis about the MPD policy, and he repeated the refrain that the officers needed to search her apartment to "make sure that K.R. was not inside." *Id.* (Am. Compl. ¶ 72).  Lewis again denied her consent.  *Id.* (Am. Compl. ¶ 73).

At this point, Hambrick told Koenig and Kennedy that, based on his conversations with Lewis and K.R.'s friend's aunt, "as well as his prior experience with . . . Lewis and K.R.," he did not think that K.R. was in the apartment.  *Id.* (Am. Compl. ¶ 74).  Koenig agreed.  *Id.* (Am. Compl. ¶ 75).  But the officers, nevertheless, continued to pursue the matter by proposing that they could arrange for a female officer to search the apartment.  *Id.* (Am. Compl. ¶ 76).  Unswayed, Lewis again denied consent to conduct the search.  *Id.*  Lewis "told the officers that if she could not file a missing person report without consenting to a police search of her apartment, then she would give up trying to file the report," and she "prepared to go back inside." *Id.* (Am. Compl. ¶ 77).  In was now 11:45 p.m., and the officers began to leave.  *Id.* at 12 (Am. Compl. ¶ 78).

"[J]ust then," however, a fourth officer, John Wright, arrived and posed many of the same questions to Lewis that she had, by that point, repeatedly answered.  *Id.* (Am. Compl. ¶¶ 78–79).  But he also added a new line of questioning, asking Lewis who was watching N.L. while Lewis was outside.  *Id.* (Am. Compl. ¶ 82).  In response, Lewis said that she did not understand the relevance of the question and stated (untruthfully) that "a friend was watching N.L." *Id.* (Am. Compl. ¶ 83).  As Lewis attempted to return to her apartment, Wright "stopped her" and asked, again, whether Lewis would consent to a search conducted by a female officer.

*Id.* (Compl. ¶¶ 85–87).  "Again, [Lewis] refused."  *Id.* (Compl ¶ 88).  After Lewis left, "Wright asked the other officers if they had run a COBALT search," and "[t]hey told him they had, and that they had found nothing."  *Id.* (Am. Compl. ¶ 90).

Wright was not dissuaded, telling the other officers that "he still wanted to search . . . Lewis's apartment," not because he thought he would find K.R. in the apartment but, rather, because "he wanted to know which 'friend' was watching N.L. inside."  *Id.* at 13 (Am. Compl. ¶ 91).  According to Plaintiffs, "[t]he other officers hesitated," and Hambrick explained that "the last time he has been to . . . Lewis's apartment, she had similarly expressed hesitation about having police in her apartment."  *Id.* (Am. Compl. ¶ 92).  Hambrick also told Wright that, in his prior experience with Lewis, she "had never lied to him."  *Id.* (Am Compl. ¶ 93).

Around this time, Defendants Brooks and Hector arrived on the scene, bringing the total number of officers present to seven.  *Id.* (Am. Compl. ¶ 95).  Wright then proposed another idea: he would "go inside, knock on . . . Lewis's door, and see who answered."  *Id.* (Am. Compl. ¶ 96).  Although the other officers "knew [this] was wrong," and Koenig and Hambrick "reiterated that they had no basis to believe K.R. was inside the apartment," they declined to stop Wright and, to the contrary, "enabled" his plan.  *Id.* (Am. Compl. ¶ 97).  Defendants Wright and Charles then entered the building, while Koenig, Hambrick, and Kennedy allegedly "lured" Lewis back outside.  *Id.* at 14 (Am. Compl. ¶¶ 98–102).  Koenig, Hambrick, and Kennedy also confirmed to Wright, over the phone, that he did not have a "'public safety' exception" to enter the apartment.  *Id.* (Am. Compl. ¶ 99).  While Kennedy, Hambrick, Koenig, Brooks, and Hector "continued to distract . . . Lewis outside," Wright and Charles approached Lewis's apartment door, which was closed but not locked, and Wright knocked on the door.  *Id.* (Am. Compl. ¶ 102–03).

Upon hearing the knock, N.L., who had been sleeping, woke up and said "Mommy, there's someone at the door." *Id.* (Am. Compl. ¶¶ 104). Wright said nothing, and simply knocked again, prompting N.L. to respond "[h]ello?" *Id.* (Am. Compl. ¶ 105). "Wright and Charles then opened . . . Lewis's apartment door fully," and "Wright stepped inside," using his flashlight to examine what "he could see from the doorway—which included the entryway, living room, kitchen, K.R.'s room and, N.L." *Id.* at 14–15. (Am. Compl. ¶ 106). Wright proceeded to ask N.L. a series of questions, including whether she was alone, and Charles asked if she needed medical attention and if she had recently seen her sister (*i.e.*, K.R.). *Id.* (Am. Compl. ¶¶ 107–12). Wright remained "standing in the threshold, detaining N.L. inside, and separating the six-year-old from her mother, for nearly an hour." *Id.* (Am. Compl. ¶ 107).

Outside, Lewis told the officers that she did not wish to pursue filing a missing person's report; that she did not want to talk with them "right outside her building;" and that she still refused to consent to a search of her apartment. *Id.* at 15–16 (Am. Compl. ¶¶ 113–17). She then went inside and discovered Wright "standing in the threshold of her apartment with [the] door swung open." *Id.* at 16 (Am. Compl. ¶ 119). Lewis reiterated, yet again, that she did not consent to a search of her apartment, and she told the officers that N.L. was alone in the apartment. *Id.* (Am. Compl. ¶¶ 120–21). At that point, Charles "ushered" Lewis away and, with officers Brook and Hector, "took turns detaining and questioning [her] against her will at the far end of her hallway, approximately 50 feet from her apartment." *Id.* (Am. Compl. ¶¶ 120–23). Wright continued to "h[o]ld her door open and searched the apartment without a warrant," while Charles, Brooks, and Hector "prevented" Lewis from getting any closer. *Id.* (Am. Compl. ¶ 122). Koenig then approached Wright and asked Wright if the apartment door had been open when Wright arrived. *Id.* (Am. Compl. ¶ 123). In response, Wright lied, initially telling Koenig

"that it had been open," then asserting that "it had been locked,' and then saying that "it had been cracked." *Id*. at 17 (Am. Compl. ¶¶ 124–26). Charles also lied, telling Koenig that the door "was open" when they arrived. *Id*. (Am. Compl. ¶ 127).

After Wright had been standing in the doorway for about twenty minutes, Brooks and Hector approached Wright and explained that they had called D.C. Child & Family Services Agency ("CFSA"), which would take over the matter. *Id*. (Am. Compl. ¶ 129). In response "Wright protested" that "[h]e did not want to leave," leading Hector to remind Wright that "the officers did not have a legal basis" to search the apartment. *Id*. (Am. Compl. ¶¶ 130–31). Wright did not move from the doorway, and Charles and Brooks "continued to barricade" Lewis at the end of the hallway, so she "could not get close to her apartment or see what Defendant Wright was doing." *Id*. at 18 (Am. Compl. ¶ 134). At this point, Lewis asked Hector if the officers "had a search warrant," to which Hector replied that one was unnecessary "because it's children." *Id*. (Am. Compl. ¶ 135). Lewis then received a video-call from K.R., which Lewis showed to Hector to prove that K.R. was not in the apartment. *Id*. (Am. Compl. ¶ 136). Wright persisted in standing in Lewis's doorway, and "Koenig told him not to back down until the supervisor arrived." *Id*. (Am. Compl. ¶ 137).

Finally, at around 12:30 a.m., Lieutenant LaShaun Lockerman arrived at the scene. *Id*. (Am. Compl. ¶¶ 140). "Outside the building, . . . Hector informed . . . Lockerman that . . . Lewis had video-called K.R. and [had] shown him that she was not in the building." *Id*. (Am. Compl. ¶ 141). "Lockerman [then] proceeded inside the building," where "Lewis video-called K.R. again, showed the screen to [her], and allowed . . . Lockerman to compare the face on [the] screen to a prior missing person's report for K.R." Id. at 18–19 (Am. Compl. ¶ 142). Lockerman agreed that "the girl on the video-call was 'definitely' K.R." *Id*. at 19 (Am. Compl.

10

¶ 143).  Lockerman then walked over to Wright, and Wright explained that he "had entered the apartment for the purposes of 'public safety,'" after which Lockerman returned to Lewis and moved outside of the building to speak with her.  *Id.* at 19 (Am. Compl. ¶ 144–48).  Lewis expressed concern that Wright would "further enter her apartment," but Lockerman assured her that would not occur.  *Id.* (Am. Compl. ¶ 145–46).

Once outside, Lockerman indicated that she was "satisfied that K.R. was not in the apartment" and that the "MPD would file a missing person's report and [would] follow CFSA's directions going forward."  *Id.* at 20 (Am. Compl. ¶ 150).  Lockerman then called CFSA for directions.  At this point, Lockerman, Kennedy, Charles, and Hambrick were outside the building, and Lewis asked Charles and Hambrick if she could return inside but was told that she could not.  *Id.* (Am. Compl. ¶ 152).  CFSA informed Lockerman that it was not concerned for N.L.'s safety and that MDP should leave.  *Id.* (Am. Compl. ¶ 153).  Hambrick, meanwhile, "continued to detain . . . Lewis" and ultimately chastised her: "Had you let me go in, none of this would have happened."  *Id.* (Am. Compl. ¶ 154).  Finally, at around 1:00 a.m.—three hours after the episode began—the officers left, and Lewis returned to her apartment.  *Id.* (Am. Compl. ¶ 155).

## B.    January 2022 Incident

The second incident at issue occurred on January 13, 2022.  The relevant chain of events began when Lewis received a call indicating that N.L. needed to be retrieved from school due to a "possible COVID outbreak."  Dkt. 13 at 21 (Am. Compl. ¶ 156).  Lewis shares custody of N.L. with N.L.'s father, who was responsible for picking N.L. up from school that day but failed to respond to the school's calls.  *Id.* (Am. Compl. ¶ 157–58).  Lewis was "displeased" that N.L.'s father failed to respond to the school's calls, leaving it to her to pick up their daughter.  *Id.* (Am.

11

Compl. ¶ 160).  In a fit of pique, she called CFSA to report N.L.'s father for neglect.  *Id.* (Am.

Compl. ¶¶ 160–63).  When she was told "that CFSA would not help [her] in this situation," she

apparently made some reference (which is not quoted in the amended complaint) to self-harm or

suicide.  *Id.* (Am. Compl. ¶¶ 164–65).

From there, things spun out of control.  Alarmed by the conversation, the CFSA

employee "called 911 and told the dispatcher that . . . Lewis had mentioned self-harm," and, as a

result, "[f]our MDP officers—Defendant Officers Johnathan Matthews, Stephen Owens,

Monique Boyd, and Jermaine Maubry—knocked on . . . Lewis's door around 4:50 p.m." *Id.* at

22 (Am. Compl. ¶¶ 166–67).  The officers told Lewis that they received a call from CFSA

indicating that she was "going to kill herself." *Id.* (Am. Compl. ¶ 169).  Lewis "had no intention

of harming herself," *id.* (Am. Compl. ¶ 170), and, accordingly, she called CFSA back for

assistance in resolving the situation with the police, *id.* (Am. Compl. ¶ 171).  The officers asked

Lewis to open the door "so that they could see [her] and verify that she was okay," but Lewis

declined to open the door. *Id.* at 22–23 (Am. Compl. ¶¶ 172–76).  Lewis told the officers that

they could "video-call her" or look in at her "from her floor-to-ceiling window" to verify she was

okay, but she maintained her refusal to open the door. *Id.* at 23 (Am. Compl. ¶ 176).  Rather

than accept either of Lewis's proposals, an "officer radioed for a unit with a breach kit," and the

officers, purportedly believing that Lewis "was at risk of harming herself," "continued

screaming" at her. *Id.* (Am. Compl. ¶¶ 177–79).

"On the other side of the door," Lewis, who was still on the phone with CFSA, "asked the

[CFSA] social worker to explain the situation to the MPD." *Id.* (Am. Compl. ¶ 180).  She then

"cracked open the door" and held the phone up so that the officers "could hear the social

worker." *Id.*  When Lewis did so, Owens "shoved his baton into the doorjamb, preventing

[Lewis] from closing the door," *id.* (Am. Compl. ¶ 181), "for the next two hours," *id.* (Am. Compl. ¶ 182).

According to Lewis, the officers then tried "a different tactic," telling her that "if they could just see N.L. and verify that she was okay, they would leave." *Id.* at 24 (Am. Compl. ¶ 184). In response, Lewis brought N.L. to the door, and the officers "summoned [her] into the hallway" "[j]ust for a second." *Id.* at 25 (Am. Compl. ¶ 187). Lewis permitted N.L. to leave the apartment "with the understanding that the officers would let [her] [come] right back into the apartment." *Id.* (Am. Compl. ¶ 188). But, after verifying that N.L. was okay, "the officers did not permit" her to rejoin her mother in the apartment. *Id.* (Am. Compl. ¶ 190).

At that point, three additional MPD officers, Albert Cipolari, Benjamin Rubin, and Benjamin Flick, arrived at the apartment, and Cipolari told Lewis "that, if she did not come out of her apartment, the officers would take N.L. away with them." *Id.* (Am Compl. ¶¶ 191–92). The interaction then reached a stalemate: Lewis refused to open the door and, instead, suggested that the officers should speak with the social worker, while the officers refused to leave without seeing Lewis; Lewis offered to speak with the officers on a video-call, so that they could assess her well-being, and they declined her offer; and Lewis unsuccessfully urged Owens to remove his baton from her doorway. *Id.* at 26 (Am. Compl. ¶¶ 197–200). At Cipolari's direction, Boyd took N.L. to the lobby, where she was held (away from her mother) for the next several hours. *Id.* (Am. Compl. ¶¶ 202–03). As time passed, Rubin instructed "Owens to 'keep the door propped.'" *Id.* at 27 (Am. Compl. ¶ 209).

Around 5:30 p.m., two paramedics arrived on the scene. *Id.* at 27 (Am. Compl. ¶ 210). Lewis stated that she would permit the paramedics to enter her apartment, but not the police. Cipolari, however, insisted that Lewis open the door and allow the MPD to "watch the

paramedics conduct their exam." *Id.* (Am. Compl. ¶ 214). Lewis refused, and, concerned about N.L.'s well-being, asked the officers to call N.L.'s father, so he could care for their daughter. *Id.* at 28 (Am. Compl. ¶ 219). "The officers refused." *Id.* (Am. Compl. ¶ 221).

Around the same time, George Arhin, who was trained in crisis management, arrived. *Id.* (Am. Compl. ¶ 224). Lewis "assured him, just as she had assured the half-dozen officers to whom she had already spoken, that she was okay" and that the CFSAs operator's call to 911 was the result of "a big misunderstanding." *Id.* at 29 (Am. Compl. ¶ 225). Arhin nonetheless continued to try "to coax her into leaving her apartment or allowing the police in, while other officers listened." *Id.* (Am. Compl. ¶ 230). "Again, . . . Lewis asked . . . Arhin to stop questioning her" and asked "Owens to take his baton out of the doorjam." *Id.* at 30 (Am. Compl. ¶ 233).

Eventually, a representative from the Department of Behavioral Health ("DBH") arrived. *Id.* at 30 (Am. Compl. ¶ 234). The DBH representative asked to enter the apartment, a request that Lewis refused, but Lewis offered to participate in a video-call with the representative. *Id.* (Am. Compl. ¶ 236). The DBH representative told Lewis that she had "two options: either let DBH into her apartment or be involuntarily committed to a psychiatric facility." *Id.* (Am. Compl. ¶ 237). Ahrin told Lewis that she "'had' to let DBH into her apartment and promised that the police would not take her to the hospital if she let DBH into her apartment," *id.* (Am. Compl. ¶ 238), while Cipolari told Lewis that "[e]ither you let her in, or we are going to force our way in right now," *id.* (Am. Compl. ¶ 240).

Faced with these options, Lewis acquiesced and permitted the DBH representative to enter her apartment. *Id.* at 31 (Am. Compl. ¶ 245). "A few minutes passed" and, then, "at Defendant Cipolari's direction, at least four Defendant Officers, including Defendant Cipolari,

stormed into the apartment, dragged [Lewis] out, and slammed her against the hallway wall." *Id.*
(Am. Compl. ¶¶ 245–46).  Lewis was handcuffed, searched (including by unzipping her
sweatshirt and exposing her breasts to the officers), and ushered out of the apartment through the
lobby. *Id.* at 31–32 (Am. Compl. ¶¶ 247–57).  "Meanwhile, Defendants Cipolari and Owens
entered . . . Lewis's apartment, and began to look around her living room." *Id.* (Am. Compl.
¶ 248).  Once in the back of the police vehicle, Arhin told Lewis: "Had you spoken to me, all this
would not have transpired." *Id.* at 32 (Am. Compl. ¶ 258).  That night, Lewis was taken to a
"psychiatric facility and involuntarily committed," before being evaluated by a doctor who
released her. *Id.* (Am. Compl. ¶ 259).

## C.    Alleged Injuries

Plaintiffs allege that they have suffered various injuries due to their treatment during the
June 2020 and January 2022 incidents. *See id.* at 35–37 (Am. Compl. ¶¶ 272–81).  Lewis alleges
that her mental health has "demonstrably worsened," that she experiences "major dissociative
episodes," and that the handcuffs placed on her in January 2022 resulted in bruises. *Id.* at 35
(Am. Compl. ¶ 273).  She alleges that, due to the handcuffing, "[h]er wrists hurt so much that she
could not carry her grocery bags for several weeks afterward." *Id.* (Am. Compl. ¶ 274).  On
behalf of N.L., Lewis alleges that her young daughter was "traumatized" and has "sought
psychotherapy" due to the incidents. *Id.* at 36 (Am. Compl. ¶ 279).

## C.    Procedural History

Plaintiffs assert 26 claims.  The first five claims allege constitutional torts arising from
the June 2020 incident:  Count 1 alleges that Defendants Wright, Charles, Hambrick, Kennedy,
Koenig, and Lockerman unlawfully entered and searched Plaintiffs' home in violation of the
Fourth Amendment, Dkt. 13 at 38–39 (Am. Compl. ¶¶ 288–92); Count 2 alleges that the June

2020 Defendant Officers unlawfully seized Plaintiff Lewis, *id.* at 39–40 (Am. Compl. ¶¶ 293–97); Count 3 alleges that Defendants Wright, Charles, Koenig, and Lockerman unlawfully seized Plaintiff N.L, *id.* at 40–41 (Am. Compl. ¶¶ 298–301); Count 4 alleges that the June 2020 Defendant Officers violated both Plaintiffs' substantive due process rights under the Fifth Amendment, *id.* at 41–42 (Am. Compl. ¶¶ 302–304), and Count 5, alleges that the June 2020 Defendant Officers violated Lewis's First Amendment rights by retaliating against her for expressing her desire to end their interaction and refusing to consent to a search of her home, *id.* at 42–43 (Am. Compl. ¶¶ 305–309).

Counts 6 through 11 allege various common law claims. Counts 6 and 7 allege that Defendants Wright, Charles, Hambrick, Kennedy, Koenig, Lockerman, and the District of Columbia are liable for intrusion upon seclusion and trespass against both Plaintiffs. *Id.* at 43–44 (Am. Compl. ¶¶ 310–14). Counts 8 and 9 allege that the June 2020 Defendant Officers and the District of Columbia are liable for intentional infliction of emotional distress and negligent infliction of emotional distress against both Plaintiffs. *Id.* at 44–46 (Am. Compl. ¶¶ 315–20). Finally, Count 10 alleges that the June 2020 Defendant Officers and the District of Columbia are liable to Plaintiff Lewis for negligence, *id.* at 46 (Am. Compl. ¶¶ 321–323), and Count 11 alleges that Defendants Wright, Charles, Koenig, Lockerman, and the District of Columbia are liable to Plaintiff N.L. for negligence, *id.* at 46–47 (Am. Compl. 324–26).

Plaintiffs raise nearly identical claims arising out of the January 2022 incident. Beginning with Counts 12–17, Lewis and N.L. assert an array of constitutional tort claims against Defendants. Count 12 alleges that Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other officers, unlawfully seized and falsely arrested Plaintiff Lewis, *id.* at 47–48 (Am. Compl. ¶¶ 327–29); Count 13 alleges that Defendants Boyd, Owens, Cipolari,

Maubry, and Finck unlawfully seized N.L., *id.* at 48 (Am. Compl. ¶¶ 33031); Count 14 alleges that Defendants Owens and Cipolari unlawfully searched Plaintiffs' home, *id.* at 4849 (Am. Compl. ¶¶ 33233); Count 15 alleges that Defendants Cipolari, Boyd, Arhin, and at least two other officers unlawfully used excessive force against Plaintiff Lewis, *id.* at 49 (Am. Compl. ¶¶ 334–35), and Count 16 alleges that Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Fink, Arhin, and at least two other officers violated Plaintiffs' Fifth Amendment rights by engaging in conduct that "shocks the conscience," *id.* at 49–50 (Am. Compl. ¶¶ 336–37); and Count 17 alleges that Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other officers violated Plaintiff Lewis's First Amendment rights by retaliating against her for asserting her rights, *id.* at 50–51 (Am. Compl. ¶¶ 338–41).

The remaining Counts allege an array of common law claims relating to the January 2022 incident.  Count 18 alleges a claim against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, at least two other officers, and the District of Columbia for falsely arresting Lewis, *id.* at 51 (Am. Compl. ¶¶ 342–45); Count 19 alleges a claim against Defendants Boyd, Owens, Cipolari, Maubry, Finck, and the District of Columbia for falsely arresting N.L., *id.* at 5152 (Am. Compl. ¶¶ 346–48); Count 20 alleges a claim against Defendants Owens, Cipolari, and the District of Columbia for intrusion upon Plaintiffs' seclusion, *id.* at 52-53 (Am. Compl. ¶¶ 349–51); Count 21 asserts a claim against Owens, Cipolari, and the District of Columbia for trespass, *id.* at 53 (Am. Compl. ¶¶ 352–54); Count 22 alleges a claim against Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, at least two other officers, and the District of Columbia for intentional infliction of emotional distress, *id.* at 5354 (Am. Compl. ¶¶ 355–58); Count 23 alleges a claim against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, at least two other officers, and the District of Columbia for negligent infliction of emotional distress, *id.*

at 54–55 (Am. Compl. ¶¶ 359–62); Count 24 alleges that Defendants Cipolari, Boyd, Arhin, at least two other officers, and the District of Columbia are liable for assault and battery against Plaintiff Lewis, *id*. at 55-56 (Am. Compl. ¶¶ 363–64); Count 25 asserts a claim for negligence on Plaintiff Lewis's behalf against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, at least two other officers, and the District of Columbia, *id.* at 56 (Am. Compl. ¶¶ 365–67); and, finally, Count 26 asserts a claim for negligence on behalf of Plaintiff N.L. against Defendants Boyd, Cipolari, Maubry, Finck, and the District of Columbia, *id.* at 56–57 (Am. Compl. ¶¶ 368–69).

Defendants move to dismiss the amended complaint in its entirety pursuant to Rule 12(b)(6). Dkt. 19. For the reasons explained below, the Court will **GRANT** in part and **DENY** in part their motion to dismiss.

Beginning with Plaintiffs' claims premised on the June 2020 incident, the Court will **GRANT** the motion to dismiss as to Counts 2, 4–5, 8–9, and 11; will **DENY** the motion to dismiss Count 1 against Defendants Wright, Charles, Hambrick, Kennedy, and Koenig, but will **GRANT** the motion to dismiss Count 1 against Defendant Lockerman; will **DENY** the motion to dismiss Count 3 against Defendants Wright, Charles, and Koenig, but will **GRANT** the motion to dismiss Count 3 against Defendant Lockerman; **DENY** the motion to dismiss as to Counts 6 and 7 against Defendants Wright, Charles, and the District of Columbia, but will **GRANT** the motion to dismiss Counts 6 and 7 against Defendants Hambrick, Kennedy, Koenig, and Lockerman; and will **DENY** the motion to dismiss Count 10 against Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, and Wright, but will **GRANT** the motion to dismiss Count 10 against Defendant Lockerman.

For Plaintiffs' claims related to the January 2022 incident, the Court will **GRANT** the motion to dismiss as to Counts 16–17, 22–23, and 25–26 and will **DENY** the motion to dismiss Counts 12–14 and 18–21.  With respect to Counts 15 and 24, the Court will **GRANT** the motion to dismiss, except to the extent Plaintiff Lewis alleges that Cipolari instructed the other officers to overly-tighten the handcuffs, and those officers complied with that direction.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although "detailed factual allegations" are not required, the complaint must contain "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  The Court must "assume [the] veracity" of "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, and must "grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks omitted).  The Court, however, need not accept "a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Police officers enjoy qualified immunity from personal liability for civil damages under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [officer] would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This limited protection "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The law is "[o]rdinarily" clearly established if there is "a Supreme Court or [] Circuit decision" on the issue or if "the clearly established weight of authority from other courts . . . ha[s] found the law to be as the plaintiff maintains." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)) (second alteration in original).

There need not be "a case directly on point" for the right to be clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate" at the time the alleged violation occurred. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, the "contours of the right must be sufficiently clear" so that any "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff seeking to overcome a claim of qualified immunity bears the burden of showing that the constitutional right that the officers allegedly violated was clearly established at the relevant time. *See Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

Finally, although the case is before the Court on a motion to dismiss and, thus, without a factual record, the Supreme Court has "identified a clear mandate for courts to resolve qualified immunity questions at the earliest possible stage of litigation." *Turpin v. Ray*, 319 F. Supp. 3d 191, 196 (D.D.C. 2018) (citing *Pearson*, 555 U.S. at 231); *see also id.* (resolving qualified immunity questions at the motion to dismiss stage); *Estate of Wilson v. District of Columbia*, No. 23-1987, 2024 WL 4370850 (D.D.C. Sept. 29, 2024) (same); *cf. Bangs v. Smith*, 84 F.4th 87, 95

(2d Cir. 2023) ("Like other affirmative defenses, official immunity may be resolved by Rule

12(b)(6) when the facts establishing it are apparent on the face of the complaint.").

## III.  ANALYSIS

**A.      Constitutional Claims Related to June 2020 Allegations**

Plaintiffs assert an array of constitutional and common law claims arising from the June

2020 incident.  The first set of those claims are premised on 42 U.S.C. § 1983, which provides a

cause of action against persons "acting under color of state law" who violate an individual's

rights under federal law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  For an act to be committed

"under color of law," the "individual must be 'clothed with the authority of state law.'" *Maniaci*

*v. Georgetown Univ.*, 510 F. Supp. 2d 50, 68 (D.D.C. 2007) (quoting *United States v. Classic*,

313 U.S. 299, 326 (1941)).  For purposes of § 1983, moreover, the District of Columbia is

treated as a state.  *See* 42 U.S.C. § 1983; *see also Muhammad v. District of Columbia*, 584 F.

Supp. 2d 134, 137 (D.D.C. 2008).  Here, there is no question that the June 2020 and January

2022 Defendant Officers were "acting under color of state law"—that is, while "clothed with the

authority" of D.C. law—at all relevant times.

That leaves two general questions with respect to each of the alleged, constitutional torts:

First, does the amended complaint adequately allege that each defendant named in each of these

counts was either directly involved in conduct that violated a constitutional right of the plaintiff

named in that count or is otherwise personally liable for the alleged misconduct.  *See Cameron v.*

*Thornburgh*, 983 F.2d 253, 258 (D.C. Cir. 1993).  Second, are the officers named in the relevant

count entitled to qualified immunity.  *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63

(2018).

1.    *Fourth Amendment Claims*

In Count 1, Plaintiffs allege that Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman engaged in an unreasonable search of their apartment in June 2020.  Dkt. 13 at 38–39 (Am. Compl. ¶¶ 288–92).  In Count 2, Lewis alleges that those Defendants, as well as Brooks and Hector, unlawfully seized her.  *Id.* at 39–40 (Am. Compl. ¶ 293–97).  And in Court 3, N.L. alleges that Wright, Charles, Koenig, and Lockerman unlawfully seized her.  *Id.* at 40–41 (Am. Compl. ¶ 298–301).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Courts have long recognized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. United States District Court*, 407 U.S. 297, 313 (1972).  Thus, a police officer may "invade the sanctity of the home" without first obtaining a search warrant, only if "the government [can] demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."  *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *see also Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable . . . .But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness." (internal quotation marks and citation omitted).

a. <u>Unreasonable Search</u>

Count 1 alleges that Wright, Charles, and several other officers violated Plaintiffs' Fourth Amendment rights based on Wright and Charles' unlawful search of their home. The Court will consider each of the Defendants or groups in turn.

*First*, Plaintiffs allege that Wright violated their Fourth Amendment rights when he crossed the threshold into their apartment. Specifically, they allege that Wright knocked on the door, heard N.L. speak on the other side, and then opened the apartment door fully. Dkt. 13 at 14–15 (Am. Compl. ¶¶ 103–109). After opening the door, Wright allegedly "stepped inside and shone his flashlight, illuminating everything that he could see from the doorway." *Id.* (Am. Compl. ¶ 106). Defendants do not suggest that Wright (or any of the other officers) had probable cause or that exigent circumstances existed justifying the search of Plaintiffs' apartment, nor do they maintain that Lewis consented to a search of the apartment.[2] *See* Dkt. 19-1 at 15–18, 48– 50. Instead, Defendants make only one argument in support of their contention that the Court should dismiss Count 1 against Wright: They maintain that the amended complaint is inconsistent, at times alleging that Wright crossed the threshold and entered the apartment, and at other times alleging "only" that he was "standing in the threshold." *Id.* at 18. "Given the

---

[2] At least at this stage of the proceeding, Defendants also do not argue that the MDP policy provides a defense to Plaintiffs' unreasonable search claim. *See* Dkt. 19-1 at 15–18; 48–50. But even if raised, the policy provides no cover for the unlawful entry because, on the facts alleged, Defendants had no reasonable basis to believe K.R. was in the apartment, especially after Lewis had K.R. video call and confirm that she was elsewhere. The entry must be assessed within the parameters of the Fourth Amendment, moreover, rather than based on the applicability of a policy. Of course, "compliance or non-compliance with an applicable policy can be potentially relevant to the constitutional reasonableness of a search or seizure." *Akinmboni v. United States*, 126 A.3d 694, 700 (D.C. 2015). But it is not dispositive. Here, the allegations contained in Plaintiffs' amended complaint, accepted as true and construed in the light most favorable to Plaintiffs, offer no support for the conclusion that "a thorough search of the residence" was "warranted." GO-OPS-3.04.03 § V.A.6(c)(1), (2).

conflicting and vague nature of Plaintiffs' allegations," Defendants continue, the Court should conclude that amended complaint fails to state a claim against Wright.  *Id.*

The Fourth Amendment draws a firm line at the home's entryway—a line that the government may not cross without a warrant or exigent circumstances.  "[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much."  *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961); *see id.* ("In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes."); *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.").  Here, Plaintiffs clearly allege that Wright crossed this line—they allege that he "stepped inside" the apartment and "shone his flashlight, illuminating everything that he could see from the doorway."  Dkt. 13 at 14–15 (Am. Compl. ¶ 106).

Defendants' contention that other portions of the amended complaint contradict this allegation fails for two reasons.  To start, Count 1 alleges that Wright engaged in an "unreasonable search" of the apartment, *id.* at 38, and, accordingly, it is immaterial whether he stepped inside or merely opened the door and then stood at the doorway looking inside "for nearly an hour," *id.* at 15 (Am. Compl. ¶ 107).  As the Supreme Court has explained, "obtaining . . . any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' constitutes a search."  *Kyllo*, 533 U.S. at 34 (quoting *Silverman*, 365 U.S. at 512).  Here, Plaintiffs allege that "Wright and Charles opened" the apartment door and, regardless of where they stood, used the open door to look into the apartment.  Dkt. 13 at 14–15 (Am. Compl. ¶¶ 103–107).  They do not contend that N.L. opened the door in response to Wright's knock, nor (for good reason) do they argue

24

that a six-year-old child, who was awoken in the middle of night by a stranger at her door, implicitly consented to the search by failing to force the door closed or to confront the officers. That suffices to resolve the issue.

In addition, at this early stage of litigation, the Court must draw all reasonable inferences in favor of Plaintiffs. *See Iqbal*, 556 U.S. at 679 (2009). Yet Defendants ask the Court to do just the opposite. Reasonably construed, the amended complaint alleges that Wright "stepped inside" the apartment, Dkt. 13 at 14 (Am. Compl. ¶ 106), albeit just inside—that is, he stepped into the "threshold," *id*. at 15, 18 (Am. Compl. ¶¶ 107, 137), or, in other words, "stood half in, half out of" the apartment, *id.* at 16 (Am. Compl. ¶ 119). There is nothing contradictory about those allegations, and they satisfy the relevant constitutional test; Wright entered the apartment, even if by just a few inches or a foot or two. Defendants' contrary reading of the amended complaint not only defies the teachings of *Iqbal*, 556 U.S. at 679, and its progeny but ignores the plain language of the document.

Qualified immunity presents a separate but easily resolved question. Law enforcement officers are protected from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This inquiry must be "particularized" to the facts of the case, *Anderson*, 483 U.S. at 640—although, of course, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Here, it was clearly established law at the relevant time that the officers were not permitted to open Plaintiffs' door to peer into their apartment and were not permitted to enter the apartment—even if by just a bit—without a warrant or exigent circumstances.[3]

*Second*, Plaintiffs have also pled a legally sufficient Fourth Amendment unreasonable search claim against Charles.  Like their allegations against Wright, Plaintiffs allege that Charles opened the apartment's door and "approached" N.L. to ask her questions.  Dkt. 13 at 14–15 (Am. Compl. ¶¶ 106–112).  As with Wright, Defendants' contention that the allegations of the amended complaint are contradictory (because Plaintiffs do not allege that Charles stepped into the apartment) is beside the point.  "[A]ny deliberate governmental intrusion into a closed space—opening a door or a closed compartment—is a search regardless of the reasons for the intrusion."  *United States v. Maple*, 348 F.3d 260, 262 (D.C. Cir. 2003).  In any event, the allegations also permit the reasonable inference that Charles did step inside the apartment when she "approached" N.L., who was in the apartment.  Dkt. 13 at 15 (Am. Compl. ¶ 110).

For the reasons discussed above, moreover, Charles is not entitled to qualified immunity at this stage of the proceeding.  The law was clearly established that any warrantless intrusion into Plaintiffs' home, barring exigent circumstances, constituted a violation of the Fourth Amendment.  Although factual development may shed further light on the relevant events, the allegations contained in the amended complaint clear that hurdle.

---

[3] To the extent that Defendants allege that there were exigent circumstances because N.L. was a child, they fail to raise that argument in the motion to dismiss.  In any event, that argument fails on the merits.  A reasonable belief that there is a wellness issue or need for medical assistance could constitute an exigent circumstance, *see, e.g.*, *Michigan v. Fisher*, 558 U.S. 45 (2009), but no such facts, based on the allegations in the amended complaint, demonstrate that the officers had any reason to believe N.L. was in fact facing "serious injur[y] or [had been] threatened with such injury," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

*Third*, Plaintiffs allege that Hambrick, Kennedy, and Koenig are liable for the unconstitutional conduct of Wright and Charles based on a bystander theory of liability. *See* Dkt. 13 at 38–39 (Am. Compl. ¶ 290). Although the D.C. Circuit has yet to address the legal sufficiency of a bystander theory, multiple decisions in this district have adopted the following test: an officer may be liable if he or she "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005) (citing *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)). The bystander theory has been justified on the basis that "an officer has an affirmative duty to intervene to prevent another officer's use of excessive force, *see Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012); that an officer may become a "tacit collaborator" by failing to intervene, *see Figueroa v. Mazza*, 825 F.3d 89, 107–08 (2d Cir. 2016); and that failure to intervene may amount to deliberate or reckless disregard of the plaintiff's constitutional rights, *see Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000)." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 67 (D.D.C. 2018). At least for present purpose, Defendants agree that "the theory of bystander liability," as described in *Fernandors*, constitutes an "exception[] to the rule that a plaintiff must allege facts sufficient to show that each defendant, through his own actions, has violated the plaintiff's rights." Dkt. 19-1 at 16.

Under that (undisputed) rule, the allegations contained in the amended complaint suffice to state a claim of bystander liability against Hambrick, Kennedy, and Koenig. Plaintiffs allege that, after Lewis refused to consent to a search of her apartment, "Wright stopped her" from ending the interaction, Dkt. 13 at 12 (Am. Compl. ¶ 87), and, separately, asked the other officers at the scene, at this point, Hambrick, Kennedy, and Koenig, if they had run a "COBALT search"

for K.R., *id.* (Am. Compl. ¶ 90). Those officers affirmed that "they had, and that they had found nothing." *Id.* Unpersuaded, Wright responded that he "still wanted to search the apartment," upon which Hambrick expressed "hesitat[ion]" and indicated that Lewis had "never lied to him." *Id.* at 13 (Am. Compl. ¶¶ 91–93). At that point, Wright "re-ran the same COBALT check," and after receiving the same results, stated that he "planned to go inside, knock on Ms. Lewis's door, and see who answered." *Id.* (Am. Compl. ¶¶ 94–96). Although Koenig, Hambrick, and Kennedy "knew that this was wrong," the amended complaint alleges that they "enabled" Officer Wright by "lur[ing]" Lewis away from her apartment so that Wright could conduct the illegal search. *Id.* at 13–14 (Am. Compl. ¶¶ 96–98). Koenig, Hambrick, and Kennedy also confirmed to Wright that there was no "public safety exception" justifying a search of the apartment. *Id.* at 14 (Am. Compl. ¶ 99). Afterwards, Wright and Charles waited for Hambrick, Koenig, and Kennedy to "distract" Lewis outside before engaging in the search. *Id.* (Am. Compl. ¶ 102).

Those allegations are sufficient to survive a motion to dismiss. The amended complaint alleges that Hambrick, Kennedy, and Koenig knew of Wright's plan to search Plaintiffs' apartment without a warrant or exigent circumstances. They also allegedly participated in Wright's plan by distracting Lewis so that the search could proceed without her interference. Although Defendants argue that the allegations fail to demonstrate that "Kennedy and Hambrick had knowledge of the alleged search or an opportunity to prevent it," Dkt. 19-1 at 17, that assertion is belied by the allegations of the amended complaint, *see, e.g.*, Dkt. 13 at 13 (Am. Compl. ¶ 97) ("Despite their knowledge that Defendant Wright's plan was wrong, the other officers did not stop" him), which the Court must accept as true for present purposes, *see Iqbal*, 556 U.S. at 679. Nor do the allegations that Koenig asked Wright "if the apartment door had been open when he arrived" and that he received conflicting information from Wright and

Charles, demonstrate that Koenig lacked knowledge of the search.  Dkt. 13 at 16–17 (Compl.

¶¶ 123–127).  To the contrary, taking the allegations contained in the amended complaint as true,

Hambrick, Kennedy, and Koenig knew about Wright's plan to conduct an illegal search and took

no action—and even participated in facilitating—the warrantless search.  *See Fernandors*, 382 F.

Supp. 2d at 72.  Indeed, the amended complaint alleges that Koenig responded to Wright's plan

by covering "his face with his hands and [saying], 'Uh, dude.'"  Dkt. 13 at 13 (Am. Compl.

¶ 97).  That is sufficient to state a claim of bystander liability.

For similar reason, the allegations of the amended complaint are sufficient to overcome

any threshold, qualified immunity defense that Hambrick, Kennedy, and Koenig might press.

Defendants do not dispute that, at the time, the law was clearly established that a bystander

officer who knows another officer is violating constitutional rights is subject to suit.  *See*

*Johnson v. District of Columbia*, 725 F. Supp. 3d 62, 72 (D.D.C. Mar. 20, 2024) (for purposes of

qualified immunity on a bystander liability claim, the "test is whether the [bystander] officer

knew that a fellow officer was violating an individual's constitutional rights") (internal quotation

marks, alterations, and citation omitted); *see also Goolsby v. District of Columbia*, 317 F. Supp.

3d 582, 595 n.3 (D.D.C. 2018) (concluding that "[a] bystander liability claim only lies if the

bystander officers knows that the other officer is violating constitutional rights" and concluding

that the defendant officers were entitled to qualified immunity because the plaintiff could not

clearly establish that the "principal officer was violating constitutional rights").

*Finally*, Plaintiffs also allege that Lockerman is liable under a supervisory theory of

liability.  Government officials are not subject to liability under § 1983 based on a garden-variety

claim of respondeat superior liability.  *Iqbal*, 556 U.S. at 676.  Instead, a § 1983 claim based on a

theory of supervisory liability "must allege that the official was responsible for supervising the

wrongdoer." *Brown v. D.C.*, 514 F.3d 1279, 1285 (D.C. Cir. 2008) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987)). "To implicate supervisory liability under § 1983," moreover, "a plaintiff must establish a high degree of fault." *Elkins v. D.C.*, 610 F. Supp. 2d 52, 64 (D.D.C. 2012) (quoting *Haynesworth*, 820 F.2d 1245, 1261). "Mere negligence is not enough." *Id.* (citing *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004)). The supervisor must do more than merely fail to "detect and prevent a subordinate's misconduct," she must "know about the conduct and facilitate it, approve it, condone it" or must "turn a blind eye for fear of what [she] might see." *Int'l Action Ctr.*, 356 F.3d at 28. Here, Plaintiffs have failed plausibly to allege that Lockerman knew about Wright and Charles's unlawful conduct or turned a blind eye towards it.

According to the amended complaint, Lockerman arrived at the scene around 12:30 a.m. Dkt. 13 at 18 (Am. Compl. ¶ 140). At that time, Hector allegedly told Lockerman that K.R. was not in the building (and instead, had appeared on a video call with Lewis) and that the officers would "not be able to get a warrant, nor did they have probable cause for a search." *Id.* (Am. Compl. ¶ 141). Lockerman then entered the apartment building, and Lewis showed Lockerman the video of K.R., confirming that she was not in the building. *Id.* (Am. Compl. ¶ 142). Lockerman approached Wright, who told her that "he had entered the apartment for purposes of 'public safety.'" *Id.* at 19 (Am. Compl. ¶ 144). Lockerman escorted Lewis outside, allegedly "leaving the other officers inside." *Id.* (Am. Compl. ¶ 147).

These alleged facts establish, at best, that Lockerman arrived late to the scene—after Wright had already entered the apartment. They do not support a claim that Lockerman condoned, approved, or facilitated the search; instead, they merely show that Lockerman heard two conflicting accounts, one from Hector and one from Wright, regarding the legality of the

search and then Lockerman promptly investigated what had happened. Those allegations fail to meet to the high standard for alleging supervisory liability under § 1983. *Int'l Action Ctr.*, 356 F.3d at 28.

To be sure, Plaintiffs argue that by leading Lewis outside, Lockerman permitted the unlawful search to continue. Dkt. 21 at 19. But the fact that Lockerman took some time to understand the relevant facts, including by speaking privately with Lewis, does not suffice. As Plaintiffs acknowledge, Lockerman was prepared to speak with Lewis inside the building, where she could have monitored the relevant events. Dkt. 13 at 19 (Am. Compl. ¶¶ 144–47). It was Lewis, however, who asked to speak outside the building. *Id.* Nor can Lockerman be faulted for briefly accepting Wright's representation—or at least not immediately rejecting his representation—"that he had entered the apartment for the purposes of 'public safety.'" *Id.* (Am Compl. ¶ 144). Indeed, even if there were reason to believe that it was negligent of Lockerman briefly to take Wright at his word (and the Court doubts that it was), supervisory liability requires more than "mere negligence." *Int'l Action Center*, 365 F.3d at 28. Taking the facts as true, and drawing the inferences in Plaintiffs' favor, Plaintiffs have nonetheless failed plausibly to plead that Lockerman affirmatively knew an illegal search had occurred, much less that she condoned or facilitated that illegal search.

Accordingly, Plaintiffs' § 1983 claim premised on the unreasonable entry and search of their apartment against Wright, Charles, Hambrick, Kennedy, and Koenig may proceed. The Court will dismiss that claim, however, against Lockerman.

### b.  Unlawful Seizure/False Arrest

Plaintiffs' unreasonable seizure and false arrest claims (Counts 2 and 3) are best considered together. *Cf. Wheeler v. American University*, 619 F. Supp. 3d 1, 27 (D.D.C. 2022) (analyzing unreasonable seizure and false arrest claims under the Fourth Amendment together).

Those claims allege that Defendants Brooks, Charles, Hambrick, Hector, Kennedy, Koenig, Lockerman, and Wright unlawfully seized Lewis outside her apartment and that Defendants Wright, Charles, Koenig, and Lockerman unlawfully seized N.L. inside the apartment.

To plead a claim of unreasonable seizure, Plaintiffs must allege facts that, if accepted as true, would "show that (1) the challenged actions constitute a seizure, and (2) the seizure was unreasonable." *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 191 (D.D.C. 2015). But "[n]ot every encounter between a police officer and a private person constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Price*, No. 22-4, 2022 WL 16713060, at *4 (D.D.C. Nov. 3, 2022). An unreasonable seizure occurs only when "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Here, Plaintiffs fail to allege that physical force was used to restrain their movement, leaving the question whether either Plaintiff submitted to an officers' show of authority.

"[A] show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about h[er] business, or, put another way, where a reasonable person would have believed that [s]he was not free to leave." *United States v. Gamble*, 77 F.4th 1041, 1044 (D.C. Cir. 2023) (quoting *United States v. Mabry*, 997 F.3d 1239, 1243 (D.C. Cir. 2021). That inquiry requires the Court to examine the totality of the circumstances, "including whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the [individual's] movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the

officer's request might be compelled." *Id.* Ultimately, the dispositive question is whether, under the totality of the circumstances, a "reasonable person" would believe that he or she is not "free to leave." *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Plaintiffs bear the burden of establishing they were seized under the Fourth Amendment. *See Castle*, 825 F.3d at 633. Similarly, to plead a claim for false arrest, Plaintiffs allege facts that, if accepted as true, would show that Defendants effected a "(1) detention or restraint against one's will within boundaries fixed by the [D]efendant[s], and (2) the unlawfulness of such restraint." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015).[4]

The Court concludes that Plaintiffs have failed adequately to allege that Lewis was subject to unreasonable seizure (Count 2) but have alleged enough to state a claim that N.L. was unreasonably seized (Count 3).

*First*, the Court is unpersuaded that Plaintiffs have adequately alleged that Lewis was unlawfully seized when Wright "stopped her" and "asked [her] if the friend [who was allegedly watching N.L.] was male or female," Dkt. 13 at 12 (Am. Compl. ¶ 84), or when he "[a]gain . . . stopped her" and "asked [her] if his female partner, Defendant Officer Natalie Charles, could

---

[4] It is unclear whether a plaintiff can proceed on a false arrest claim without an actual arrest. *See Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 191 (D.D.C. 2015) (noting that a "false-arrest claim" is "predicated . . . on the occurrence of an actual arrest" and concluding that the plaintiff's false arrest claim demanded "little attention" because there were no allegations that an officer ever committed an arrest or that the "officer's actions constitute[d] an arrest in this jurisdiction"). Courts, however, typically look to state common law to define the contours of constitutional torts under § 1983, *see Pierson v. Ray*, 386 U.S. 547, 554–55 (1967), and the D.C. Circuit has simply noted that the "elements of the tort[] of false arrest . . . are "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015). Because the parties have not addressed this question, the Court will leave it, to the extent necessary, for another day.

search [her] apartment," *id.* (Am. Compl. ¶¶ 86-87).  After Wright posed those questions, Lewis "told the officers she was going inside to check on N.L., get water, and use the restroom."  *Id.* (Am. Compl. 84–89).  She then "left" the area where the officers were standing.  *Id.* (Am. Compl. ¶ 90).

By this point in the interaction, no seizure had occurred.  Law enforcement officers do not violate the Fourth Amendment by merely "approaching an individual . . . in [a] public place, by asking [her] if [s]he is willing to answer some questions, [or] by putting questions to h[er] if the person is willing to listen."  *Florida v. Royer*, 460 U.S. 491, 497 (1983).  Here, moreover, it was Lewis who initially called for police assistance; Defendants did not observe Lewis committing a crime and decide to execute a stop or arrest, they responded to her missing child report.  A reasonable person in that circumstance may expect law enforcement to ask questions to assess the situation, including questions related to the apartment in question and whether the child, or other children, were in the apartment.  More to the point, Lewis evidently felt free to end the encounter "to check on N.L., get water, and use the restroom," Dkt. 13 at 12 (Am. Compl. ¶ 89).  Although Lewis alleges that Wright "stopped" her to ask various questions, even construing the amended complaint in the light most favorable to Plaintiffs, that bare assertion— or, more precisely, the unadorned use of the word "stopped"—is insufficient to allege that she was seized for purposes of the Fourth Amendment.

Nor does the amended complaint adequately allege that a seizure occurred when Lewis exited her building onto Connecticut Avenue and "found the detectives standing right outside." Dkt. 13 at 15 (Am. Compl. ¶ 113).  At that point, Lewis "walked with" Defendants to another corner of her building, informed them that she "did not consent" to a search of her apartment, and then returned inside.  *Id.* at 15–16 (Am. Compl. ¶ 115–17).  Once Lewis turned the corner,

however, she saw Wright standing in the threshold of her apartment, at which point she alleges

that Charles "ushered [her] away from her apartment."  *Id.* (Am. Compl. ¶¶ 119–22).  Lewis

alleges that she was "detain[ed]" by Charles, Brooks, and Hector, who took turns "questioning

[her] against her will at the far end of her hallway."  *Id.* (Am. Compl. ¶ 122).  After twenty

minutes, and as Wright entered Lewis's apartment, she alleges that Charles and Brooks

"continued to barricade [her] at the end of the hallway, so she could not get close to her

apartment or see what Defendant Wright was doing," *id.* at 17–18 (Am. Compl. ¶¶ 129–34), and

that they "continued to question her," *id.* at 18 (Am. Compl. ¶ 135).

On these allegations, Lewis comes closest to plausibly pleading that a seizure occurred,

but she still falls short.  According to Plaintiffs' own allegations, all that Charles and Brooks did

was block Lewis from approaching her apartment, where she could have seen "what . . . Wright

was doing."  *Id.* (Am. Compl. ¶ 134).  They do not allege that any of the officers prevented her

from leaving the building or, for that matter, going anywhere else in the building; the officers

simply kept her from returning to her own apartment.  Because she was otherwise free to go, no

seizure occurred for purposes of the Fourth Amendment.

For similar reasons, the Court is also persuaded that, even accepting Plaintiffs'

nonconclusory allegations as true, the officers would be entitled to qualified immunity with

respect to this claim.  No clearly established rule prevents law enforcement from excluding an

individual from an area related to an ongoing investigation, so long as the individual is otherwise

free to leave.  *Cf. Ferris v. District of Columbia*, 2023 WL 8697854, at *12 (D.D.C. Dec. 15,

2023) (observing that several courts have held that "police officers' exclusion or expulsion of a

person from an area, even through the use of force, is not a Fourth Amendment seizure"); *see

also Edrei v. City of New York*, 254 F. Supp. 3d 565, 574 (S.D.N.Y. 2017) ("An officer's request

to leave an area, even with use of force, is not a seizure unless 'accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements.'") (quoting *Salmon v. Blesser*, 802 F.3d 249, 255 (2d Cir. 2015)), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018); *Sheppard v. Berman*, 18 F.3d 147, 153 (2d Cir. 1994) (rejecting unlawful seizure claim when plaintiff was escorted out of a courthouse by court officers but was free to go anywhere else he wished).[5]

Finally, Plaintiffs have not adequately alleged that Lockerman seized Lewis. Plaintiffs allege that Lockerman "took [Lewis] back outside the building . . . and forced [her] to speak" for several minutes. Dkt. 13 at 40 (Am. Compl. ¶ 296). But the facts alleged in the amended complaint do not support that legal conclusion. According to Plaintiffs, Lewis asked Lockerman to speak outside because she did not want to create a scene in her building. *Id.* (Am. Compl. ¶ 145). Lockerman then escorted her outside, where they had a conversation regarding the officers' entry into her apartment. *Id.* at 19–20 (Am. Compl. ¶¶ 147–53). None of this supports a claim that Lewis was prevented from simply walking away or that Lockerman forcefully (or through the threat of force) "took" Lewis outside the building against her will.

Accordingly, the Court will dismiss Lewis' June 2020 unlawful seizure claim (Count 2).

*Second*, in contrast, the Court is persuaded that Plaintiffs have adequately alleged that N.L. was unlawfully seized in June 2020. According to Plaintiffs, N.L. was subjected to an

---

[5] Plaintiffs assert that Defendants do not raise qualified immunity with respect to Count 2 and that they have therefore waived the defense, citing *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 162. *See* Dkt. 21 at 48–49. Although Defendants do not specifically discuss qualified immunity as to Count 2, the defense is not waived. *Lerner* involved the defendants' failure to raise qualified immunity in their answer to the plaintiff's complaint, not a dispositive motion. *Lerner*, 362 F. Supp. 2d at 162. And "affirmative defenses must be raised in a responsive pleading, not a dispositive motion." *Harris v. Sec'y, U.S. Dep't of Veterans Affs.*, 126 F.3d 339, 341 (D.C. Cir. 1997). The Court, accordingly, concludes that Defendants have not waived their qualified immunity defense.

unreasonable seizure when Wright and Charles stood at her door, "preventing [her] from leaving," and when Koenig and Lockerman failed to prevent this seizure.  Dkt. 13 at 40–41 (Am. Compl. ¶¶ 300–01).  It bears emphasis that N.L. was a child at the time, so the question of whether a seizure occurred must be viewed through that lens.  *See United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir.1994) (noting that "whether the person being questioned is a child or an adult" is "relevant" to whether a person would feel free to leave); *see also Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (concluding that the plaintiff's "encounter" with police officers should be viewed "through the eyes of a reasonable sixteen-year-old"); *see also Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 360 (S.D.N.Y. 2012).

Viewed in that light, the Court concludes that Plaintiffs have alleged facts that, when viewed in the light most favorable to Plaintiffs, support a claim that N.L was subjected to an unreasonable seizure.  It does not require a leap of faith to infer that a six-year-old, who was awoken around midnight and confronted by police officers would "believe[] that [s]he was not free to leave."  *Gamble*, 77 F.4th at 1044.  The amended complaint further alleges that N.L. was "naked" and that, even after she told Charles and Wright that she was not "injured," did not need "medical attention;" that she had not seen K.R. for "about two days," Dkt. 13 at 15 (Am. Compl. ¶¶ 109–12); that the officers blocked the threshold to her apartment "for nearly an hour," *id.* (Am. Compl. ¶ 107); and that kept her from reuniting with her mother.  The Court does not doubt that a brief interaction, to the extent necessary, might have been reasonable, even if N.L. did not feel free to leave.  But blocking the doorway of a presumably frightened child for about an hour, while her mother stood fifty feet away down the hall, Dkt. 13 at 15–18 (Am. Compl. ¶ 113–39), suffices at least to state a claim against Wright and Charles.

For the same reasons discussed above, moreover, the Court is persuaded that the claim against Koenig can stand on a theory of bystander liability but that the claim against Lockerman fails under both that theory and under a theory of supervisory liability.

The Court will, accordingly, deny Defendants' motion to dismiss N.L.'s June 2020 unlawful seizure claim (Count 3), except with respect to Lockerman.

2.    *Fifth Amendment Substantive Due Process*

Plaintiffs further allege that all June 2020 Defendant Officers violated their Fifth Amendment rights to substantive due process (Count 4).  The Fifth Amendment's substantive due process guarantee "[i]s intended to prevent government officials from abusing their power, or employing it as an instrument of oppression."  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (internal citations omitted)).  To establish "a substantive due process violation, [a] plaintiff must show the governmental action at issue 'can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense.'"  *Robinson v. D.C.*, 736 F. Supp. 2d 254, 261 (D.D.C. 2010) (quoting *Collins*, 503 U.S. at 128).  But when another constitutional "Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 50 ("[A] claim need not be certain to succeed under the more specific amendment to foreclose substantive due process analysis.").  "[O]nly a purpose to cause harm *unrelated to the legitimate object of* arrest [or investigatory stop, or other seizure] will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process

violation." *Robinson*, 736 F. Supp. 2d at 261 (quoting *Lewis*, 523 U.S. at 836) (emphasis added)).

The Fourth Amendment protects members of the public from unreasonable searches or seizures even when they are not suspected of engaging in criminal misconduct. *See Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 530 (1967). In short, "even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security. *Id.* at 530–31; *see also Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 69 (1992) ("The reason . . . an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the [Fourth] Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, . . . or on a whim, for no reason at all.").

Plaintiffs concede that if the Fourth Amendment "encompasses all of the alleged conduct," their Fifth Amendment claims "fall aside." Dkt. 21 at 31. But, as fallback, they assert that if they have failed to state a claim under the Fourth Amendment, then the Court should address whether they have, nonetheless, stated one under the Fifth Amendment. "Determining where a Fourth Amendment excessive force claim ends and a Fifth Amendment due process claim beings is not always straightforward." *Robinson*, 736 F. Supp. 2d at 261. Here, however, the actions that Plaintiffs challenge fall squarely in the Fourth Amendment rubric. That is not to say that each of their constitutional claims survive scrutiny. But the claims rise or fall based on

Fourth Amendment doctrine.  Substantive due process does not provide a mortar to fill the gaps in a wall that is built with bricks molded from Fourth Amendment doctrine.

The Court will, accordingly, dismiss Plaintiffs' Fifth Amendment substantive due process claim related to the June 2020 incident (Count 4).

3.    *First Amendment Retaliation*

Lewis also brings a First Amendment retaliation claim (Count 5) against the June 2020 Defendant Officers.  She alleges that her refusal to permit Defendants to search her home and her request to be "free from government harassment," constituted protected speech and that Defendants retaliated against her for that speech by searching her apartment and seizing her in the hallway.  Dkt. 13 at 42–43 (Am. Compl. ¶¶ 305–09).

"To state a claim for First Amendment retaliation, a plaintiff must allege that: '(1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.'"  *Black Lives Matter D.C.*, 544 F. Supp. 3d at 46, *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)).  In *Nieves v. Bartlett*, the Supreme Court clarified the causation requirement, holding that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent retaliatory motive."  587 U.S. 391, 398–99 (2019).  Here, Plaintiffs' amended complaint fails to allege but-for causation—that is, that Defendants searched Lewis's apartment and seized her because of her protected speech.

To be sure, the amended complaint does aver that "[b]ut for . . . Lewis's assertion of her protected First Amendment rights, Defendants would not have engaged in the[] adverse actions against her," namely, "lur[ing] [her] outside under false pretenses" while her home was "unlawfully entered and searched" and "detain[ing] [her]" for "several hours in the middle of the night."  Dkt. 13 at 42 (Am. Compl. ¶¶ 306–07).  The amended complaint also invokes Hambrick's statement that "[h]ad [Lewis] let [him] go in, none of this would have happened." *Id.* (Am. Compl. ¶ 308).  But legal conclusions will not suffice*, see Twombly*, 550 U.S. at 555, at and the factual allegations set forth in the amended complaint do not suggest that Defendants engaged in the allegedly illegal conduct in retaliation for Lewis's speech; rather, the statements, at most, indicate that Defendants were going to enter her apartment regardless of what Lewis said.  There is no indication that Defendants searched the apartment—or lured Lewis outside or stayed on the scene for hours—in retaliation for anything that Lewis said.

The Court does not doubt that the June 2020 incident might have come to a more expeditious conclusion had Lewis consented to the search of her apartment.  But a retaliation claim requires factual allegations sufficient to support a plausible inference that the search (or any other governmental action) was taken to punish or to harm Lewis for speaking out or to deter others from speaking in a like manner.  *See Retaliation*, Black's Law Dictionary at 1510 (10th ed. 2014) ("The act of doing someone harm in return for actual or perceived injuries or wrongs; an instance of reprisal, requital, or revenge.").  The amended complaint, however, merely alleges that Lewis might have avoided an unlawful search—and the attendant delay—had she consented to a lawful search.  Even accepting that allegation as true, it does not establish that the unlawful search was retaliatory.

The Court will, accordingly, dismiss Lewis's First Amendment retaliation claim (Count 5).

4.    *Common Law Claims*

Plaintiffs also assert a series of common law claims, including intrusion upon seclusion (Count 6), trespass (Count 7), intentional infliction of emotional distress (Count 8), negligent infliction of emotional distress (Count 9), and negligence (Counts 10 and 11), resulting from the June 2020 incident.

a.    <u>Intrusion Upon Seclusion</u>

Both Lewis and N.L. assert that Wright, Charles, Hambrick, Kennedy, Koenig, and Lockerman, as well as the District of Columbia, are liable for the common law tort of intrusion upon seclusion.  Intrusion upon seclusion has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person."  *Garay v. Liriano*, 943 F. Supp. 2d 1, 24 (D.D.C. 2013) (quoting *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989)).  To start, Plaintiffs have adequately alleged the first two elements as to Defendants Wright and Charles; as the Court has already explained, Plaintiffs have adequately alleged that those Defendants violated their Fourth Amendment rights when they unlawfully entered the apartment.  *Cf. id.* at 24 ("It is clear that the first two prongs [of the intrusion upon seclusion tort] are satisfied here—namely, that there was a physical intrusion when the officers improperly entered [the plaintiff's] apartment and that [the plaintiffs] had secluded themselves in their home.").  The question, then, is whether the warrantless entry into Plaintiffs' apartment in violation of the Fourth Amendment would be highly offensive to an ordinary, reasonable person.

Judge Boasberg denied summary judgment in *Garay v. Liriano*, 943 F. Supp. 2d 1, 24–25 (D.D.C. 2013), on this exact question; he concluded that "[a]lthough District of Columbia courts have yet to address whether [a] warrantless entry" would satisfy the third element of the intrusion-upon-seclusion tort, several other Courts have deemed it sufficient, *see id.* at 24 (collecting authority). Other courts have observed, for example, that, in the context of an intrusion-upon-seclusion claim premised on a Fourth Amendment violation, "it is axiomatic that any constitutional violation is highly offensive." *Berg v. United States*, No. 3-4642, 2007 WL 425448, at *8 (D. Minn. Feb. 2, 2007) ("If [Plaintiff] is able to prove that there was a violation of her Fourth Amendment rights, then the intrusion element would be established because she will have established a violation of her legitimate expectation of privacy."). This Court agrees, and concludes that, if the allegations in the amended complaint are sufficient to state a claim that Plaintiffs' Fourth Amendment rights were violated by Wright and Charles, those same allegations likely suffice to state a claim for intrusion upon seclusion against those Defendants. But, in any event, the allegations in this case go beyond a garden-variety unlawful search. Plaintiffs allege that the officers intentionally lured Lewis away from her apartment and that they confronted N.L.—an undressed, six-year-old child, who was awoken around midnight—in order to peer into Plaintiffs' apartment, after Lewis had expressly refused to consent to a search. Regardless of the standard, that is enough to state a claim.

It is unclear, however, what basis Plaintiffs have for asserting an intrusion-upon-seclusion claim against Hambrick, Kennedy, Koenig, and Lockerman. As discussed above, Plaintiffs' have adequately pled that Hambrick, Kennedy, and Koenig are liable for the unlawful entry under a bystander liability theory. That theory was sufficient to state a claim under § 1983, but Plaintiffs fail to muster any authority holding that bystander liability applies to their common

law claim.  *See Jackson*, 327 F. Supp. 3d at 68–69 (D.D.C. 2018) ("Common law theories of

vicarious liability are not identical to 'bystander liability' under § 1983," and, as a result, to hold

one defendant liable for the intentional tort of another, "the plaintiff must show some basis for

vicarious liability under the common law, such as aiding and abetting or conspiracy"); *see also

id.* (observing that the plaintiff failed to plead any theory of common law vicarious liability for

the individual defendants in the complaint as to common law tort allegations and addressing each

defendants' individual actions accordingly).  Plaintiffs allege that "Defendants Wright, Charles,

Hambrick, Kennedy, Koenig, and Lockerman are jointly and severally liable for *entering and

searching* Plaintiffs' home without consent, a warrant, probable cause, or any other legal basis."

Dkt. 13 at 43 (Am. Compl. ¶ 310) (emphasis added).  But Hambrick, Kennedy, Koenig, and

Lockerman did not enter or peer into Plaintiffs' apartment, and Plaintiffs have not alleged an

aiding-and-abetting or conspiracy theory of liability to support their intrusion-upon-seclusion

claim.  As to Defendant Lockerman, moreover, the Court has already concluded that Plaintiffs

have failed to allege a basis to assert supervisory liability under § 1983 with respect to the

search.  For the same reasons, the Court is unpersuaded that Plaintiffs have alleged an intrusion-

upon-seclusion claim based on supervisory liability.

Plaintiffs also allege that the District of Columbia is vicariously liable under the doctrine

of respondeat superior for the tortious conduct of Wright and Charles.  Dkt. 13 at 43 (Am.

Compl. ¶ 311).  Respondeat superior "is not an independent tort claim, but rather a legal theory

of vicarious liability that transfers liability from an agent to its principals."  *Jefferson v. District

of Columbia*, No. 22-1436, 2023 WL 4250118, at *4 (D.D.C. June 29, 2023) (citation omitted).

The District of Columbia may be vicariously liable under the respondeat superior doctrine "when

a plaintiff brings common law tort claims against a District employee acting in the scope of

employment." *Id.* There are "two requirements to establish respondeat superior liability: (1) the existence of an employer-employee relationship, and (2) the tortious conduct occurs while the employee is acting within the scope of his employment." *Sheppard v. United States*, 640 F. Supp. 2d 29, 34 (D.D.C. 2009). The D.C. Court of Appeals has explained that "the test for scope of employment is an objective one, based on all the facts and circumstances." *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986). District of Columbia law defines the scope of employment in accordance with the Restatement (Second) of Agency, which provides that: "(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." *Sheppard*, 640 F. Supp 2d at 35 (quoting *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987) and Restatement (Second) of Agency § 228).

At least at this stage of the proceeding, Defendants do not contest that Wright and Charles were acting within the scope of employment if and when they committed the tort of intrusion upon seclusion. And, in any event, Plaintiffs have adequately alleged that Wright and Charles were acting within the scope of their employment; they were responding as MPD officers to the report of a missing person during regular working hours (Plaintiffs do not allege that either officer was off duty) and within the confines of the District of Columbia. The Court, accordingly, concludes that Plaintiffs have stated an intrusion-upon-seclusion claim premised on a respondeat superior theory of liability against the District of Columbia for the allegedly tortious conduct of Wright and Charles.

In sum, then, the Court will deny Defendants motion to dismiss Plaintiffs' intrusion-upon-seclusion claim (Count 6) against Wright, Charles, and the District of Columbia but will dismiss the claim against Hambrick, Kennedy, Koenig, and Lockerman.

b.  Trespass

Count 7 asserts a claim for trespass against Wright, Charles, Hambrick, Kennedy, Koenig, Lockerman and the District of Columbia.  In the District of Columbia, "the tort of trespass consists of 'the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property." *Turpin v. Ray*, 613 F. Supp. 3d 186, 215 (D.D.C. 2020) (quoting *Robinson v. Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017)). "Trespass has three elements: (i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest."  *Id.* (internal quotation marks and citation omitted).  Where officers lawfully enter an apartment, no trespass is committed.  *See Garay*, 943 F. Supp. 2d at 25; *see also Robinson*, 264 F. Supp. 3d at 164 ("[I]t is true an officer's *lawful* entrance into a home will not constitute a trespass.").  But that same protection "does not extend to *unlawful* entries."  *Id.* (collecting authority) (emphasis in original); *cf. Utah v. Strieff*, 579 U.S. 232, 237 (2016) ("[O]fficers who violated the Fourth Amendment were traditionally considered trespassers.").

Here, Plaintiffs have adequately alleged a prima facie claim of trespass against Wright and Charles.  The Court has already concluded that Plaintiffs have sufficiently pled that those Defendants unlawfully entered the apartment in violation of the Fourth Amendment, satisfying all three elements.  In response, Defendants merely rehash the same arguments discussed, and rejected, above.  *See* Dkt. 19-1 at 39.  Plaintiffs respondeat superior theory of liability against the District of Columbia also passes muster; the Court has already concluded that the amended complaint adequately alleges that Wright and Charles were acting within the scope of their

employment when they entered the apartment.  But Plaintiffs have failed to state a claim against

Hambrick, Kennedy, Koenig, and Lockerman.  Plaintiffs do not allege that these Defendants

themselves entered the apartment, nor do they argue that they are liable on an aiding and abetting

or conspiracy theory.

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs trespass claim

(Count 7) against Wright, Charles, and the District of Columbia but will dismiss the claim

against Hambrick, Kennedy, Koenig, and Lockerman.

### c.  Intentional Infliction of Emotional Distress

Plaintiffs also claim that the June 2020 Defendant Officers and the District of Columbia,

are liable for intentional infliction of emotional distress ("IIED") (Count 8).  "To state a claim

for intentional infliction of emotional distress, a plaintiff must allege: '(1) extreme and

outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes

the plaintiff severe emotional distress.'"  *Simpson v. Colbert*, No. 21-479, 2024 WL 3887393, at

*6 (D.D.C. Aug. 21, 2024) (quoting *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C.

2008)).  "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly

intolerable in a civilized community.'"  *Jackson*, 327 F. Supp. at 70 (quoting *Amobi v. D.C.

Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014)); *see also E.M. v. Shady Grove Reproductive

Science Center P.C.*, 496 F. Supp. 3d 338, 406 (D.D.C. 2020) ("The outrageousness requirement

'is not an easy one to meet'" (quoting *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 264 (D.D.C.

2018)); Restatement (Second) of Torts § 46 (1965) ("It has not been enough that the defendant

has acted with an intent which is tortious or even criminal, or that he has intended to inflict

emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of

aggravation which would entitle the plaintiff to punitive damages for another tort.").

As an initial matter, Defendants argue that this claim is time-barred under D.C. Code § 12-301(a)(4), which imposes a one-year statute of limitations for certain intentional torts, including assault, battery, false arrest, and false imprisonment.  Under D.C. law, intentional infliction of emotional distress claims are subject to that one-year statute of limitations if "the emotional distress aspect of the claim is essentially an outgrowth of other pleaded torts." *Saunders v. Nematti*, 580 A.2d 660, 662–63 (D.C. 1990).  But "an independent action for intentional infliction of emotional distress, not intertwined with any of the causes of action for which a period of limitation is specifically provided in the other provisions of § 12-301, is governed by the general residuary three-year limitation of section 12-301(8)."  *Id.* at 665.  The D.C. Circuit has applied *Saunders* to hold that the one-year statute of limitations governed an intentional infliction of emotional distress claim that was intertwined with a claim of battery. *See Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997); *see also Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 37 (D.D.C. 2010) ("[P]laintiff's claim for intentional infliction of emotional distress is based on the same events as her claims for assault, battery, false arrest and false imprisonment—namely, the alleged events that occurred on [the relevant evening].  [The plaintiff] does not allege any separate tortious conduct in support of this claim . . . The one-year statute of limitations therefore applies.").

That same reasoning applies here.  Count 8 alleges that Defendants tricked Lewis into leaving her building so that they could search her apartment, where N.L. was alone and undressed, and that they "detained . . . Lewis down the hallway while all of this was happening" and while Wright "detained N.L. in the apartment."  Dkt. 13 at 44 (Am. Compl. ¶ 315).  For purposes of this claim, Plaintiffs do not allege that Defendants entered the apartment.  As framed, the claim is "dependent upon and 'intertwined' with" Plaintiffs claims that they were

unlawfully detained—that is, falsely arrested—and that the officers invaded their privacy—that

is, they were subjected to an intrusion upon their seclusion.  It does not draw on an analogy to

trespass, which might trigger a different statute of limitations (but which, given the minimal

trespass that allegedly occurred, would not involve extreme or outrageous misconduct).  The

statute of limitations for torts sounding in false arrest or an invasion of privacy, however, is one

year.  See D.C. Code § 120391(4); *see also Saunders*, 580 A.2d at 661–62; *Greenpeace, Inc. v.*

*The Dow Chemical Co*., 97 A.3d 1053, 1062 (D.C. 2014); *Doe v. Southeastern Univ.*, 732 F.

Supp. 7, 8 (D.D.C. 1990).  Accordingly, as currently pled, Plaintiffs IIED claim is time-barred.

But even if not time-barred, Plaintiffs have, nonetheless, failed to allege facts sufficient to

plead an intentional infliction of emotional distress claim.  As noted above, Plaintiffs allege that

"Defendants Hambrick, Kennedy, and Koenig tricked" Lewis into "leaving her building," while

Defendants Wright and Charles "hid in the lobby so she would not see them, and then searched

the apartment—in which a naked child was alone—for more than an hour" and that Defendants

unlawfully detained N.L. and Lewis while the search occurred.  Dkt. 13 at 44 (Am. Compl.

¶ 315).  Even "criminal" or unconstitutional conduct alone is not sufficient to state a claim for

intentional infliction of emotional distress.  *See* Restatement (Second) of Torts § 46 (1965).  The

conduct at issue must be "'so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a

civilized community.'"  *Jackson*, 327 F. Supp. at 70 (quoting *Amobi*, 755 F.3d at 995).

Although Plaintiffs allegations are substantial, they do not satisfy that very demanding

standard.  Some examples from other cases makes the point.  In *Amons v. District of Columbia*,

for example, this Court denied the defendant police officer's motion to dismiss because the

alleged facts demonstrated that he "unlawfully entered and searched [the plaintiff's] home

without justification . . . killed [the plaintiff's] pet dog in [the plaintiff's] home and . . . detained [the plaintiff] for twenty-two hours." 231 F. Supp. 2d 109, 118 (D.D.C. 2002). And, in *Daniels v. D.C.*, 894 F. Supp. 2d 61, 67–68 (D.D.C. 2012), the Court declined to dismiss an intentional infliction of emotional distress claim, but, in that case, officers "pushed, shoved, and jerked" plaintiff, subjected her to a violent ride in a police car, and cursed at her, even after plaintiff informed the officers that she was pregnant, and plaintiff eventually needed to be hospitalized to stabilize her pregnancy, *id.* at 67–68.

Plaintiffs argue that "[c]ourts have found that law enforcement officers who make false statements have engaged in 'extreme and outrageous' conduct." Dkt. 21 at 41. According to Plaintiffs, Defendants lied when they told Lewis that the policy required them to search her apartment, "when it did not," and when Defendants lured Lewis outside "so Defendants Wright and Charles could search her apartment." *Id.* But the cases that Plaintiffs cite do not support their contention. In *Pitt v. District of Columbia*, 491 F.3d 494, 507 (D.C. Cir. 2007), for example, the D.C. Circuit concluded that a reasonable jury could have returned a verdict for the plaintiff on his intentional infliction of emotional distress claim because the plaintiff offered evidence that an officer's affidavit "contained several glaring omissions and at least one false statement" and because "the jury could have inferred from the evidence that at least one officer tampered with evidence in an attempt to link [the plaintiff] to the scene of the crime." *Id.* at 506. Allegations of false statements and omissions in an affidavit submitted to the court, as well as allegations of evidence tampering, are readily distinguishable from allegations that Defendants lured someone away from an apartment to search said apartment.

The second case that Plaintiffs rely upon, *District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010), is also inapposite. There, the D.C. Court of Appeals considered the sufficiency of

the evidence in support of a jury's IIED verdict in favor of the plaintiff.  The court concluded

that the evidence was sufficient because a reasonable jury could have found that the defendant,

an MDP detective, rear-ended the plaintiff in a private, road rage incident; then called the police

to report "an officer in distress" and falsely reported that the plaintiff had caused the accident by

"driving recklessly;" and, finally, "conveyed to" a "lower-ranking officer" that "the incident

called for an automatic lock-up," which led to plaintiff's arrest, detention for approximately

fourteen hours, and (baseless) criminal prosecution.  *Id.* at 801.  Although the facts alleged in this

case are troubling, they are not nearly as "extreme and outrageous" as those at issue in the *Tulin*

case—or other cases in which the D.C. courts have sustained IIED claims.

 The Court will, accordingly, dismiss Plaintiffs' IIED claim (Count 8).

  d. <u>Negligent Infliction of Emotional Distress</u>

 Plaintiffs also assert a claim for negligent infliction of emotional distress ("NIED")

against all June 2020 Defendant Officers and the District of Columbia (Court 9).  "The tort of

negligent infliction of emotional distress in the District of Columbia requires a plaintiff to show

that he or she was (1) in the 'zone of danger;' which was (2) created by the defendant's

negligence; (3) making the plaintiff fear for his or her own safety; resulting in (4) emotional

distress that was serious and verifiable."  *Hawkins v. Washington Metro. Area Transit Auth.*, 311

F. Supp. 3d 94, 106 (D.D.C. 2018) (quoting *Jograj v. Enter. Servs.*, *LLC*, 270 F. Supp. 3d 10,

26–27 (D.D.C. 2017)).  To be in the zone of danger, a plaintiff must be "physically endangered

by the defendant's negligent activity."  *Destefano v. Children's Nat'l Med. Ctr.*, 121 A.3d 59, 69

(D.C. 2015) (quoting *Johnson v. District of Columbia*, 728 A.2d 70, 77 (D.C. 1999)).  "A

defendant has a duty of care toward those individuals who are in danger of physical injury from

the defendant's negligence."  *Hawkins*, 311 F. Supp. 3d at 107.

Among other flaws, Plaintiffs have failed to allege facts sufficient to satisfy the "zone of danger" requirement. During the "earliest iteration" of the tort of NIED, the D.C. courts applied a "'physical impact' rule, which permit[ted] recovery . . . if the distress result[ed] from a physical impact and [was] accompanied by [a] physical injury." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011). Although the D.C. Court of Appeals eventually "abandoned the 'physical impact' requirement," except in cases involving a special relationship between the defendant and the alleged victim, *id.* at 796, 800–19, it still applies the "'zone of physical danger' rule, which permits recovery for mental distress [only] if the defendant's actions caused the plaintiff to be 'in danger of physical injury' and if, as a result, the plaintiff 'feared for his own safety.'" *Id.* at 796 (citations omitted). Applying this rule, the D.C. Court of Appeals has "denied claims brought by bystanders who witnessed harm to another, but did not fear for their own safety," such as a mother who experiences "distress as a result of watching her child being scalded in [a] bathtub." *Id.* at 798 (citations omitted). "Considering the 'strong public policy considerations [that] counsel against imposing "virtually infinite liability" for negligent conduct,' the 'zone of danger' test is stringent." *Sherrod*, 334 F. Supp. at 262. "A classic example is that of the reckless driver who speeds by a pedestrian, missing her by only inches." *Arias v. DynCorp.*, 752 F.3d 1011, 1017 (D.C. Cir. 2014).

Here, Plaintiffs do not allege that they had the type of "special relationship" with Defendants that might have obviated the need to allege that they were in "the zone of physical danger." Dkt. 21 at 43–45. Nor do they plausibly allege facts sufficient to establish that they were in danger of physical injury. Although they allege that "the officers placed [them] in a zone of danger wherein Plaintiffs feared for their own safety," Dkt. 13 at 45 (Am. Compl. ¶ 319), that allegation is too "conclusory" to "suffice" under *Iqbal*, 556 U.S. at 678, and its progeny. The

facts that Plaintiffs do allege, moreover, present a theory of harm—or fear of harm—that has nothing to do with "physical danger." They allege, for example, that Lewis was concerned that the police presence and related commotion invited personal embarrassment "in front of her mostly white and wealthy neighbors" and risked adverse action by her "building manager." Dkt. 13 at 7 (Am. Compl. ¶ 39). That is not enough to satisfy the "zone of physical danger" requirement.

The Court will, accordingly, dismiss Plaintiffs' claim for negligent infliction of emotional distress (Count 9).

      e.  <u>Negligence</u>

Plaintiffs also assert two negligence claims: Lewis asserts a negligence claim against all June 2020 Defendant Officers and the District of Columbia (Count 10), and N.L. asserts a negligence claim against Wright, Charles, Koenig, Lockerman, and the District of Columbia (Count 11). "The elements of a cause of action for negligence are (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) damage to the interests of the plaintiff, (4) proximately caused by the breach." *Goolsby v. District of Columbia*, 354 F. Supp. 3d 69, 74 (D.D.C. 2019) (quoting *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001)). Under D.C. law, "negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." *Id.* at 77 (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003)); *see also Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006) (affirming dismissal of the plaintiff's negligence claim because it was "not separate and distinct from [the plaintiff's] false arrest claim; rather, it is intertwined with and dependent on that claim").

The Court begins with the first element, the existence (or not) of a duty of care owed by the defendant to the plaintiff. "The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff. Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence." *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010) (quoting *N.O.L. v. District of Columbia*, 674 A.2d 498, 499 n.2 (D.C. 1996)) (internal quotation marks omitted). For a negligence claim against police officers, the "inquiry is whether the officer's conduct violated the standard of care of a reasonably prudent police officer." *Chinn*, 839 A.2d at 707. It bears emphasis that "'[i]ntent and negligence are regarded as mutually exclusive grounds for liability. As the saying goes, there is no such thing as a negligent battery.'" *Id.* at 706 (quoting 1 Dobbs, Law of Torts § 26 at 51 (2001)). Accordingly, where a plaintiff alleges claims sounding in intentional tort and in negligence, "negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from" the intentional tort "itself and [that is] violative of a distinct standard of care." *Id.* at 711.

Defendants maintain that Plaintiffs have failed to identify "plausible duties distinct from [her] intentional tort claims." Dkt. 24 at 27. Although Lewis's factual basis for the alleged breach of duty is slim, the Court is persuaded that she has adequately pled a distinct standard of care and a breach of that standard of care, although "just barely" so. *Goolsby*, 354 F. Supp. 3d at 78. Lewis alleges that Defendants "owed [her] a duty to properly respond to her request for aid" and that they breached that duty by "failing to follow credible leads to find K.R., and instead detaining [Plaintiffs] for four hours in the middle of the night, breaching the sanctity of their home, and traumatizing them in front of their neighbors." Dkt. 13 at 46 (Am. Compl. ¶ 322). Construing these allegations in the light most favorable to Plaintiffs, they allege that Lewis

feared for K.R.'s safety and turned to the police for assistance and that, rather than take her complaints seriously, they harassed her and her daughter over a period of hours, causing them emotional injury.

At least as to Defendants Wright, Brooks, Charles, Hambrick, Hector, Kennedy, and Koenig—and as to the District of Columbia on a respondeat superior theory of liability—Lewis has alleged a plausible negligence claim that is distinct from the alleged, intentional torts. (The Court is unpersuaded, however, that Lewis has alleged facts sufficient to support a claim of negligence against Lockerman.) To be sure, Plaintiffs' theory—and the precise contours of the alleged duty of care—are far from clear at this point in the litigation. But discovery may provide a basis for adding the missing detail. *See Goolsby*, 354 F. Supp. 3d at 79. Defendants argue, for example, that they were acting in a manner consistent with department policy. Dkt. 19-1 at 46. That may be true, but resolution of that question must await summary judgment, at which point Lewis will be required to "develop with greater specificity the standards of care applicable to [her] negligence claim and explain how those standards are distinct from those governing [her] intentional tort claims." *Goolsby*, 354 F. Supp. 3d at 79.

In contrast, the Court is unpersuaded that N.L. has alleged a negligence claim that is "based upon at least one factual scenario that presents an aspect of negligence apart from" her intentional tort claims. N.L. alleges that Wright and Charles "owed [her] a duty of care in entering her home, purportedly to look for her sister" and that they breached that duty when they "awoke [her] . . . questioned her . . . and separated [her] from her mother for several hours." Dkt. 13 at 47 (Compl. ¶ 325). But that claim is "intertwined with and dependent" on her other intentional tort claims, and, in particular, her false arrest and trespass claims. *Stewart-Veal*, 896 A.2d at 235.

The Court will, accordingly, deny Defendants' motion to dismiss Lewis's negligence claim (Count 10), but will grant their motion to dismiss that claim against Lockerman as well as N.L.'s negligence claim (Count 11) against Wright, Charles, Koenig, Lockerman, and the District of Columbia.

**B.    Claims Related to January 2022 Allegations**

1.    *Fourth Amendment Claims*

In Counts 12–15, Plaintiffs' assert an array of § 1983 claims premised on the January 2022 Defendant Officers' alleged violations of their Fourth Amendment rights.  Plaintiffs allege that Lewis was unlawfully seized or arrested (Count 12); that N.L was unlawfully seized or arrested (Count 13); that Defendants conducted an unreasonable search of their apartment (Count 14); and that Defendants used excessive force against Lewis (Count 15).  Defendants response to each of these claims is essentially the same: the officers who responded to Lewis's apartment "had been informed that she had threatened suicide," and they, therefore, "had probable cause to enter her apartment and [to] seize her;" they had good cause to separate N.L. from her mother while they confirmed that Lewis was not a threat to herself or others; the search of the apartment was incident to a lawful seizure; and they did not use excessive force under the circumstances. Dkt. 19-1 at 22–26.  As to each claim, moreover, Defendants invoke their qualified immunity, arguing that they did not act in violation of any clearly established law.

Plaintiffs' response is equally straightforward.  They do not dispute that officers can seize a potentially suicidal individual—or at least do not dispute that no clearly established law precludes officers from doing so—but they contend that officers may not detain someone based upon an initial report of a mental health emergency, when the officers are able to observe the individual and that observation fails to confirm that an imminent risk exists.  Dkt. 21 at 24–27. And because the officers lacked authority to seize Lewis, Plaintiffs argue, the officers lacked

authority to seize N.L. and lacked authority to search their apartment (and certainly lacked

authority to search the apartment after Lewis was already in custody).  Finally, they contend that

the amended complaint adequately alleges that the officers used more force than necessary to

seize Lewis.

As explained below, the question presented is a close one.  On the one hand, courts are

duty bound to resolve assertions of qualified immunity at the earliest stage of the proceeding

possible, *see Pearson*, 555 U.S. at 231, and Defendants' theory that they acted based on

reasonable concerns about Lewis's safety and the safety of her daughter has the ring of truth.

But, on the other hand, the Court is required to construe the amended complaint and to draw all

reasonable inferences in Plaintiffs' favor and cannot resolve factual disputes at this early stage of

the proceeding.  Striking this balance, the Court is persuaded that Plaintiffs have alleged

enough—although just enough—to survive a motion to dismiss and that the present dispute is

better left to summary judgment.

a.  <u>False Arrest/Unlawful Seizure</u>

Lewis alleges (Count 12) that Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least

two other officers unlawfully seized and falsely arrested her, Dkt. 13 at 47 (Am. Compl. ¶ 327),

and N.L asserts similar claims (Count 13) against Boyd, Owens, Cipolari, Maubry, and Finck, *id.*

at 48 (Am. Compl. ¶ 330).  As above, the Court will analyze Plaintiffs' unreasonable seizure and

false arrest claims (Counts 18 and 19) together.  *See Wheeler*, 619 F. Supp. 3d at 27.  Defendants

move to dismiss, arguing that they had probable cause to conduct a welfare check and to carry

out an involuntary seizure under D.C. law, *see* D.C. Code § 21-521, and they were acting within

the scope of this "community caretaking" exception to the warrant requirement.

Under D.C. law, a police officer "who has reason to believe that a person is mentally ill

and, because of the illness, is likely to injure himself or others if he is not immediately detained

may, without a warrant, take the person into custody, transport him to a public or private

hospital, . . . and make application for his admission thereto for purposes of emergency

observation and diagnosis." D.C. Code § 21-521. But any such seizure must, nonetheless,

satisfy Fourth Amendment standards, and "[i]t is a 'basic principle of Fourth Amendment law'

that searches and seizures inside a home without a warrant are presumptively unreasonable."

*Payton v. New York*, 445 U.S. 573, 586 (1980) (citation omitted). As Judge Cooper recently

observed in case similar to this one, *Wheeler v. American University*, 619 F. Supp. 3d 1, 27

(D.D.C. 2022) (citation omitted), "'a seizure of a person for an emergency mental health

evaluation raises concerns that are analogous to those implicated by a criminal arrest, and both

are equally intrusive.'" Here, the officers acted without a warrant, raising the questions whether

exigent circumstances obviated the need for a warrant and whether the seizures were otherwise

reasonable.

      Neither the Supreme Court nor the D.C. Circuit has yet squarely to address whether the

Fourth Amendment permits a police officer to enter an individual's home without a warrant to

make a seizure based on a suspicion that the individual is at imminent risk of suicide. For

present purposes, however, the Court need not resolve that question because, at a bare minimum,

no clearly established precedent precludes an officer from doing so. *See Wesby*, 583 U.S. at 62–

63 (police officers are entitled to qualified immunity unless they violated a federal statutory or

constitutional right and "the unlawfulness of their conduct was 'clearly established at the time'")

(citation omitted). Although the Supreme Court has declined to recognize a community-

caretaking exception as a "standalone doctrine that justifies warrantless searches and seizures in

the home," *Caniglia v. Strom*, 593 U.S. 194, 196–99 (2021), it has held that the "police may

enter a home without a warrant when they have an objectively reasonable basis for believing that

an occupant is seriously injured or imminently threatened with such injury," *Brigham City, Utah, v. Stuart*, 547 U.S. 398, 400 (2006); *see also Michigan v. Fisher*, 558 U.S. 45, 49, (2009) (per curiam) (where "there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger" any warrantless entry was justified (internal quotation marks omitted)); *Corrigan v. District of Columbia*, 841 F.3d 1022, 1030 (D.C. Cir. 2016) (exigent circumstances can justify a search when necessary "'to protect or preserve life or avoid serious injury'") (citation omitted).  At least two Justices, moreover, have suggested that a warrant is unnecessary to enter a home to determine whether an occupant is at "imminent risk of suicide," *Caniglia*, 593 U.S. at 201 (Alito, concurring); *id.* at 204 (Kavanaugh, concurring) ("[P]olice officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide.").  Case law from other circuits further supports that same conclusion.  *See*, *e.g*., *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014).

But accepting the premise that a police officer may enter a home without a warrant when necessary to address an imminent risk that the occupant might attempt suicide (or might otherwise pose an imminent risk to others) does not—standing alone—justify dismissing Counts 12 and 13 of Plaintiffs' complaint.  The Court must also consider whether the officers had "'probable cause to believe'" that Lewis "'pose[d] a[n] [imminent] danger to herself or'" to N.L. *Wheeler*, 619 F. Supp. 3d at 27 (quoting *Rudolph v. Babinec*, 939 F.3d 742, 747 (6th Cir. 2019)). As with other probable cause determinations, whether an officer has probable cause to execute a mental health seizure "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), which requires "a showing of only a probability or substantial chance of dangerous

behavior," *Wheeler*, 619 F. Supp. 3d at 27 (quoting *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005) (internal quotation marks omitted)).

"The case law on mental-health seizures also clearly establishes the importance of officers' on-the-scene observations." *Wheeler*, 619 F. Supp. 3d at 27. To be sure, "[i]f probable cause exists, a person's denial that they are at risk of suicide does not by itself eliminate that probable cause." *Rudolph*, 939 F.3d at 747. But "absent an emergency," the responding officers must conduct a reasonable inquiry, even when confronted with reports of "concerning behavior." *Wheeler*, 619 F. Supp. 3d at 27 (collecting authority). The officers, moreover, may not "simply assume[] a threat without exploring whether the situation reflect[s] a misunderstanding, a bizarre but non-dangerous incident, or something more problematic." *Goines v. Valley Comm. Services Bd.*, 822 F.3d 159, 170 (4th Cir. 2016). Most importantly, as Judge Cooper explained in *Wheeler*, "it is 'clearly established'" for purposes of qualified immunity "that officers 'may not detain someone for an emergency mental evaluation' based on an initial report of concerning behavior, 'where the officers were able to observe the person alleged to be suicidal . . . and observed nothing indicating' that to be the case." 619 F. Supp. 3d at 28. This does not mean that courts should second-guess the real-time decisions made by law enforcement officers with the benefit of twenty-twenty hindsight. But, as with other probable cause determinations, the Court must engage in a searching evaluation of all of the relevant circumstances, albeit from the perspective of a reasonable officer faced with difficult and evolving events.

At this early stage of the proceeding, and accepting Plaintiffs' allegations as true, the Court is persuaded that the amended complaint survives scrutiny. To start, although Plaintiffs avoid specifying exactly what Lewis said to the initial CFSA operator, there is little doubt that she made a reference to killing herself. Dkt. 13 at 21–22 (Am. Compl. ¶¶ 165–66). That

reference provided ample basis for the officers to investigate. But the basis for seizing Lewis is significantly less clear after that. Although the officers were not required simply to accept Lewis's say so, she did tell them that "she was fine." *Id.* at 22 (Am. Compl. ¶ 173). She also offered to speak with the officers on a "video-call" or to allow them to view "her from her floor-to-ceiling window," *id.* at 23 (Am. Compl. ¶ 176), and attempted to diffuse the incident with the help of a "CFSA social worker," who called and "asked . . . to explain the situation to MPD," *id.* (Am. Compl. ¶ 180). Lewis then proceeded to assure the officers that she was okay over a period of two hours, suggesting again "that they talk to the CFSA social worker on the phone and/or check on her via video call." *Id.* at 24 (Am. Compl. ¶ 183). Lewis also permitted N.L. to leave the apartment, so the officers could confirm that she was okay. *Id.* at 25 (Am. Compl. ¶¶ 187–90).

Even more significantly, "two paramedics arrived at the scene" at around 5:30 p.m. *Id.* at 27 (Am. Compl. ¶ 210). At the point, "Lewis told the officers . . . that she would allow the paramedics but not the police to come into her apartment [to] verify her well-being," *id.* (Am. Compl. ¶ 211), but the officers "refused" that compromise, *id.* (Am. Compl. ¶ 213). As the incident continued, Lewis continued to assure the officers that she was okay and that "[t]his was all a big misunderstanding." *Id.* at 29 (Am. Compl. ¶ 225). Finally, around 7:00 p.m., "a representative from the Department of Behavioral Health ('DBH') arrived" at the scene and "asked . . . Lewis to let her inside the apartment." *Id.* at 30 (Am. Compl. ¶¶ 234–35). "The DBH representative told . . . Lewis that she had two options: either let DBH into her apartment or be involuntarily committed to a psychiatric facility." *Id.* (Am. Compl. ¶ 237). After some additional back and forth, Lewis eventually agreed to allow the DBH representative to enter her apartment. *Id.* at 30–31 (Am. Compl. 238–45). But despite that concession, and despite the

opportunity for the DBH representative to observe Lewis in person, the officers "rammed through [her] door" at around 7:10 p.m. "and forced their way into . . . [her] apartment." *Id.* at 31 (Am. Compl. ¶ 246). They then "dragged" her out, placed her handcuffs, and transported her "to a psychiatric facility," where she was held overnight. *Id.* at 31–32 (Am. Compl. ¶¶ 246–59).

Accepting these allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that the allegations suffice to allege claims that Lewis and N.L. were seized without probable cause. The entire chain of events was triggered by a comment that Lewis made to a CFSA operator in the course of complaining about her former husband's failure to pick-up their daughter at school. Hours passed before a seizure was made, and officers had ample time to observe Lewis for themselves. Even more significantly, a DBH representative had the opportunity to observe Lewis in person—and two paramedics were present outside the apartment. It is, of course, possible that the officers, paramedics, and DBH representative observed behavior that they believed confirmed that Lewis was at risk of suicide. But none of that is in the record at this early stage of the proceeding, and what is in the record supports the reasonable inference that the officers were intent on making an arrest, not because they observed concerning behavior, but because—as Plaintiffs allege Officer Arhin said—Lewis refused to speak to him, *id.* at 32 (Am. Compl. ¶ 258). More, of course, is required to support probable cause to seize someone from their home.

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs' unlawful seizure claims (Counts 12 and 13) and false arrest claims (Counts 18 and 19), relating to the January 2022 incident.

      b.   Unreasonable Search

Plaintiffs also allege that Owens and Cipolari conducted an unreasonable search (Count 14) of their apartment when Owens used his baton to hold the front door ajar, and when Owens

and Cipolari later entered the apartment without a warrant or probable cause.  To the extent Plaintiffs allege that the officers entered the apartment to make an unlawful arrest, this claim survives Defendants' motion to dismiss for the same reasons discussed above.  But, above and beyond that theory, Plaintiffs also allege that that Owens and Cipolari unlawfully entered the apartment *after* Lewis was in custody, at which point they "began to look around her living room."  Dkt. 13 at 31 (Am. Compl. ¶ 248).  Although law enforcement officers are permitted to engage in a protective sweep of the premises when executing a lawful seizure of an individual, *see Maryland v. Buie*, 494 US 325, 336–337 (1990), here, the seizure was allegedly unlawful and, in any event, a search allegedly occurred after Lewis was in custody.[6]

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs' unreasonable search claim (Count 14) with respect to the January 2022 incident.

      c.  <u>Excessive Force</u>

Lewis further claims that Defendants Cipolari, Boyd, Arhin, and at least two other January 2022 officers used excessive force in violation of the Fourth Amendment (Count 15) when they removed her from her apartment. Dkt. 13 at 49 (Compl. ¶¶ 334–35).  Specifically, she claims that the "officers had no basis for their unlawful detention of [her] and were thus not entitled to the use of any force upon her." *Id.* (Am. Compl. ¶ 335).  In addition, she alleges that Defendants "removed [her] from her apartment, slammed her against the hallway wall, handcuffed her, and violently placed her in a police vehicle." *Id.*  Defendant Cipolari also

---

[6] Plaintiffs also allege that Defendants left their "apartment door open," which "expos[ed] their home to another unlawful search by CFSA officials."  Dkt. 13 at 49 (Am. Compl. ¶ 333).  Even taking that allegation as true, Defendants are not liable for an allegedly unlawful search by third parties not named in the amended complaint—here, the CFSA officials who subsequently search the apartment.  Plaintiffs make no argument as to how Defendants would be liable for such exposure, beyond the bare assertion.

allegedly instructed that her handcuffs be "tighten[ed]," and Defendant Boyd "conducted an invasive search of" her, including by "exposing her bare breasts to other officers." *Id.* As explained below, the Court concludes that Lewis has stated a claim relating to overly-tight handcuffing but that, in all other respects, her excessive force claim fails on the pleadings.

"A police officer's use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing government interests at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Young v. D.C.*, 322 F. Supp. 3d 26, 37 (D.D.C. 2018) (quoting *Graham*, 490 U.S. at 396–97). "Whether a particular use of force is excessive depends on the facts of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Jackson*, 327 F. Supp. 3d at 64 (quoting *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011)).

As with other Fourth Amendment claims, the inquiry is an objective one, and the relevant question is whether the officer's actions are "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Notably, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.

*Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)

(per curiam)).  As a result, "the issues of whether an officer used excessive force and whether an

officer is entitled to qualified immunity are determined according to a single standard.  For both

issues, the proper question . . . is whether 'the excessiveness of the force is so apparent that no

reasonable officer could have believed in the lawfulness of his actions.'"  *Scott v. District of

Columbia*, 101 F.3d 748, 759 (D.C. Cir. 1996) (citation omitted).

 As an initial matter, the Court is unpersuaded that the mere fact that Plaintiffs have

adequately alleged that they were unlawfully seized means that they have also, without more,

stated viable claims for excessive force.  Although the Court must, of course, consider the

amount of force employed in light of all the relevant circumstance, unlawful seizure and

excessive force claims are distinct, and not every unlawful seizure claim that involves physical

contact between the victim and the police translates into an excessive force claim.  *See, e.g.*,

*Goolsby*, 317 F. Supp. 3d at 591 n.1 ("As the courts of appeals have recognized, [an] unlawful

arrest claim and excessive force claim require distinct inquiries.  The fact that an officer may

have lacked reasonable suspicion or probable cause to detain an individual does not necessarily

mean that any force used to effectuate that detention was per se excessive.").  Rather, an

unlawful arrest claim requires the Court to decide whether "the facts and circumstances

surrounding the arrest were sufficient to establish probable cause," while an excessive force

claim requires the Court to consider whether the amount of force that was employed was "so

excessive that no reasonable officer could have believed it to be lawful."  *Wardlaw v. Pickett*, 1

F.3d 1297, 1304 (D.C. Cir. 1993).

 Turning to the amount of force that was employed, Plaintiffs first allege that the

responding officers "slammed [Lewis] against the hallway wall."  Dkt. 13 at 49 (Am. Compl.

¶ 335).  Throwing someone against a wall with sufficient force to cause injury might, of course, constitute the excessive use of force.  The problem here, however, is that the word "slammed" is both conclusory and vague, and Plaintiffs neither allege that Lewis suffered any injury (or even any pain) as a result nor offer any details that support a plausible inference that the amount of force that was employed was constitutionally excessive.  As the D.C. Circuit has observed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" is unconstitutional.  *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008); *see also Rudder*, 666 F.3d at 795.  And, to the contrary, officers are permitted to use "some degree of physical coercion or threat to arrest a suspect."  *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018).  To a survive a motion to dismiss, Plaintiffs must allege some specific, non-conclusory facts that would permit the Court to distinguish between a mere shove and a constitutional violation.

The same is true of Lewis's allegations that the officers "violently" placed her in the police vehicle.  Dkt. 13 at 49 (Am. Compl. ¶ 335).  That allegation is, once again, too conclusory and lacks the type of detail necessary to distinguish between the type of force that officers are allowed to employ—or might reasonably believe they are allowed to employ—to effect an arrest from gratuitous or excessive force.  And Plaintiffs' allegation that "Boyd blithely unzipped . . . Lewis's sweatshirt, exposing her breasts to the surrounding officers," *id.* at 31 (Am. Compl. ¶ 250), does not involve the use of force, but might be better framed (if at all) as a challenge to the reasonableness of a search incident to an arrest.  Moreover, nowhere in Plaintiffs' 371-paragraph amended complaint do they allege that Boyd intentionally exposed Lewis's breasts—rather than, perhaps, negligently unzipping the sweatshirt without first checking to see if she was wearing a shirt or other covering.

Finally, Lewis alleges that "Cipolari instructed the other officers to tighten the handcuffs" that they had placed on Lewis, "and they complied—so much so that they left bruises." Dkt. 13 at 31 (Am. Compl. ¶ 247). A police officer may, of course, place an individual in handcuffs while executing a seizure of that person. But "[a]lmost every Court of Appeals has held that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury or where an individual complains about the overly-tight cuffing." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 23 (D.D.C. 2011) (collecting authority demonstrating that an excessive force claim based on handcuffing is established where the overly-tight handcuffs caused physical injury and officers ignored complaints). Mere bruising, however, is generally insufficient to allege an excessive force claim. *See Lin v. District of Columbia*, 2022 WL 4007900, at *13 (D.C Cir. Sept. 2, 2022) (because "no specific physical injuries other than bruising were diagnosed" after the plaintiff was handcuffed, no reasonable jury could find that the officers used excessive force).

Accordingly, Lewis's allegation, standing alone, might not suffice to state a claim. But she further alleges that she suffered an injury to her wrists, which prevented her from "carry[ing] grocery bags for several weeks afterward," Dkt. 13 at 35 (Am. Compl. ¶ 274), and she alleges that, *after* she had been handcuffed, Cipolari instructed the other officers to tighten the handcuffs. Although a close question, the Court is persuaded that these allegations are sufficient to survive a motion to dismiss. At summary judgment, however, she will need to offer some evidentiary basis to infer that the officers had reason to believe that the handcuffs were too tight, *see, e.g.*, *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (denying the plaintiff's excessive force claim where she alleged "little in the way of physical injuries caused by handcuffing," and "more critically," failed to "allege that her physical complaints to the officers

went unheeded," rendering it "fair to ask how a reasonable officer should know that a problem

has occurred"), and she will need to document some actual injury resulting from the overly-tight

handcuffing.

The Court will, accordingly, grant Defendants' motion to dismiss Lewis's excessive force

claim (Count 15), except to the extent she alleges that Cipolari instructed the other officers to

overly-tighten the handcuffs, and those officers complied with that direction.

### 2.    *Fifth Amendment Claim*

Plaintiffs' Fifth Amendment claim relating to the January 2022 incident (Count 16) fails

for the same reason that their claim relating to the June 2020 incident fails. As discussed above,

the Fourth Amendment "'provides an explicit textual source of constitutional protection' against

a particular sort of government behavior," and therefore "'that Amendment, not the more

generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'"

*Elkins*, 690 F.3d at 562 (quoting *Albright*, 510 U.S. at 273).

Plaintiffs concede that, "[i]f this Court finds that the Fourth Amendment encompasses all

of the alleged conduct, Plaintiffs' Fifth Amendment claims may fall aside." Dkt. 21 at 31. But

they also argue that if the Court concludes that they have failed adequately to allege any of their

Fourth Amendment claims, they may proceed on their Fifth Amendment claims in the

alternative. In pressing that argument, Plaintiffs invoke this Court's decision in *Robinson v.

District of Columbia*, 736 F. Supp. 2d 254, 261 (D.D.C. 2010). But as discussed above, the

Court permitted the Fifth Amendment substantive due process claim to proceed in that case only

because the defendant allegedly acted with "no legitimate law-enforcement purpose." *Id.* at

262–63. The same cannot be said here. Defendants responded to a report that Lewis was at risk

of self-harm, and they acted to address that concern. Even if they acted overzealously, as

Plaintiffs allege, they were acting with a legitimate law-enforcement purpose.

The Court will, accordingly, dismiss Plaintiffs' Fifth Amendment substantive due process claim (Count 16) relating to the January 2022 incident.[7]

3.    *First Amendment Retaliation*

Plaintiffs also allege that Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, and at least two other January 2022 officers retaliated against Lewis (Count 17) in violation of her First Amendment rights.  Dkt. 13 at 50–51 (Compl. ¶¶ 338–41).  Even construing the amended complaint liberally, that claim fails because Plaintiffs, once again, have not alleged facts sufficient to support an inference of but-for causation.  *See Nieves*, 587 U.S. at 398–99.

Assuming that Lewis's assertion of her "right to be free from government harassment and lawfully declin[ing] to engage with police officers" constitutes constitutionally protected speech, the amended complaint does not allege facts that, if accepted as true, would support a plausible inference that Defendants seized her and searched her apartment in retaliation for her speech. Dkt. 13 at 50 (Am. Compl. ¶ 339).  Plaintiffs' allegation that "[b]ut-for . . . Lewis's assertion of her protected First Amendment rights, Defendants would not have engaged in the adverse actions against her" is simply too conclusory to support the First Amendment claim, and, in any event, is contradicted by many of Plaintiffs' other allegations.  *Id.* at 51 (Am. Compl. ¶ 341).  Nor does Plaintiffs' allegation that Arhin told Lewis that "had she spoken to them, all this would not have transpired" save her claim.  *Id.* (alterations omitted).  At best, that allegation suggests that, had Lewis presented herself to Defendants, thereby mitigating their concerns about self-harm, no

---

[7] Plaintiffs also claim in their opposition to Defendants' motion to dismiss that their substantive due process right to refuse unwanted medical treatment was violated.  Dkt. 21 at 26; *see Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).  This allegation appears nowhere in the amended complaint and thus lies beyond the scope the current proceedings.

search or seizure would have been necessary—it does not support an inference that Defendants effected the seizure in retaliation for Lewis's protected speech.

The Court will, accordingly, dismiss Plaintiffs' claim (Count 17) that Defendants retaliated against Lewis for engaging in protected speech during the January 2022 incident.

4.    *Common Law Claims*

Finally, Plaintiffs assert an array of common law claims relating to the January 2022 incident. They assert claims for false arrest (Counts 18 and 19), intrusion upon seclusion (Count 20), trespass (Count 21), intentional infliction of emotional distress (Counts 22 and 23), assault and battery (Count 24), and negligence (Counts 25 and 26).

a.    <u>False Arrest</u>

As discussed above, the Court analyzed Plaintiffs' false arrest claims (Counts 18 and 19) in tandem with their unlawful seizure claims and has denied Defendants' motion to dismiss as to those claims.

b.    <u>Intrusion Upon Seclusion</u>

Plaintiffs allege that Owens, Cipolari, and the District of Columbia committed the tort of intrusion upon seclusion when they unlawfully entered the apartment in January 2022. *See* Dkt. 13 at 52 (Am. Compl. ¶ 350). For present purposes, the Court need not repeat the description of the elements of an intrusion upon seclusion claim, which is set forth above. Moreover, for the same reasons that the Court has concluded that Plaintiffs' amended complaint adequately alleges the first two elements of this tort with respect to the June 2020 incident, the Court concludes that it adequately alleges the first two elements with respect to the January 2022 incident. *See Garay*, 943 F. Supp. 2d at 25. The third element, which asks whether the intrusion was highly offensive to an ordinary, reasonable person, is also satisfied. As above, the Court concludes that if the allegations in the amended complaint are sufficient to state a claim that Defendants violated

Plaintiffs' Fourth Amendment rights, those same allegations are sufficient to state a claim for intrusion upon seclusion against those Defendants.  *See id.* at 24–25.  The amended complaint, accordingly, adequately alleges an intrusion upon seclusion claim against Owens and Cipolari with respect to the January 2022 incident.

The amended complaint also adequately alleges a claim against the District of Columbia on a respondeat superior theory.  At least for present purposes, Defendants do not dispute that Owens and Cipolari were acting within the scope of their employment.  Because the District of Columbia may be vicariously liable "when a plaintiff brings common law tort claims against a District employee acting in the scope of his employment," *Jefferson*, 2023 WL 4250118, at *4, Plaintiffs intrusion upon seclusion claim against the District survives Defendants' motion to dismiss.

The Court will, accordingly, deny Defendants motion to dismiss Plaintiffs' intrusion-upon-seclusion claim (Count 20) against Defendants Owens, Cipolari, and the District of Columbia.

### c.  Trespass

Plaintiffs also assert a claim for trespass against Owens, Cipolari, and the District of Columbia.  As discussed above, when officers unlawfully enter an apartment, they have also committed common law trespass.  *See Garay*, 943 F. Supp. 2d at 25.  The Court has concluded that Plaintiffs have adequately alleged that Owens and Cipolari unlawfully entered and searched the apartment.  And, the same respondeat superior analysis discussed above, which again, Defendants do not contest, adequately supports Plaintiffs' claim against the District of Columbia.

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs trespass claim (Count 21).

     d.   <u>Intentional Infliction of Emotional Distress</u>

Plaintiffs assert a claim of intentional infliction of emotional distress against Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, at least two other officers, and the District of Columbia.  Plaintiffs base their intentional infliction of emotional distress claim on those Defendants "unlawfully detain[ing] [Lewis] and us[ing] excessive force against her."  Dkt. 13 at 54 (Am. Compl. ¶ 356).  Plaintiffs continue that Defendants "yelled" at Lewis about "personal matters," and "tricked N.L. into leaving her apartment and used N.L. as bait to lure [Lewis] outside."  *Id.*

Consistent with the analysis set forth above, Plaintiffs' allegations that Defendants violated their Fourth Amendment rights are insufficient, standing alone, to support an IIED claim.  Plaintiffs must also allege facts sufficient to show that Defendants' actions were "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Jackson*, 327 F. Supp. 3d at 70 (quoting *Amobi*, 755 F.3d at 995).  Here, although Plaintiffs' allegations raise serious concerns, they do not meet that very demanding standard.

The Court will, accordingly, grant Defendants' motion to dismiss Plaintiffs' intentional infliction of emotional distress claim (Count 22).

     e.   <u>Negligent Infliction of Emotional Distress</u>

Plaintiffs further allege that Defendants Owens, Boyd, Rubin, Cipolari, Maubry, Finck, Arhin, and at least two other officers committed the common law tort of negligent infliction of emotional distress (Count 23).  As with Count 9, discussed above, Plaintiffs do not allege that they had the type of "special relationship" with Defendants that might have obviated the need to allege that Defendants' conduct placed them in "the zone of physical danger," Dkt. 21 at 43–45, yet they fail to allege facts sufficient to satisfy the zone-of-physical-danger test.  First, although

Plaintiffs allege that Defendants placed them in the zone of danger by detaining and separating them, that allegation is far too conclusory to survive a motion to dismiss.  Second, although Plaintiffs allege that Lewis was the victim of the excessive use of force, that allegation is premised on the same allegations of intentional misconduct underlying Plaintiffs' false arrest, intrusion upon seclusion, intentional infliction of emotional distress, and assault and battery claims.  "Adding the word 'duty' and reiterating the allegations of intentional conduct are insufficient to plead negligence based claims."  *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 139–40 (D.D.C. 2011); *see also Chinn*, 839 A.2d at 708 ("[I]t is impossible to negligently commit assault and/or battery as the states of mind are separate and incompatible.").  Plaintiffs' negligent infliction of emotional distress claim is, therefore, duplicative and fails to identify an independent basis for the claim.

The Court will, accordingly, grant Defendants' motion to dismiss Plaintiffs' claim of negligent infliction of emotional distress (Count 23).

   f. <u>Assault and Battery</u>

Next, Lewis claims that Defendants Cipolari, Boyd, Arhin, at least two other officers, and the District of Columbia committed the tort of assault and battery (Count 24) when the officers, at Cipolari's direction "physically dragged" Lewis from her home, "violently placed her in handcuffs," and "involuntarily transported her to a psychiatric facility."  Dkt. 13 at 55 (Am. Compl. ¶ 363).

The intentional torts of assault and battery are "related but 'conceptually distinct' torts under District of Columbia law."  *Jackson*, 327 F. Supp. 3d at 68.  An assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim."  *Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012) (internal quotation marks and citation omitted).  On the other hand, a battery "is an intentional act that causes a harmful or offensive

73

bodily contact." *Id.* (internal quotation marks and citation omitted).  An officer effecting an arrest "commits a battery," but the officer is "clothed with privilege" unless the force used exceeds "that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest." *Chinn*, 839 A.2d at 706; *see also Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) ("A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary.") (internal quotation marks and citation omitted).

Here, for the same reasons explained above, the Court concludes that Lewis's excessive force claim is, for the most part, too vague and conclusory to state an assault and battery claim; Lewis has not alleged facts sufficient to show that any force used in effectuating the arrest was beyond that which the responding officers reasonably believed was necessary.  That conclusion, however, does not apply to Lewis's claim alleging that Cipolari directed the other officers to tighten her handcuffs to the point that they caused her to suffer a lasting injury.  For the same reasons that the Court will permit Lewis's excessive force claim to go forward with respect to the handcuffing, the Court will permit the claim to go forward on an assault and battery theory. And, the same respondeat superior analysis discussed above, which again, Defendants do not contest, adequately supports Lewis's claim, on that narrow ground, against the District of Columbia.

The Court will, accordingly, grant Defendants' motion to dismiss Lewis's assault and battery claim (Count 24), except to the extent she alleges that Cipolari instructed the other officers to overly-tighten the handcuffs, and those officers complied with that direction.

g.  Negligence

Plaintiffs also allege two negligence claims.  Lewis premises her negligence claim (Count 25) on the allegedly "unlawful acts" of Owens, Boyd, Rubin, Cipolari, Maubry, Arhin, at least two other officers, and the District of Columbia, and asserts that they breached their "duty to act reasonably and in the interest of her well-being when they approached her regarding an allegation that she was going to harm herself."  Dkt. 13 at 56 (Compl. ¶¶ 365–67).  They allegedly breached that duty they "yelled[ed] at [Lewis] for more than an hour . . . , lur[ed] N.L. out of the apartment under false pretenses and us[ed] her as bait . . . , dragg[ed] [Lewis] from her home . . . , and unlawfully search[ed] their residence."  *Id.*

Lewis's negligence claim is not "distinctly pled" and is instead based on the same conduct underlying her intentional tort claims.  As a result, the claim fails as a matter of D.C. law.  *See Chinn*, 839 A.2d at 711; *see also Stewart-Veal v. District of Columbia*, 896 A.2d 232, 234 (D.C. 2006) (affirming dismissal of the plaintiff's negligence claim because it was "not separate and distinct from [the plaintiff's] false arrest claim; rather, it [was] intertwined with and dependent on that claim").  Lewis merely attaches the word "duty" to the same factual allegations supporting her intentional tort claims.  *See Hunter v. District of Columbia*, 824 F. Supp. 2d at 139–40.  Unlike her negligence claim relating to the June 2020 incident, Lewis does not allege a distinct duty owed to her; she points to a far too general duty to "act reasonably" and in her "interest."

Plaintiff N.L.'s negligence claim (Count 26) fails for the same reasons.  N.L. claims that Boyd, Cipolari, Maubry, Fink, and the District of Columbia owed her a "duty to act in the interests of her well-being when conducting their 'wellness check,'" but that the officers violated that duty when the "tricked her," "threatened to take her away from her mother," and "detained

75

her in the lobby." Dkt. 13 at 57 (Compl. ¶ 368). But as with Lewis's negligence claim, N.L's

negligence claim is not "separate and distinct" from her intentional tort claims.

The Court will, accordingly, dismiss Plaintiffs' negligence claims (Counts 25 and 26)

relating to the January 2022 incident.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss, Dkt. 19, is hereby **GRANTED**

in part and **DENIED** in part.

Beginning with Plaintiffs' claims premised on the June 2020 incident, the Court will

**GRANT** the motion to dismiss as to Counts 2, 4–5, 8–9, and 11; will **DENY** the motion to

dismiss Count 1 against Defendants Wright, Charles, Hambrick, Kennedy, and Koenig, but will

**GRANT** the motion to dismiss Count 1 against Defendant Lockerman; will **DENY** the motion to

dismiss Count 3 against Defendants Wright, Charles, and Koenig, but will **GRANT** the motion

to dismiss Count 3 against Defendant Lockerman; **DENY** the motion to dismiss as to Counts 6

and 7 against Defendants Wright, Charles, and the District of Columbia, but will **GRANT** the

motion to dismiss Counts 6 and 7 against Defendants Hambrick, Kennedy, Koenig, and

Lockerman; and will **DENY** the motion to dismiss Count 10 against Defendants Brooks,

Charles, Hambrick, Hector, Kennedy, Koenig, and Wright, but will **GRANT** the motion to

dismiss Count 10 against Defendant Lockerman.

For Plaintiffs' claims related to the January 2022 incident, the Court will **GRANT** the motion to dismiss as to Counts 16–17, 22–23, and 25–26 and will **DENY** the motion to dismiss Counts 12–14 and 18–21.  With respect to Counts 15 and 24, the Court will **GRANT** the motion to dismiss, except to the extent Plaintiff Lewis alleges that Cipolari instructed the other officers to overly-tighten the handcuffs, and those officers complied with that direction.

Accordingly, surviving the motion to dismiss are Counts 1, 3, 6–7, 10, 12–15, 18–21, and 24, against the aforementioned Defendants, which will advance to summary judgment.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 2, 2025